Saadia M. Shapiro, Esq.
Shapiro & Shapiro, LLP
1300 Flatbush Avenue
Brooklyn, N.Y. 11210
(718) 434-8800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:

MAYWOOD CAPITAL CORP., et al.,

                                        Debtors.

------------------------------------------------------------x

Bankruptcy Appeal

Case No. 08 cv 00942(DC)

---

**BRIEF OF APPELLANT 125th STREET OWNER LLC
ON APPEAL FROM THE DECEMBER 20, 2007 ORDER OF UNITED STATES
BANKRUPTCY JUDGE ROBERT D. DRAIN DENYING THE MOTION OF
JOHN S. PEREIRA, AS CHAPTER 11 TRUSTEE, WHICH MOTION SOUGHT
AN ORDER ALLOWING THE TRUSTEE TO SELL TO 125TH OWNER LLC
CERTAIN REAL PROPERTY AND IMPROVEMENTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………..…………………….......................ii

JURISDICTIONAL STATEMENT………………..….…..……………1

STATEMENT OF ISSUES PRESENTED……………………………….1

STANDARD OF REVIEW……………………………………………….2

STATEMENT OF FACTS and PROCEDURAL HISTORY…………………3


ARGUMENT………………………………………………………………12
### Point I
The Bankruptcy Court erred, as a matter of law, in denying the chapter 11 Trustee's motion ("Approval Motion") to approve certain contracts ("Contracts"), to sell certain properties ("Properties") to Appellant (which were <u>not</u> subject to higher offers), because the Bankruptcy Court considered no argument and received no evidence as to the Trustee's business reasons/judgment for entering into the
Contracts…………..……………….....................................................…....12


### Point II
The Bankruptcy Court erred, as a matter of law, in deciding that the Trustee's duty to maximize the value of the assets of the estate allows the Trustee to violate the covenant of good faith and fair dealing implied in the Contracts where the Contracts were entered into after the Trustee's exercise of sound business judgment and The Contracts were not subject to higher and better offers.
……………………………………………………….……………………..15


### Point III
The Bankruptcy Court erred, as a matter of law, in denying the Approval Motion when it substituted <u>its</u> business judgment based on events occurring on December 10, 2007 for the <u>trustee's</u> business judgment based on the facts before him as of
August 21, 2007……………………………………………………..……..23


CONCLUSION…………………………………………………………..28

# TABLE OF AUTHORITIES

## CASES

*In re Am. Freight Sys., Inc.*, 114 B.R. 261, 262-63 (D. Kan. 1990)......................18

*In re Blue Coal Corp.*, 59 B.R. 157, 163 (Bankr. M.D. Pa. 1986) ).......................27

In re: Charalabos Bakalis, a/k/a Bob Bakalis, 220 B.R. 525 (Bankr. EDNY 1998)...26

*In re Cotton*, 136 B.R. 888, 890 (M.D. Ga. 1992); *rev'd on other grounds*, 992 F.2d 311 (11th Cir. 1993)....................................................................................16

*CSI Inv. Partners 11, L.P. v Cendant Corp*, 507 F. Supp 2d 384, 425 (S.D.N.Y. 2007)......................................................................................................16

*DiMarco v. Flannery (In re Flannery)*, 11 B.R. 974, 977 (Bankr. E.D. Pa. 1981).......................................................................................................26

*In re Frye*, 216 B.R. 166, 172 (Bankr. E.D.Va 1997)...................................16,18

*In re General Insecticide Co.*, 403 F.2d 629, 630-631 (2d Cir. 1968)....................27

*G-K Dev. Co. v. Broadmoor Place Invs., L.P. (In re Broadmoor Place Invs., L.P.)*, 994 F.2d 744, 745 (10th Cir. 1993)....................................................................27

*Irving Trust Co. v. Nationwide Leisure Corp.*, 562 F. Supp 960, 968 (S.D.N.Y. 1982).......................................................................................................20

*In re Landscape Properties, Inc.*, 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988).....................................................................................................17,18

*In re Lloyd Carr and Co.*, 617 F.2d 882, (1st Cir. 1980)(decided under 1898 Bankruptcy Act).....................................................................................17

*In re Lyons Transportation Lines, Inc.*, 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994)……………………………………………………………....17,18,20

*See also, In re Martin*, 91 F. 3d. 389, 395 (3d Cir. 1996)………………………………..16

*In re Mondie Forge, Inc.*, 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992)…..…………..26

In re: Orion Pictures Corporation, 4 F.3d 1095 (2nd Circuit 1993)………..…24,25,26

*In re Pintlar Corp.*, Civ. No. 97-0263-N-BLW, (D.Idaho 1998)…..………………18,19

In re Psychometric Systems, Inc., 367 B.R. 670 (Bankr. D. Colorado March 30, 2007)………………………………………………………….......18

*In re Pugh*, 167 B.R. 251 (Bankr. M.D. Fla. 1994)…………..………………….17

*In re Rothwell*, 159 B.R. 374 (Bankr. D. Mass. 1993)……………………….17

*Siddiqui v. Gardner (In re Williamson)*, 327 B.R. 578, 583 (E.D. Va. 2005)…......18

*In re Smith*, 352 B.R. 500 (Bankr. N.D. Ala. 2006)………………….………...17

*In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995)…………………26

*In re Sparks*, 190 B.R. 842, 843 (Bankr. N.D. Ill. 1996)……………………17

*Thousand Acres Dev., LLC v. Iannacone (In re Kreger)*, 307 B.R. 106, 111 (8th Cir. B.A.P. 2004) ………………………………………………………17

*In re Tidewater Group, Inc.*, 8 B.R. 930 (Bankr. N.D. Ga. 1981) ………………..16

*In re United Shipping Co.*, 1989 WL 12723 (Bankr. D. Minn. Feb 17, 1989) ……..16

*White v. C.B. Hannay Co. (In re Lyons Transp. Lines)*, 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994) ………………………………………………18,20

*In re Wintex*, 158 B.R. 540 (D. Mass. 1992) …………………………………...17

*In re WPRV-TV, Inc.*, 983 F.2d 336, 340 (1st Cir. 1993) …………………………...26

**TREATISES AND STATUTES**

**American Law Review, A.L.R. 3d 629**……………………………………………...18

*Restatement (Second) of Contracts* **§ 205**…..………………...………................17

**Bankruptcy Code § 363(b)**……………………………………………….25,26

## JURISDICTIONAL STATEMENT

This is an appeal from the December 20, 2007 final order of United States Bankruptcy Judge Robert D. Drain which denied the motion of John S. Pereira, as Chapter 11 Trustee, which motion sought an order allowing the Trustee to sell to 125th Street Owner LLC certain real property and improvements located at 65-67 East 125th Street, New York, N.Y.; 77 East 125th Street, New York, N.Y.; and 70 East 125th Street, New York, N.Y. (the "Properties"). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a).

## STATEMENT OF ISSUES PRESENTED

1.  Did the Bankruptcy Court err, as a matter of law, in denying the chapter 11 Trustee's motion ("Approval Motion") to approve certain contracts ("Contracts"), to sell certain properties ("Properties") to Appellant (which were <u>not</u> subject to higher offers), because the Bankruptcy Court heard no arguments and received no evidence as to the Trustee's business reasons/judgment for entering into the Contracts?

2.  Did the Bankruptcy Court err, as a matter of law, in deciding that the Trustee's duty to maximize the value of the assets of the estate allows the Trustee to violate the covenant of good faith and fair dealing implied in the Contracts where the Contracts were entered into after the Trustee's exercise of sound business judgment and The Contracts were <u>not</u> subject to higher and better offers?

3.  Did the Bankruptcy Court err, as a matter of law, in denying the Approval Motion when it substituted <u>its</u> business judgment based on events occurring on December

10, 2007 for the <u>trustee's </u>business judgment based on the facts before him as of August

21, 2007?

## STANDARD OF REVIEW

Pursuant to Rule 8013 of the Federal Rules of Bankruptcy Procedure, on appeal,

findings of fact by the bankruptcy court are set aside if clearly erroneous. A factual finding

is clearly erroneous when "the reviewing court on the entire evidence is left with the

definite and firm conviction that a mistake has been committed." *United States v. United*

*States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 68 S. Ct. 525 (1948). The lower

court's legal conclusions are reviewed *de novo* and mixed questions of law and fact under

a mixed standard, affording a clearly erroneous standard to integral facts, but exercising

plenary review of the lower court's interpretation and application of those facts to legal

precepts. *In re: Cellnet Data Systems, Inc.*, 327 F.3d 242, 244 (3d Cir 2003); See *In re*

*Machne Menachem*, 04 CV 1698, page 3 (M.D. Pa. Nov. 16, 2005). Mixed questions of

law and fact are those where "the historical facts are admitted or established, the rule of

law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or

constitutional] standard, or to put it another way, whether the rule of law as applied to the

established facts is or is not violated." *Pullman-Standard v. Swint,* 456 U.S. 273, 289 n.19,

72 L. Ed. 2d 66, 102 S. Ct. 1781 n.19 (1982).

A mixed question of law and fact is found whenever a legal precept is applied to

the sum of the facts of a case. *Meridian Bank v. Alten*, 958 F.2d 1226, 1229;(3d Cir

1992). Because the "good faith" requirement of 11 U.S.C. § 1129 is not defined, courts

in the Third Circuit have applied a "totality of circumstances" test.   See *In re PPI*

*Enterprises (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003).

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

On March 23, 2005, the Bankruptcy Court ordered the joint administration of the Chapter 11 cases of forty-eight different debtors under the above main caption and directed the appointment of a Chapter 11 Trustee for these debtors. The Chapter 11 petitions for the debtors involved in this adversary proceeding -- 65-67 East 125th Street Realty Corp., 77 East 125th Street Realty LLC and 79 East 125th Street Realty LLC (the "Debtors") -- were each filed on February 19, 2005.

By order dated March 24, 2005, this Court approved the appointment of John S. Pereira (the Trustee") as the Chapter 11 Trustee for the procedurally consolidated debtors, which included his appointment as the Chapter 11 Trustee for the estates of the Debtors.

In 2005, Mr. Shapiro approached the Trustee's attorney, John Campo, on several occasions regarding his interest in purchasing the Properties. (Mr. Shapiro had first called the Trustee himself, but was told to speak to his attorney). Mr. Shapiro explained that he owned, or was about to purchase, the lots in between the Properties and because of his unique geographical position would pay above market prices to obtain the Properties. Attached as Exhibit A is a tax map that outlines the properties currently owned by Mr. Shapiro and the three Trustee Properties that are the subject of this action.

These bankruptcy proceedings involve many more properties than the three parcels that are the subject of this action. Mr. Shapiro spent almost two years convincing, discussing, and negotiating with Trustee's counsel to segregate these three properties on 125th Street from the rest of the Trustee controlled properties. The essence of Mr.

Shapiro's argument was twofold. The first point was that as owner of three contiguous properties in the very middle of the Trustee Properties, Mr. Shapiro would be willing to pay a premium for the Properties since they are not contiguous and would not have the same value to any other purchaser. The second point was a good neighbor argument: Mr. Shapiro already had building plans for the four lots he owned; if he could expand my building project to include the Trustee's three abandoned1 lots it would result in a betterment of the Harlem neighborhood on 125th Street.

Counsel to the Trustee initially told Mr. Shapiro that the time was not right to sell the Properties. He explained that the Trustee was still in litigation seeking to recover title to the Properties. However, Mr. Shapiro told counsel to the Trustee that he would be prepared to enter into a contract, give the Trustee a deposit and have the closing take place if and when the Trustee prevailed in the litigation. Mr. Shapiro repeatedly sought and obtained reassurance from Trustee's counsel that in light of his willingness to have his deposit monies tied up at no interest for a potentially lengthy period of time the Trustee would not "shop" the deal further.

To convince the Trustee that the price Mr. Shapiro would pay for the Properties was above market, Mr. Shapiro provided him with (i) information regarding the recent acquisition of the lots owned by him which were the same size as each of the Properties, (ii) bank appraisals on those lots which had been performed between the years 2004 and 2006 in connection with the purchase or re-financing of the properties (iii) other recent comparable sales of identically sized properties and (iv) other pertinent information, such as the new zoning rules negatively affecting these Properties. The appraisals and

---

1 The only currently occupied property of the Properties has three out of several apartments occupied by tenants who are not paying rent.

comparable sales which were thus provided to the Trustee showed that the value of identically sized lots with identical zoning features and comparable buildings ranged from $1.675 million to $2.3 million.

Mr. Shapiro would not have disclosed any of this information had Trustee's counsel not "lulled" him with specific assurances that Mr. Shapiro was the only logical and proper purchaser and that he would be properly fulfilling his duty as a Trustee by entering into a contract with Mr. Shapiro which would not be subject to other offers.

After some negotiation Mr. Shapiro and the Trustee agreed that the price for the three Properties would be fixed at $7,800,000 -- or an average price of $2,600,000 for each property. In a time when real estate prices on 125th Street in Harlem were trending downwards as a result of an announced downzoning of that section of the street, this represented an increase of $300,000 per lot, or 13%, over the highest of the most recent comparable sales of identically sized lots on the same block.  For the three Properties, this was a premium of approximately $900,000 over the highest prior market prices.

In the course of negotiations, counsel to the Trustee repeatedly assured Mr. Shapiro that the Trustee did not see the need to look for other buyers and would not even entertain any other offers. The evidence of the appraisals and history of recent sales at significantly lower values; the fact that the Properties were not yet in the Trustee's name and Mr. Shapiro's willingness to leave his deposit without interest and wait an indeterminate period for the closing, all mitigated in favor of providing Mr. Shapiro with the assurance sought.

Accordingly the Trustee specifically agreed that the Contracts would not to be subject to other higher offers. This is reflected in the Contract's omission of a "higher or

better offer" provision.   Such a provision *is* included in eight prior sales made by the Trustee in this case. See Paragraph 19 of each of the following docket entries in this case; ##107, 108, 109, 166 (Exhibits 2, 3, 4, and 5) and 377.   That paragraph which was deliberately omitted in the Contracts with Plaintiff read as follows:

Higher and/or Better Offers

(i)    This agreement is conditioned upon Trustee's not receiving, after notice and hearing, a higher or better offer which Trustee is prepared to accept and which the Bankruptcy Court shall approve, but Trustee agrees that no offer shall be deemed higher or better unless it provides for a Purchase Price equal to or greater than 105% of the amount stated as the Purchase Price in Paragraph 2.  If such an offer is accepted by Trustee and approved or authorized by the Bankruptcy Court, whether or not this Agreement has previously been approved or authorized by the Bankruptcy Court, (a) this Agreement shall be null and void with respect to the named Purchaser referred to in the preamble of this Agreement and any assignee of the same, (b) the Deposit, together with any accrued interest, shall be returned to said Purchaser, and (c) neither party shall have any further rights or obligations hereunder, except rights or obligations under this Agreement which expressly survive the Closing or other termination of this Agreement.

(ii)    If Trustee elects to conduct an auction of the Property, then with respect to any offer at such auction that is received, accepted and approved in accordance with subparagraph 19(i) above, the offeror shall assume all the terms of this Agreement as Purchaser hereunder (as such terms, including those with respect to the Purchase Price, shall have been modified by the terms of the auction), and this Agreement shall not thereafter be conditioned upon or subject to Trustee's not receiving a higher or better offer.

On August 21, 2007, the Trustee, and Mr. Shapiro executed the Contracts and Mr. Shapiro deposited $780,000 with the Trustee.   (Copies of the Contracts are annexed as Exhibits B, C and D.)

Pursuant to the Contracts:

•    Plaintiff agreed to pay $7,800,000 for the Properties for an average price of $2,600,000 which is $300,000 per lot above the highest of most recent comparable sales in a down-trending market

- Plaintiff agreed to leave a $780,000 deposit for an indeterminate period of time [paragraph 6. date set by Trustee not less than 40 days after Court approval]

- Interest on the deposit monies were not to be credited against the purchase price [paragraph 2(i)]

- The contracts were subject to Bankruptcy Court approval [paragraph 3], but were not made subject to other higher or better offers

- The Trustee agreed to "promptly" file a motion to obtain Bankruptcy Court approval of the contracts [paragraph 3(ii)]

- The Trustee was not penalized in any fashion if he was not able to obtain title to the Properties [paragraph 20]

It is respectfully submitted that implied in the Contracts was a covenant of good faith and fair dealing which required that the Trustee not permit or condone any act or conduct that would obstruct, frustrate or delay Appellant's contemplated purchase of the Properties.

Although the Trustee had agreed to submit the Contracts for approval by the Bankruptcy Court "promptly" upon execution of the Contracts on August 21, 2007, it was not until November 12, 2007 that the Trustee actually filed a motion (the "Approval Motion") seeking approval of the Contracts. A copy of the Approval Motion is annexed as Exhibit E. The Approval Motion did not contain any indication that the Contracts were subject to higher or better offers for the Properties and specifically noted in paragraph 6 that the Plaintiff had requested that the Contracts not be subject to higher and better offer.

The Approval Motion contained the following relevant paragraphs:

> "6. In consideration for entering into the Contracts notwithstanding that the litigation was pending, and agreeing to remit the deposits under the Contracts at the time of their execution, the Purchaser has requested that

7

> the Contracts, which the Trustee believes are at fair market value, not be
> subject to higher or better offers.
>
> ....
>
> 10. .......... In the instant case, the Trustee has sufficient business
> justification for the sale of the Properties to the Purchaser, under the
> terms set forth in the Contracts.
>
> ....
>
> 11. The price for which each Property is being sold reflects the current
> market conditions of New York real estate. The Trustee believes that these
> conditions favor the sale of each Property at this time. The Trustee has
> determined in his business judgment that sale into the current market,
> pursuant to the terms of each Contract, should lead to the best results for
> the Debtor's estate."

In the intervening 80 days between execution of the Contracts and the filing of the Approval Motion, Mr. Shapiro and his real estate attorney, Abe Rappaport, made numerous phone calls and sent numerous emails to counsel to the Trustee complaining about the delay and inquiring as to the reasons. Counsel to the Trustee offered a variety of miscellaneous excuses which were found to be very unsatisfactory. Because of the lengthy delay and the unsatisfactory excuses, it certainly appears as though the Trustee and/or his counsel were, in that period, trying to ascertain whether there were any higher offers. This is buttressed by the emergence of Rudd Development Group LLC as a new proposed contract vendee for the Trustee's Properties, because Rudd shortly after the Contracts were signed had begun pestering Mr. Shapiro to sell the properties he owned on 125th street. The timing of these calls suggests that Rudd became aware of the Contracts even before they became public knowledge. Like Mr. Shapiro, Rudd was trying to string together six lots and it strains credulity to believe that Rudd was not notified by the Trustee of the existence of the signed Contracts before they became public and it strains credulity to believe that the information was not released to solicit a better offer.

On or about late August or early September, 2007, shortly after the Contracts were signed but before they became public knowledge with the filing of the Approval Motion, Mr. Shapiro received a call from an individual who identified himself as Michael Rubin ("Rubin"). He asked whether Mr. Shapiro would sell him the properties on 125th Street and offered a price higher than the price Mr. Shapiro had paid. Mr. Shapiro replied that the properties were not for sale. Rubin later sent an email reiterating the offer and identifying himself as the Associate Director of Management of Rudd Realty Management Corp. Over the ensuing weeks Rubin called many more times; at one point he was calling Mr. Shapiro almost every day. Although Mr. Shapiro was aware of his calls, he did not take them. Even though the price offered by Rubin in his email represented a profit to Mr. Shapiro over what was paid for those properties, Mr. Shapiro did not pursue the offer because he relied on the representations made by counsel to the Trustee and the enforceability of the Contracts upon their terms. The very day before the hearing on the Trustee's Approval Motion, Rubin called Mr. Shapiro again with the same request and Mr. Shapiro again refused to discuss the sale of his properties.

At some point after the Approval Motion was filed, the Trustee's counsel called Mr. Shapiro to say that another buyer for the properties had materialized and was offering an additional $1 million over the price Mr. Shapiro had agreed upon with the Trustee. He did not identify who the offer was from and suggested that Mr. Shapiro match the offer. Mr. Shapiro declined because he believed he had a binding contract.

On December 10, 2007, an hour before the hearing on the Approval Motion, counsel for the Trustee sent an email to Mr. Shapiro advising that "early this afternoon" the Trustee had signed new and conflicting contracts to sell the Properties with Rudd,

notwithstanding his multiple representations about not entertaining other offers. Counsel to the Trustee advised that the price specified was $8,800,000 and that the new contracts contained "essentially" the same terms as the contracts with Plaintiff, except that they were subject to higher or better offers and that Rudd was entitled to a "break-up" fee of 2%.

Counsel to the Trustee then appeared in Court on December 10th and announced that he was not proceeding with the Approval Motion because the Trustee had signed another contract for the Properties at a better price with Rudd and wished instead to proceed with an auction sale.

As reflected in the transcript from the December 10, 2007 hearing (a copy of which is annexed hereto as Exhibit "F"), the Bankruptcy Court never entertained the merits of the approval motion seeking Court ratification of the Trustee's Contracts with Appellant. In fact, the transcript makes clear that the Court never really addressed the approval motion at all. Instead, the Court simply ordered an auction of the Properties which was scheduled for December 21, 2007.

On December 20, 2007, Appellant, by its attorney Isaac Nutovic, brought a motion seeking a Temporary Restraining Order to prevent the auction which was scheduled for the next day (A copy of the moving papers are annexed as Exhibit "G"). A hearing on said motion was conducted on December 21, 2007, immediately preceding the time set for the auction.

At the December 21, 2007 hearing, the Bankruptcy Court denied the aforementioned motion (A copy of the transcript is annexed hereto as Exhibit "H"). Essentially, the Bankruptcy Court held that in its business judgment, the Contracts with

Appellant did not evidence the highest and best offers available for The Properties in light of the subsequently signed Rudd contracts.

At the auction sale, the Irgang entities proposed to settle the underlying litigation through their purchase of the Properties from the Trustee in exchange for releases with the Trustee for all matters at issue in the Litigation and their payment to the Trustee of $15 million in cash.

On December 28, 2007 by filing a Notice Of Appeal (Annexed hereto as Exhibit "I"), Appellant instituted the within appeal from the Bankruptcy Court's decision to deny the approval of the contracts between the Appellant and the Trustee.

On December 19, 2007, Appellant instituted an adversary proceeding against the Trustee for breach of contract and the covenant of good faith and fair dealing implied in each contract pursuant to the laws of the State of New York (A copy of the Complaint is annexed as Exhibit "J").

The events that transpired between the Appellant and the Trustee beginning roughly two years ago and continuing to the present day simply do not pass the "smell test". The Appellant spent years negotiating in good faith with the Trustee. After years of negotiations which resulted in great benefits being conferred upon the bankruptcy estate, the parties finally entered into the Contracts. As it turned out, the Trustee's good faith in dealing with the Appellant throughout this process is highly suspect. Despite exercising good business judgment when signing the Contracts which were not subject to higher and better offers, the Trustee "railroaded" the Appellant at the eleventh hour with a higher and better offer. In Court, the Appellant's rights were summarily dismissed

without any consideration of contrary legal argument or the facts and circumstances and without any sound policy rationale.

ARGUMENT

**1.      The Bankruptcy Court erred, as a matter of law, in denying the chapter 11 Trustee's motion ("Approval Motion") to approve certain contracts ("Contracts"), to sell certain properties ("Properties") to Appellant (which were <u>not</u> subject to higher offers), because the Bankruptcy Court considered no argument and received no evidence as to the Trustee's business reasons/judgment for entering into the Contracts.**

A review of the transcript from the December 10, 2007 hearing clearly shows that the Bankruptcy Court never legitimately considered the Trustee's approval motion. The Bankruptcy Court accepted no arguments regarding the business justification(s) for the Trustee entering into The Contracts with the Appellants. The Bankruptcy Court never took any evidence as to what transpired between the Trustee and the Appellant throughout the course of their two (2) year relationship. The Bankruptcy Court never considered the Appellants Contracts at all.

The Bankruptcy Court's failure to consider the Appellant's Contracts is further highlighted by the Court's written Order dated December 20, 2007 which formalized its findings and decisions from the December 10th hearing (A copy of the Order is annexed as Exhibit "K"). Despite the fact that the hearing was scheduled for the purpose of considering the approval of Appellant's contracts, the Order is entitled:

**"ORDER APPROVING BREAK-UP FEE FOR RUDD DEVELOPMENT GROUP, LLC, IN CONNECTION WITH CHAPTER 11 TRUSTEE'S PROPOSED SALE OF THE TRUSTEE'S RIGHT, TITLE AND INTEREST OF CERTAIN REAL PROPERTY AND IMPROVEMENTS LOCATED AT 65-67 EAST 125TH STREET., NEW YORK, NEW YORK, 77 EAST 125TH ST., NEW YORK, NEW YORK, AND 70 EAST 125TH ST., NEW YORK, NEW YORK, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBERANCES, PURSUANT TO 11 U.S.C. §§363, 506(c) AND 1146(C)"**

Furthermore, the only mention of the Appellant's Contracts comes in a single sentence written on the second page of the Order, as follows:

> **"ORDERED, as follows:**
> **1.The Motion is denied in light of the existence of a higher and better transaction( as memorialized by Rudd Contract)."**

Clearly, the lower Court's analysis began and ended with the singular determination that because the Rudd Contracts were for a higher sales price, the Appellant's Contracts could not be approved.  It is respectfully submitted, that  had the Bankruptcy Court properly entertained the Approval Motion, it would have determined that:

(i) The Appellant assumed a special risk (which no other bidder was willing to assume at that time) by paying over a down payment on the Contracts even though The Properties were not yet titled in the Trustee's name and were still the subject of litigation by the Trustee to recover title;

(ii) In August of 2007 (as opposed to December of 2007),Appellant was the <u>only</u> prospective purchaser who was willing to enter into a   binding contract and leave a 10% deposit while awaiting the results of the litigation;

(iii)  By entering into the Contract while litigation was pending the Trustee was hoping to speed the Bankruptcy Court's resolution of the litigation and consummate final payment for the Properties earlier;

(iv)  The prices of comparable properties and sales of similar lots on the same block demonstrated that the Trustee was receiving a premium over the prices of very recent sales;

(iv)  Appellant had worked with the Trustee for two years to extract the unique value of three lots sold together and had provided the information necessary for the Trustee to package the deal.

These factors all show that the Trustee exercised sound business judgment at the time he entered into the Contracts with Appellant.   Furthermore, in his approval motion, the Trustee acknowledged that he exercised sound business judgment in entering into the Contracts with Appellant:

> "In the instant case, the Trustee has sufficient business justification for the sale of the Properties to the Purchaser, under the terms set forth in the Contracts....The price for which each Property is being sold reflects the current market conditions of New York real estate. The Trustee believes that these conditions favor the sale of each Property at this time. The Trustee has determined in his business judgment that sale into the current market, pursuant to the terms of each Contract, should lead to the best results for the Debtor's estate."

Nonetheless, a review of the transcript from the December 10th hearing and the Order issued by the Court thereafter dated December 20, 2007, makes clear that the Court never even considered the Trustee's "business justification" in entering into the Contracts with Appellant.

The first time that the Bankruptcy Court even remotely considered the Trustee's business judgment on the record was at the hearing conducted on December 21, 2007 immediately prior to the auction sale and _after_ the Court had already memorialized its denial via a written order . The transcript from this hearing makes clear that at said hearing, the Bankruptcy Court was of the opinion that it had already denied the approval

14

motion on the December 10, 2007 hearing when in fact the transcript from the December 10th hearing shows that this did not occur. Clearly, the Bankruptcy Court had reached its conclusions prior to addressing the arguments.

Furthermore, the Bankruptcy Court's decision essentially holds that a Trustee can never be bound to an agreement which is not subject to higher and better offers. If upheld, this ruling will undoubtedly hamstring trustees and prevent them from capitalizing on unique situations, such as the present situation, where signing such a contract will be an exercise of sound business judgment for the benefit of the estate.

Based on the foregoing, it is respectfully submitted that the Bankruptcy Court erred, as a matter of law, in denying the chapter 11 Trustee's motion ("Approval Motion") to approve certain contracts ("Contracts"), to sell certain properties ("Properties") to Appellant (which were not subject to higher offers), because the Bankruptcy Court heard no testimony and received no evidence as to the Trustee's business reasons/judgment for entering into the Contracts.

**2.    The Bankruptcy Court erred, as a matter of law, in deciding that the Trustee's duty to maximize the value of the assets of the estate allows the Trustee to violate the covenant of good faith and fair dealing implied in the Contracts where the Contracts were entered into after the Trustee's exercise of sound business judgment and The Contracts were not subject to higher and better offers.**

It is respectfully submitted that the case at bar presents a critical question of law with far reaching public policy implications: Does a Trustee's duty to maximize the

value of the assets of an estate allow the Trustee to violate the covenant of good faith and fair dealing implied in all contracts where a contract was entered into after the Trustee exercised sound business judgment and the contract was not subject to higher and better offers?

Absent a statute expressly exempting trustees from the duties and obligations of ordinary contract law, there should be, at the very least, a sound policy rationale given by the Court's for allowing trustees the freedom to operate outside of the confines of the law as it is applied to everyone else.  It is respectfully submitted that a review of the case law in this area shows that the issues presented by this appeal are genuine and relevant:

Under New York law, every party to a signed agreement is charged with an implied covenant of good faith and fair dealing.  See, e.g. *CSI Inv. Partners 11, L.P. v Cendant Corp*, 507 F. Supp 2d 384, 425 (S.D.N.Y. 2007).  That covenant precludes each party from engaging in conduct that will deprive the other party of the benefits of its agreement. *Id.*  Several cases have held that trustees who enter into agreements subject to court approval remain bound pending court approval of the agreement; other cases disagree.

Cases holding that a trustee or debtor is bound by agreements pending court approval include *In re Frye*, 216 B.R. 166, 172 (Bankr. E.D.Va 1997); *In re Cotton*, 136 B.R. 888, 890 (M.D. Ga. 1992); *rev'd on other grounds*, 992 F.2d 311 (11th Cir. 1993); *In re United Shipping Co.*, 1989 WL 12723 (Bankr. D. Minn. Feb 17, 1989); *In re Tidewater Group, Inc.*, 8 B.R. 930 (Bankr. N.D. Ga. 1981)). *See also, In re Martin*, 91 F. 3d. 389, 395 (3d Cir. 1996) (We have no quarrel with the district court's statement that the trustee was required to deal with the Myers with "honesty in fact in the conduct or

16

transaction concerned ... and [to] refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." 1995 WL 389592 at * 11 (citations and quotations omitted). The *Restatement (Second) of Contracts* § 205 implies a duty of good faith and fair dealing for all contracts"); *In re Lyons Transportation Lines, Inc.*, 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994). The following cases have been cited for the contrary position: *In re Sparks*, 190 B.R. 842, 843 (Bankr. N.D. Ill. 1996) *In re Pugh*, 167 B.R. 251 (Bankr. M.D. Fla. 1994); *In re Rothwell*, 159 B.R. 374 (Bankr. D. Mass. 1993); *In re Lloyd Carr and Co.*, 617 F.2d 882, (1st Cir. 1980)(decided under 1898 Bankruptcy Act); *See also In re Wintex*, 158 B.R. 540 (D. Mass. 1992).

The District Court of Colorado discussed the competing interests as follows:

> "Nevertheless, the court must always scrutinize whether the trustee has fulfilled his duty to "maximize the value obtained from a sale, particularly in liquidation cases." *Id.* (citations omitted). *See also In re Landscape Properties, Inc.*, 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988). In this case, the Trustee did not market the Assets before entering into the settlement. Although he became aware of a potentially better offer, he did not pursue it, believing he was bound to honor his agreement with Michael. At the hearing, the Trustee expressed his sense of conflicting duties, namely a duty of good faith and fair dealing implied in his contract with Michael, and a duty to the creditor body at large, to maximize the value of the estate. In an effort to avoid violating either of these obligations, he presented his Motion to the Court, disclosed the competing offer, and left it in the hands of the Court to decide whether to approve the agreement.
>
> The Tenth Circuit has not yet directly addressed the issue of whether a trustee is bound by an agreement to settle or to sell assets, precluding him from shopping the deal or withdrawing his motion. Outside the Tenth Circuit, courts are divided on this issue. Some courts hold that an agreement cannot be binding on the trustee, absent court approval. *Thousand Acres Dev., LLC v. Iannacone (In re Kreger),* 307 B.R. 106, 111 (8th Cir. B.A.P. 2004) ("[B]uyers routinely make offers to purchase assets from a trustee, which offers are subject to higher and better offers being received at the hearing for approval of the sale. . . . [and] once the order approving the sale is entered, that order represents a binding obligation . . . ."); *In re Smith,* 352 B.R. 500 (Bankr. N.D. Ala. 2006) (trustee's motion to sell was not binding, and trustee did not breach any contractual obligations when,

upon being advised of a higher offer, he withdrew his motion); *Siddiqui v. Gardner (In re Williamson),* 327 B.R. 578, 583 (E.D. Va. 2005) (during the period between execution of the contract and the court hearing on approval, the property remained on the market, subject to higher offers and this was all part of the "normal process of exposing the property to the market."); *In re Landscape Properties, Inc.,* 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988) (in sustaining objection to private sale based solely on availability of higher offer, court held there is no contract without bankruptcy court approval); *In re Am. Freight Sys., Inc.,* 114 B.R. 261, 262-63 (D. Kan. 1990) (bankruptcy court did not err in considering competing bids on date of sale hearing because prior bid was merely "a proposed sale which was subject to the bankruptcy court's approval."). Other courts hold that an agreement is binding on all the parties pending court approval. *In re Frye,* 216 B.R. 166, 173 (Bankr. E.D. Va. 1997) (see collection of cases therein); *White v. C.B. Hannay Co. (In re Lyons Transp. Lines),* 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994) (holding that absent fraud, a settlement agreement is binding pending approval by bankruptcy court). In, In re Psychometric Systems, Inc., 367 B.R. 670 (Bankr. D. Colorado March 30, 2007).2

In an unreported decision, *In re Pintlar Corp.,* Civ. No. 97-0263-N-BLW, (D.Idaho 1998) (copy attached), the District Court affirmed the principle that a contract between a trustee and a third party which is subject to court approval is binding on both sides pending approval by the Bankruptcy Court. In the *Pintlar* case, the trustee of a litigation trust created by confirmation of a Chapter 11 plan, signed an agreement -- subject to court approval but <u>not</u> subject to higher offers -- to assign certain litigation rights to Nycal Corporation for $1 million. As required by the confirmed Chapter 11 plan, the trustees filed a motion with the Bankruptcy Court for the approval of that agreement. After the agreement was signed the trustees entered into a second agreement with the targets of the litigation to settle the trustees' claim for $1.75 million. The

---

2 It must be noted that the Court in <u>Psychometric</u> ultimately denied the approval of an agreement in light of a subsequent higher and better offer. However, the facts presented to that Court are clearly distinguishable from the facts in the case at bar in that (a) the Court clearly stated that the Trustee did not market the Assets before entering into the settlement and, therefore, the agreement undervalued the assets and (2) the Court made no mention of the agreements not being subject to higher and better offers. In the case at bar, however, at the December 12th hearing the Trustee, through his attorney, clearly states that the Properties were correctly valued and marketed at the time the Contracts were signed. For a further discussion of these competing interests see, "Second And Higher Offer As Affecting Final Approval Of Trustee's Sale", 1 A.L.R.3d 629.

trustees then abandoned their motion to sell the litigation rights to Nycal Corporation and brought the settlement agreement with the litigation targets before the Bankruptcy Court for approval. The Bankruptcy Court granted the trustees' motion to settle the claims over Nycal Corporation's objection.

Nycal Corporation subsequently sued the trustees, claiming a breach of the implied duty of good faith and fair dealing and sought damages. The trustees defended on the grounds that they had a fiduciary duty to pursue the higher bid. The Bankruptcy Court dismissed the complaint for failure to state a claim. On appeal, the District Court reversed, holding that by negotiating a new agreement with the litigation targets, the trustees had breached their contractual duties which were not abrogated by, or inconsistent with, the trustees' fiduciary obligations to maximize the estate.

The holding of *Pintlar* applies squarely to the facts presented in this case. Indeed, the facts here mitigate even more strongly against the Trustee than the trustees in that case. Here, the Trustee repeatedly reassured Plaintiff that "the properties are yours and we will entertain no other offers". The Trustee also deleted from the Contracts the provision -- contained in eight other contracts he signed selling properties in this case -- which would have allowed the Trustee to accept other offers or conduct an auction sale. Just as in *Pintlar*, the Trustee first filed a motion for approval of his agreement with Plaintiff; then, in complete derogation of his good faith duties, negotiated a new agreement with Rudd, signed it and took a deposit from Rudd to secure the new contracts. Just as in *Pintlar*, the Trustee here withdrew the Approval Motion preventing the Contracts from going into effect. The precedent of the *Pintlar* decision is particularly compelling on these facts.

19

Furthermore, in In Re Lyons Transportation Lines, Inc., et al, Debtor; Vedder J. White v. C.B. Hannay Co., 163 B.R. 474, (Bankr. W.D. of Pa., 1994), the Court was faced with the following facts:

A shipper paid the accounts receivable owed to the bankruptcy trustee, and the parties negotiated a settlement of the freight tariff charges owed. The bankruptcy trustee moved for approval of compromise. Before the court approved the proposed settlement, the shipper requested that the settlement not be approved because of passage of the Negotiated Rates Act (act), Pub. L. No. 103-180, 107 Stat. 2044 (1993). The act strengthened the protection for shippers from the claims of bankruptcy trustee for freight undercharges. The bankruptcy trustee, however, argued that § 2(f) of the act required the court to enforce the agreement.

The court concluded that the parties, each represented by counsel, negotiated a mutual settlement agreement that could not be considered fraudulent. The court granted the motion to enforce the settlement agreement. The agreement was appropriate at the time it was negotiated considering the range of probabilities, the degree of uncertainty, and the costs of continued litigation. The shipper could not retract the settlement in view of § 2(f). The court refused to award the bankruptcy trustee pre-judgment interest, filing fees, and costs.

The courts which have found a trustee to be bound pending court approval are better reasoned.  If a trustee is not bound by his agreements pending court approval, then the agreements are illusory, see, e.g., *Irving Trust Co. v Nationwide Leisure Corp.*, 562 F. Supp 960, 968 (S.D.N.Y. 1982) and the other parties to the agreement are similarly not bound.  This would mean that a trustee in bankruptcy would never be able to sign any

contract to sell assets, because the other parties would have the right to back out too. There is also no sound rationale for giving special consideration to a bankruptcy trustee because of his fiduciary duties to maximize assets. There are many other fiduciaries in other contexts, similarly charged with an obligation to maximize the value of assets under their control, who are not exempted from ordinary contract rules. In addition, how far can a trustee go to maximize assets? Is he allowed to make misrepresentations? Clearly, not. The better view of the cases is that once the Contracts were signed, the Trustee was bound by a covenant of good faith and fair dealing, was obligated to present the Contracts for approval by this Court and should not have attempted to deprive Plaintiff of the benefit of the Contracts by negotiating a new deal with Rudd.

The facts of the case at bar are a perfect illustration of the dangers wrought by adhering to a rule of law which has no sound policy justifications. Trustees will simply be allowed to manipulate the otherwise clear rules of law to the great detriment of the public at large: Appellant spent two years negotiating with the Trustee for these properties. The Appellant spent significant time and money evaluating the Properties. Appellant conferred an undeniable benefit upon the estate by supplying the Trustee with appraisals and other financials which the Trustee used to properly value the Properties. At a time when no other bidders were willing to sign contracts to purchase the Properties because of the uncertainty caused by the underlying litigation, the Appellant did sign contracts and the appellant did pay over a down payment. The Appellant was assured by the Trustee that no break-up fee was necessary because no subsequent offers, if any, would be entertained. The Appellant reasonably relied on these representations in foregoing a break up fee. Although the Trustee included provisions in other similar

contracts which made those other contracts expressly subject to higher and better offers, the intention of the parties to the within transaction was that the Contracts would <u>not</u> be subject to higher and better offers. Accordingly, the provisions expressly making the Contracts subject to higher and better offers were deleted from the Contracts. Additionally, the Contracts expressly obligated the Trustee to "promptly" move for Court approval. Despite this contractual obligation the Trustee failed to promptly move for Court approval of the Contracts. Despite numerous requests from the Appellant that the approval motion be brought in a timely manner, the Trustee simply provided excuse after excuse for his failure to honor the Contracts. Not at all surprisingly, during this period of inexcusable delay new bidders "emerged". Then, all of one (1) hour prior to the December 10, 2007 approval hearing, Appellant is informed by the Trustee's counsel that a higher and better bid was received and that such bid would be accepted if not matched by the Appellant. In the Bankruptcy Court one (1) hour later, Judge Drain considers <u>no</u> <u>arguments</u> as to the Trustee's business justification for entering into the Contracts with the Appellant as the motion for approval is essentially withdrawn without consideration. Instead, the Bankruptcy Court rules that as a matter of law the Appellant's rights could be summarily dismissed even though the Trustee admittedly exercised sound business judgment in executing the Contracts with Appellant. The rule of law, it would seem, is that trustees may act with impunity in their attempts to maximize profits. The Appellant, therefore, respectfully submits that there exists no sound policy rationale for condoning this type of behavior on the part of bankruptcy trustees and a review of the relevant cases reveals that to the best of counsel's knowledge, no Court has yet to articulate a sound policy rationale for deviating from the accepted principles of contract law for the benefit

of bankruptcy estates and to the great detriment of all others.

Based on the foregoing, it is respectfully submitted that the Bankruptcy Court erred when it decided that, under the facts of this case, the Trustee's duty to maximize the value of the assets of the estate superseded the Trustee's covenant of good faith and fair dealing.

**3.    The Bankruptcy Court erred, as a matter of law, in denying the Approval Motion when it substituted _its_ business judgment based on events occurring on December 10, 2007 for the _trustee's_ business judgment based on the facts before him as of August 21, 2007.**

At the December 21st hearing, Justice Drain clearly held that the standard of review on approval motions is whether the Court, in _its_ business judgment feels that the proposed transaction is in the best interests of the estate at the time of judicial review. Taken to its logical end, this decision essentially eliminates the judgment of the trustee all together, as the only thing that matters is the Courts' opinion using its 20-20 hindsight on the day of a hearing. This opinion wholly fails to recognize, acknowledge or even consider the delicate balance that must be reached between maximizing the value of assets on the one hand and honoring viable contracts on the other.

Furthermore, this opinion is not supported by any articulated public policy concerns: what is the policy rationale for allowing a Bankruptcy Court to use 20-20 hindsight in considering subsequent offers where an experienced Trustee represented by experienced counsel admittedly made a good business judgment by entering into Contracts which

were <u>not</u> subject to higher and better offers?  Why should the rule of law allow a trustee

to disregard his or her agreements with impunity?  If Justice Drain's decision is left

undisturbed, then the rule of law in this jurisdiction will be that where a trustee exercises

good business judgment at the time he or she enters into a contract which is <u>not</u> subject to

higher and better offers, and that trustee thereafter delays in filing an approval motion

while entertaining other offers (in direct violation of the signed contract), and the trustee

misleads the contract vendee into believing that there are no higher and better offers and

none would be negotiated, the trustee will, nonetheless, still be authorized to disregard

the contract in the event that a better offer <u>subsequently</u> materializes.  It is respectfully

submitted that there is no logical policy rationale for adopting a rule of law such as this.

In reaching this "20-20 hindsight" conclusion, Justice Drain referred to <u>In re: Orion</u>

<u>Pictures Corporation</u>, 4 F.3d 1095 (2nd Circuit 1993), where the Second Circuit held that:

> "In *In re Minges* we held that a bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine a contract and the surrounding circumstances and apply its best "business judgment" to determine if it would be beneficial or burdensome to the estate to assume it. 602 F.2d at 43. In reviewing a trustee's or debtor-in-possession's decision to assume an executory contract, then, a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate. Although several bankruptcy courts have read § 365 as authorizing them to resolve questions involving the validity of contracts before deciding whether to permit the trustee or debtor-in-possession to assume the contracts, *see, e.g., In re L.T. Ruth Coal Co.,* 66 Bankr. 753, 757-58 (Bankr. E.D. Ky. 1986); *In re Nexus Communications, Inc.,* 55 Bankr. 596, 598 (Bankr. E.D.N.C. 1985); *In re National Sugar Refining Co.,* 21 Bankr. 196, 198 (Bankr. S.D.N.Y. 1982), we believe that nothing in § 365 provides such authorization.
>
> As we held in *Minges,* the process of deciding a motion to assume is one of the bankruptcy court placing itself in the position of the trustee or debtor-in-possession and determining whether assuming the contract would be a good business decision or a bad one. Every businessperson would like to control the end result of her projections and judgments: a stock analyst who had the power to

cause stocks to rise and fall to meet her projections would have an enviable track record. This is essentially what the bankruptcy court did here. Permitting a bankruptcy court to rule conclusively on a decisive issue of breach of contract would render the use of "business judgment" required by *In re Minges* unnecessary, and is incompatible with the limited purpose of motions to assume of ensuring that valuable property is preserved and burdensome property discarded.

Finally, it is important to keep in mind that the bankruptcy court's "business judgment" in deciding a motion to assume is just that--a judgment of the sort a businessman would make. In no way is this decision a formal ruling on the underlying disputed issues, and thus will receive no collateral estoppel effect. In a given case, a bankruptcy court might decide that it would be beneficial for the trustee or debtor-in-possession to assume a certain contract because the court thinks it unlikely that a court would hold that the debtor had breached the contract, and thus assuming the contract would be a good "business judgment." This "business judgment" could turn out to be wrong, however, if a later fact finder in an adversary proceeding decides that the underlying contract was in fact breached. In such a case, the judge's wrong decision is simply an error of business judgment, not legal error."

Judge Drain erroneously applied the Orion decision to the case at bar: Orion dealt with a motion to approve the trustee's decision to assume a contract pursuant to §365. In order to approve the assumption of a contract, a bankruptcy court must first use its business judgment to ascertain whether or not the debtor is in breach of the contract. A debtor's breach would prevent the assumption of a contract by the trustee. Orion, therefore, stands for the proposition that a Bankruptcy Court is to use its business judgment when determining whether or not a debtor is in breach of a contract which a trustee seeks to assume pursuant to §365. Orion does not authorize Bankruptcy Court judges to replace a trustees business judgment at the time a contract was signed with the Court's own business judgment at the time of a hearing to determine whether or not to approve a sale pursuant to §363 of the Bankruptcy Code. It is respectfully submitted that the accuracy of Appellant's interpretation of Orion is buttressed by the fact that Orion is rarely if ever cited by any Court's in discussing the standard of review on an approval

motion brought pursuant to §363 of the Bankruptcy Code.

Another factor distinguishing Orion form the case at bar is that in <u>Orion</u> the Court was not asked to determine whether a trustee is released form his obligations to honor contracts in favor of his duty to maximize the value of assets in a bankruptcy estate. Furthermore, the <u>Orion</u> Court was not faced with a controversy involving <u>real property</u>. In <u>Orion</u>, the Court's approval of the trustee's motion to assume the debtor's contract with Showtime did <u>not</u> extinguish the right's of Showtime in that contract. The case at bar is entirely different: since real property is inherently unique, if left undisturbed the Bankruptcy Court's decision will effectively extinguish the Appellant's rights.

The Appellant concedes, as it must, that under "typical" circumstances, the standard of review employed by Courts in determining approval motions is as set forth in, <u>In re: Charalabos Bakalis, a/k/a Bob Bakalis</u>, 220 B.R. 525 (Bankr. EDNY 1998):

> "Although a trustee's business judgment enjoys "great judicial deference," *WPRV-TV*, 143 B.R. at 319, this discretion is not without limit. A duty is imposed upon the trustee to maximize the value obtained from a sale, particularly in liquidation cases. *See, e.g., In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) ("When a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate."); *In re Mondie Forge, Inc.*, 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992) ("The trustee has a duty to realize the maximum return for the estate for further distribution to the Debtor's creditors."); *DiMarco v. Flannery (In re Flannery)*, 11 B.R. 974, 977 (Bankr. E.D. Pa. 1981) ("In a liquidation case, the sale to the highest bidder is legally essential . . . ."); *see also* 11 U.S.C. § 704(1) (among other responsibilities, the Trustee has the duty to "collect and reduce to money the property of the estate . . . and close such estate as expeditiously as compatible with the best interests of parties in interest"). A trustee must also seek to avoid undue risk, particularly when dealing with money of the estate. *See* 11 U.S.C. § 345 (providing strict rules for the investment of money of the estate); *see also* IIA Scott on Trusts § 174, at 468 (4th ed. 1987) (stating that a trustee, who has a duty to preserve the estate, must use "caution that may be greater than that of a prudent man who is dealing with his own property").
>
> To ensure compliance with those duties, a bankruptcy court is generally afforded wide latitude in deciding whether to grant or deny approval of estate asset sales. *See In re WPRV-TV, Inc.*, 983 F.2d 336, 340 (1st Cir. 1993); *Chung King*, 753

F.2d at 549 (citing *In re General Insecticide Co.*, 403 F.2d 629, 630-631 (2d Cir. 1968)). Furthermore, in appropriate circumstances it is proper for a court to interfere with the trustee's judgment "for the purpose of safeguarding the interest of parties concerned, such as creditors and bidders." *In re Blue Coal Corp.*, 59 B.R. 157, 163 (Bankr. M.D. Pa. 1986); *see also G-K Dev. Co. v. Broadmoor Place Invs., L.P. (In re Broadmoor Place Invs., L.P.)*, 994 F.2d 744, 745 (10th Cir. 1993) (approving the sale to an alternate bidder that was not recommended by the trustee)."

A reasonable reading of the aforementioned opinions leads to the conclusion that a Bankruptcy Court's role is to <u>review the business judgment of the trustee</u> rather than substitute its own business judgment for that of the trustee3.  It is respectfully submitted that this interpretation of the Court's role is also logically consistent with the legislative intent in drafting the revisions to the Bankruptcy Code which reduced the Courts' role in the management of bankruptcy estates.

Obviously, the Appellant recognizes that had its contracts with the Trustee been subject to higher and better offers, the Bankruptcy Court would have been justified in denying the Trustee's approval motion.  However, it is respectfully submitted that where as here, the Trustee exercised sound business judgment at the time he entered into the Contracts which were <u>not</u> subject to higher and better offers, the appropriate and logical standard of review which should have been applied by the Bankruptcy Court is whether the <u>Trustee</u> exercised sound business judgment <u>at the time he entered into the Contracts</u>. Holding otherwise simply provides an unfair and illogical advantage to the bankruptcy estate.

---

3 While it is true that in <u>Bakalis</u> the Court dealt with a situation where the actions to be approved were in the best interest of the respective estates <u>at the time of judicial review</u>, it is certainly a stretch to say that these opinions stand for the rule that a trustee can breach contracts that were (1)entered into after the exercise of sound business judgment by the trustee, (2) in the best interest of the estate at the time the contracts were signed and (3) were not subject to higher and better offers, simply because a higher and better offer materialized immediately prior to judicial approval.

**Conclusion**

For all the foregoing reasons, the Appellant requests that this Court reverse the

Order dated December 20, 2007 and direct the Bankruptcy Court to approve the Contracts

entered into with Appellant.


Dated:   Brooklyn, New York
         February 12, 2007

                                        SHAPIRO & SHAPIRO, LLP
                                        Counsel to 125th Owner LLC

                                        By:   _s/Saadia M. Shapiro_____
                                              Saadia M. Shapiro, Esq.
                                        1300 Flatbush Avenue
                                        Brooklyn, N.Y. 11210
                                        (718) 434-8800



# Exhibit "A"



Exhibit "B"

**MAYWOOD - 65-67 East 125th Street, New York, New York**

CONTRACT OF SALE

      AGREEMENT made as of the 24th day of August, 2007, by and between JOHN S. PEREIRA, as trustee ("Trustee") of 65-67 East 125th St. Realty Corp., the debtor ("Debtor") in a Chapter 11 proceeding Case No. 05-10961 (RDD) (one of the cases procedurally consolidated in In re: Maywood Capital Corp., et al, Consolidated Case No. 05-10987 (RDD)) pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and 125th Street Owner LLC ("Purchaser").

W I T N E S S E T H

1.     <u>Agreement to Purchase: Description of Property</u>

      Trustee hereby agrees to sell to Purchaser, and Purchaser hereby agrees to purchase from Trustee, upon the terms and conditions hereinafter contained, all of the estate, right and title of Trustee in and to (i) those certain lots, pieces and parcels of land, situate, lying and being in the County of New York, State of New York, as more particularly described in Schedule A annexed hereto and the appurtenances thereto and more particularly described as 65-67 East 125th Street, New York, New York (collectively, the "Land"); (ii) all buildings and improvements located on the Land and the appurtenances thereto (collectively, the "Improvements"); and (iii) all fixtures located on and used in connection with the operation and maintenance of the Land and/or Improvements (collectively, the "Personalty"). The Land, Improvements and Personalty are hereinafter sometimes collectively called the "Property."

2.     <u>Consideration</u>

      The consideration for the purchase of the Property is Two Million, Six Hundred Thousand and no/100 Dollars ($2,600,000.00) (the "Purchase Price"), without offset or reduction (except as expressly provided for herein), payable by Purchaser as follows:

      (i)    Two Hundred Sixty Thousand and no/100 Dollars ($260,000.00) (the "Deposit") upon execution and delivery of this Agreement, by check of Purchaser, subject to collection, payable to the order of Dreier LLP., as Escrow Agent (the "Escrow Agent"). Upon Closing (as hereinafter defined) any interest earned on the Deposit shall belong to the Trustee and shall not be credited against the Purchase Price at Closing.

      (ii)    Two Million, Three Hundred Forty Thousand Dollars ($2,340,000.00) upon Closing, by unendorsed certified check of Purchaser or official bank check drawn on a bank which is a member of the N.Y. Clearing House Association or otherwise satisfactory to the Trustee.

      (iii)    In addition to the Purchase Price, Purchaser shall also pay the net apportionments and adjustments set forth in Paragraph 10 hereof.

      (iv)    At Trustee's request (made by facsimile transmission if Trustee so elects), made no later than two business days prior to the Closing, Purchaser shall provide at the Closing

separate unendorsed certified or official bank checks, aggregating the amount to be paid to Trustee at Closing, made payable to those parties which Trustee so requests.

(v)    Trustee shall, to the extent required by the Bankruptcy Court or the Order (as hereinafter defined), pay at Closing or escrow a portion of the Purchase Price at Closing to pay any and all State and/or local transfer, conveyance or gains tax imposed upon closing of title to the Property.

3.    Bankruptcy Court Approval

(i)    The obligations of Trustee and Purchaser under this Agreement are expressly conditioned upon entry of an order (and its becoming final and unappealable or, in the event of an appeal, no stay pending appeal being granted) by the Bankruptcy Court approving or authorizing this Agreement or approving or authorizing the Trustee to execute, deliver and perform this Agreement and containing the terms described below (the "Order"). In the event the Bankruptcy Court fails to enter the Order within 120 days after the full execution hereof, Purchaser may terminate this Agreement by notice to the Trustee.

(ii)    The Order must be in a form reasonably acceptable to Trustee and Purchaser's title insurer and/or Primary Land Services LLC. The Order shall provide that all liens, claims and encumbrances affecting the Property, other than the Permitted Encumbrances (as hereinafter defined), shall be subject and subordinate in lien and priority to this Agreement, and shall, if valid, attach to the proceeds of sale (net of all Trustee commissions, attorney fees and all other expenses of the sale) payable pursuant to this Agreement (all such liens and encumbrances shall hereinafter be referred to as "Subordinate Liens and Encumbrances"). If this Agreement fails to close for any reason, then such liens and encumbrances shall affect the Property in accordance with their terms. After the agreement is fully executed and the deposit has been paid, the Trustee shall promptly file a motion in the Bankruptcy Court to obtain such Order.

(iii)    If Purchaser shall terminate this Agreement pursuant to this Paragraph 3, then this Agreement shall be null and void and the Escrow Agent shall promptly return the Deposit previously paid by Purchaser hereunder, together with all accrued interest thereon, if any, and upon such return of funds to Purchaser, there shall be no further liabilities or obligations upon either of the parties hereto except for those which by the express terms hereof survive such a termination.

4.    Time of the Essence

In the event that Purchaser fails to timely close the transaction contemplated by this Agreement in accordance with the terms of this Agreement, Trustee shall have the option of terminating this Agreement, time being of the essence with respect to Purchaser's obligations hereunder (subject to Paragraph 11). In the event of such termination, all payments made by Purchaser to Trustee prior to such termination (including, without limitation, the Deposit delivered to the Escrow Agent), together with accrued interest, if any, (the "Prior Payments") shall be retained by Trustee as liquidated damages (and not as a penalty) for all loss, damage and expense suffered by Trustee, including, without limitation, the loss of its bargain, and neither

party hereto shall have any further right or obligation to the other except for those which by the express terms hereof survive such a termination (but Purchaser's liability with respect to those obligations which survive such termination shall not be limited to the amount of the Prior Payments).

     5.    <u>Release of Environmental Claims</u>

On and after Closing, Purchaser agrees to defend, indemnify, hold harmless, release and discharge Trustee from and against any and all liability relating to or arising from any environmental, dangerous, hazardous and/or toxic condition, substance, material and/or waste which currently exists or which may exist in the future on the Property (collectively, "<u>Environmental Claims</u>"), including, without limitation, any claims made pursuant to 42 U.S.C. §9601 <u>et seq.</u> and any claims made for contribution, indemnity and reimbursement. This Paragraph 5 shall survive the Closing.

     6.    <u>The Closing</u>

(i)    The Property shall be transferred and conveyed by Trustee to Purchaser and Purchaser shall pay the balance of the Purchase Price (the "**<u>Closing</u>**") on the date (the "**<u>Closing Date</u>**") set by Trustee, which date shall be a day not less than forty (40) days following the entry of the Order.

(ii)    The Closing shall be held in the office of Trustee's counsel, or at the office of Purchaser's lender or lender's counsel (if the same is required by the lender, and provided such office is located in the City of New York), or at such other mutually convenient location as may be agreed upon by the parties hereto.

     7.    Permitted Encumbrances; Other Matters
           Omitted by Purchaser's Title Insurer

Subject to subparagraphs 7(i) and (ii) below, upon the Closing Trustee shall convey and Purchaser shall accept, the Property, without any warranties by Trustee, subject only to the matters set forth in Schedule B annexed hereto (collectively, the "<u>Permitted Encumbrances</u>").

(i)    Purchaser shall, if Purchaser desires a title report or title insurance on the Property: (a) promptly order a title report (the "<u>Title Report</u>") from (and at Closing, purchase title insurance through) Primary Land Services, LLC ("<u>Primary</u>") or from a title insurance company licensed to do business in the State of New York; (b) cause the Title Report to be issued to Purchaser promptly after the date of execution of this Agreement; (c) cause a copy of the Title Report and any amendments, supplements and endorsements to the Title Report to be issued to Trustee's attorney simultaneously with the issuance of the same to Purchaser; and (d) notify Trustee of any defect in or objection to title that is noted in the Title Report or any amendment, supplement or endorsement thereto, and is objected to by Purchaser, other than the Permitted Encumbrances, the Subordinate Liens and Encumbrances and/or a Schedule C Lien (as hereinafter defined), which notice must be given promptly after Purchaser receives the Title Report or amendment, supplement or endorsement thereto that first notes such defect or objection. Trustee shall be permitted reasonable adjournments of the Closing Date to remove

such defects or objections. Trustee shall use reasonable efforts to remove all such title exceptions but shall not be obligated to expend any funds with respect to the same and the Trustee's inability to remove such defects shall not be deemed a breach hereof. In the event that Trustee elects not to remove such defects or objections, then Trustee shall give Purchaser written notice of Trustee's election not to remove the same and Purchaser shall have the option, exercisable within 10 days after receipt of Trustee's notice to elect to either (x) purchase the Property subject to said defects or objections without any offset or deduction against the Purchase Price, or (y) terminate the agreement. Prior to the date of this Agreement, Trustee had ordered and given to Purchaser a copy of a title report and commitment on the Property from Primary, and will incur cancellation charges in the event title insurance on the Property is not subsequently purchased through Primary. Accordingly, in the event that Purchaser does not purchase title insurance on the Property through Primary, Purchaser shall reimburse Trustee at the Closing for any cancellation fees (up to the amount of $500) associated with Trustee's cancellation of its title insurance commitment from Primary.

(ii)     If the Property shall be subject at the time of the Closing to any liens or encumbrances, the removal or satisfaction of which prior to the Closing Trustee has expressly assumed responsibility for removing or satisfying hereunder, as shown on Schedule C hereto (each, a "Schedule C Lien") (other than the Subordinate Liens and Encumbrances which are deemed removed as a matter of law), then Purchaser shall (unless Trustee has offered and Purchaser agrees to accept an offset against the Purchase Price on account of any such items) provide at the Closing separate unendorsed certified or official bank checks, as requested, aggregating no more than the amount due Trustee at that date, to facilitate the satisfaction of any of such liens or encumbrances. In addition, Trustee shall have the right at the Closing to direct that Purchaser's title insurer to escrow a portion of the closing proceeds, as reasonably necessary, in order to enable such insurer to omit any liens or encumbrances which Purchaser is not obligated to take title subject to (other than the Subordinate Liens and Encumbrances which are hereby deemed removed as a matter of law) from Purchaser's title insurance policy, if any, and any lien or encumbrance so omitted shall be deemed removed and/or satisfied. In the event that Purchaser is not obtaining a title insurance policy or Purchaser's title company refuses to omit any liens or encumbrances which Purchaser is not obligated to take title subject to (other than the Subordinate Liens and Encumbrances which are hereby deemed removed as a matter of law), then any such liens and encumbrances shall be deemed removed and/or satisfied if Primary issues a title commitment omitting the same.

8.     Access to the Property

Purchaser shall be afforded access from time to time to the Property for the purposes of inspection and the taking of measurements. Purchaser shall be permitted to make searches of governmental records as it reasonably deems necessary with respect to the Property, and Trustee agrees to cooperate with Purchaser and to issue any consents or authorizations reasonably required therefor, provided that Trustee shall not be required to incur any expense in connection therewith. Purchaser's access to the Property shall be conditional upon the following:

(i)     Such access to the Property must be at reasonable times, with reasonable prior notice to and the prior consent of Trustee, and Trustee may require that his representative(s) accompany Purchaser during such access to the Property.

(ii)    Purchaser, upon Trustee's request, shall produce evidence, prior to Purchaser's entry onto the Property, of insurance policies in such amounts as may be reasonably determined by Trustee as adequate for liability and workers' compensation and other risks that may arise from such entry upon and activities on the Property, and shall name Trustee, and any other parties designated by Trustee, as additional insureds. Such insurance shall not be cancelable unless at least thirty (30) days' prior written notice has been given to Trustee. Prior to Purchaser's entry onto the Property, Purchaser shall also provide Trustee with such indemnities and assurances as are requested by Trustee in order to protect Trustee from liabilities and risks which may arise from such entry. Subject to Paragraph 9 below, Trustee shall be solely entitled to the proceeds of any property and casualty insurance, if any, carried by Trustee with respect to the Property. Purchaser shall be solely responsible for carrying, at any time during the term of this Agreement, any property and casualty insurance it desires with respect to the Property. Notwithstanding the above to the contrary, Purchaser shall not have to provide the above-described insurance in connection with any entry onto the Property by the Purchaser or its agents for non-invasive inspection purposes.

(iii)    Any entry upon and activities on the Property shall be entirely at Purchaser's own risk, and Purchaser shall indemnify, defend and hold harmless Trustee from and against all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, that Trustee may incur by reason of claims based upon or connected with any such entry upon and activities on the Property. Without limitation, Purchaser shall promptly repair any damage caused by the activities of Purchaser or its agents and shall restore the Property to its condition prior to Purchaser's entry thereon. This subparagraph 8(iii) shall survive the Closing or other termination of this Agreement.

9.    <u>As-Is; Complete Agreement</u>

(i)    Purchaser has inspected the Property and is thoroughly acquainted with its condition. Purchaser agrees to purchase the Property "as is" and in its present condition, subject to reasonable use, wear, tear, fire or casualty loss, vandalism and natural deterioration between now and the Closing (but subject further to subparagraphs 9(ii) and (iii) below). Purchaser shall take the Property subject to all violations of law (except for any monetary penalties that have already been assessed in connection with any such violations) or municipal ordinances, orders or requirements promulgated by any governmental department having authority as to lands, housing, buildings, fire, health, labor, environment, highways, use, land use and other similar conditions affecting the Property. Purchaser acknowledges that neither Trustee nor any agent or representative or purported agent or representative of Trustee has made, and Trustee is not liable for or bound in any manner by, any express or implied warranties, guaranties, statements, inducements, representations or information pertaining to the Property, or any part thereof, the physical condition, environmental, dangerous, hazardous and/or toxic condition, income, expenses or operation thereof, compliance with the rent control laws, the Rent Stabilization Law or the Rent Stabilization Code, or any laws or regulations associated therewith, the uses which can be made of the Property or any other matter or thing with respect thereto. Without limiting the foregoing, Purchaser acknowledges and agrees that Trustee is not liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations, real estate brokers' "set-ups" or any other information respecting the Property, furnished by Trustee or any

broker, employee, agent, consultant or other person representing or purportedly representing Trustee.

   (ii) In the event that the Property sustains fire or casualty loss between the date hereof and the Closing, then Trustee shall have the right to terminate this Agreement by giving Purchaser notice of its election to so terminate within thirty (30) days after Trustee becomes aware of the occurrence of such fire or casualty loss, provided, however, that in the event Trustee has given notice of its election to terminate in accordance with this sentence, Purchaser shall have the option, on 10 days written notice, to elect to close on the property without any offset or deduction to the purchase price. Purchaser shall be entitled to receive the proceeds of any applicable insurance and Purchaser agrees to cooperate with Trustee in settling any such claim.

   (iii) Notwithstanding subparagraph 9(ii) above to the contrary, in the event that the Property sustains fire or casualty loss between the date hereof and the Closing in excess of $130,000.00 (a "Loss") (as determined by the reasonable estimate of Trustee's consultant made within 30 days after any such Loss) and Trustee (a) does not elect to repair the Property to substantially the same condition as it existed in immediately prior to such Loss (which election shall be made in a notice to Purchaser within 15 days after Trustee's consultant delivers its written estimate to Trustee) or (b) Trustee elects to repair the Property to substantially the same condition as it existed in immediately prior to such Loss (and Purchaser fails to deliver Purchaser's Waiver (as hereinafter defined)) but Trustee does not substantially complete said repairs within 6 months after said Loss, then Purchaser shall have the right to terminate this Agreement by giving written notice to Trustee of its election to so terminate within 15 days after (x) Trustee gives its notice that it elects not to repair the Loss or (y) the expiration of the 6 month period described above during which Trustee failed to substantially complete the repairs, as the case may be (and upon such termination the Deposit, along with any accrued interest, shall be promptly returned to Purchaser).

In the event that Trustee (A) so elects not to repair said Loss and Purchaser fails to exercise its termination right in the time provided for above (time being of the essence) or (B) so elects to repair said Loss and Purchaser, within 5 days after receipt of Trustee's election to repair said Loss (time being of the essence), delivers to Trustee a written waiver ("Purchaser's Waiver") of its termination rights under this subparagraph 9(iii) (in which case Trustee shall not make any repairs), then subparagraph 9(ii) shall control with respect to such Loss. However, in the event that Trustee so elects to repair said Loss (and Purchaser fails to deliver Purchaser's Waiver) but Trustee fails to substantially complete the repairs within the required 6 month period and Purchaser fails to exercise its termination right in the time provided for above (time being of the essence), then the Closing shall occur on a date not less than 10 business days after the repairs are substantially complete.

   10. <u>Apportionments and Offsets to the Purchase Price</u>

   (i) The following apportionments and adjustments shall be made at the Closing, as of 11:59 P.M. of the day immediately preceding the Closing Date. All such apportionments and adjustments, if in favor of Purchaser, shall be offset against the Purchase Price, provided that if such aggregate offsets exceed the Purchase Price, Purchaser shall not in

any event be entitled to any credits or refunds in addition to Purchaser's offset against the Purchase Price:

(a)    Real estate taxes, assessments and water, sewer and vault charges, if any (collectively, "Real Estate Taxes") on the basis of the fiscal period for which assessed. Real Estate Taxes paid (or to be paid out of the Closing proceeds) by Trustee and pertaining in whole or in part to the period following the Closing shall be Purchaser's obligation and an apportionment shall be made therefor. If the Closing shall occur before a new tax rate is fixed, then the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. If there is a water meter on the Property, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing, which obligation shall survive the Closing. In the event that any assessment is payable in installments, then all installments payable on or after Closing shall be Purchaser's responsibility.

(b)    Any fuel then existing on the Property based upon the greater of (1) its then fair market value or (2) the original cost of the same.

(c)    Any rents received under any leases affecting the Property to the extent such rents relate to leases which Purchaser is required to assume pursuant to this Agreement. Any rents received by Purchaser subsequent to Closing shall be applied first to the current rent and then to the time period prior to the Closing and shall be promptly forwarded to Trustee upon Purchaser's receipt of the same, but Purchaser shall only be obligated to forward to Trustee one month's worth of arrearages for each tenant plus any pro-rata amount due Trustee for rents collected which relate to the month in which the Closing occurred. This subparagraph 10(i)(c) shall survive the Closing.

(d)    In the event that Purchaser fails to purchase title insurance from Primary or orders the Title Report from a title insurance company other than through Primary, then Purchaser shall pay Trustee the applicable amount(s) specified in subparagraph 7(i).

(e)    Trustee agrees to deliver to Purchaser at Closing any security deposit which Trustee has in his possession relating to any lease which is being assumed by Purchaser pursuant to this Agreement and which, as reflected in Trustee's records, has not prior to Closing been applied to a default under said lease or otherwise lawfully applied under said lease or returned to the tenant thereunder. Purchaser hereby agrees to defend, indemnify, hold harmless, release and discharge Trustee from and against any claims by tenants or others with respect to security deposits, including claims made for contribution, indemnity and reimbursement; this sentence shall survive the Closing.

(f)    Any payments made under the contracts shown on Schedule E, which Purchaser is required to assume pursuant to this Agreement, including, without limitation, payments of union benefits and wages, if any.

(g)    Any payments of benefits and wages of any non-union superintendent of the Property or any similar employee.

(ii)    Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at the Closing shall be promptly corrected, which obligations shall survive the Closing but, with respect to any sum owed Purchaser, the same shall not survive the conclusion of the administration of the Debtor's estate (and shall survive prior to such conclusion only to the extent monies are then currently available to pay the same).

(iii)    Trustee shall not be obligated to accept more than $2,000.00 in the aggregate at Closing in cash or uncertified checks.  Any amounts owed in excess of $2,000.00 must be paid in accordance with subparagraph 2(ii).

(iv)    Except as otherwise herein provided, the customs with respect to title closings recommended by the Real Estate Board of New York shall apply to the apportionments at the Closing.

11.    Conditions of Closing

The obligation of Trustee to close title in accordance with this Agreement is expressly conditioned upon Purchaser having made all required payments and having complied with all of its non-monetary obligations under this Agreement, provided that with respect to non-monetary obligations, Purchaser shall be given notice of any failure to comply with the same and shall be given the lesser of (i) fifteen (15) days' notice or (ii) the amount of time left to Closing (as previously set by Trustee), to cure its failure to comply with such non-monetary obligations. The obligation of Purchaser to close title in accordance with this Agreement is expressly conditioned upon the Bankruptcy Court approving the Contracts of Sale between the Trustee and Purchaser herein for the properties located at 77 East 125th Street, New York, New York and 79 East 125th Street, New York, New York and Trustee's being prepared to close under such additional Contracts of Sale.

12.    Closing Documents

(i)    Trustee shall deliver to Purchaser at the Closing:

(a)    A deed, substantially in accordance with the form annexed hereto as Schedule D or such other form of deed as the Order shall direct (the "Deed").

(b)    Actual possession of the Property, subject to any tenancies or any other rights to use or occupy any portion of the Property as set forth on Schedule B as Permitted Encumbrances.

(c)    All original leases and any other documents related thereto, rent records, registration forms and rent histories for all tenants to the extent they are in Trustee's possession (the "Lease Documents") or a letter directing Trustee's managing agent to deliver the Lease Documents to Purchaser upon presentation of said letter to Trustee's managing agent.

(d)    An appropriate non-foreign affidavit pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended, sufficient to provide an exemption under Subdivision (b) thereof.

(e)    An assignment of rent arrears in accordance with Paragraph 29.

(ii)    Purchaser and Trustee shall execute, acknowledge and deliver to each other such other instruments and documents, if any, to which either party may be entitled pursuant to any of the other provisions of this Agreement or which are required by law.

(iii)    Purchaser agrees to pay at or subsequent to the Closing, all sales taxes which may become due and payable in connection with the sale hereunder of any Personalty, and indemnifies, defends and holds harmless Trustee, from all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, for such sales taxes, whether asserted before or after the Closing. This subparagraph shall survive the Closing.

(iv)    Purchaser shall assume and execute an assumption agreement with respect to all residential leases affecting the Property. Purchaser shall also assume and execute an assignment and assumption agreement with respect to all non-residential leases and contracts shown on Schedule E hereto for which Trustee receives Bankruptcy Court approval to assume and assign to Purchaser.

(v)    Purchaser shall execute the appropriate documentation indicating that Purchaser (or Purchaser's lender) is the designated settlement/reporting agent for the purposes of the preparation and filing of the Form 1099-S (if such form is required under the Internal Revenue Code, as amended).

13.    Condemnation

If, at any time prior to the Closing, the Trustee receives notice that all or a material part of the Property shall be taken in the exercise of the power of eminent domain by any governmental authority (a "Taking"), then Purchaser shall have the option to terminate this Agreement by giving notice to the Trustee within 20 days after the Trustee provides a copy of such Notice to the Purchaser. In the event that Purchaser does not elect to terminate this Agreement, then in such event the Trustee shall not without the consent of Purchaser enter into any agreement concerning any condemnation award to which Trustee may be entitled as a consequence of such taking, and shall assign to Purchaser at the Closing all of Trustee's right, title and interest to any such award.

14.    Fees and Disbursements of Counsel, etc.

Each of the parties hereto shall bear and pay the fees and disbursements of its own counsel, accountants and other advisors in connection with the negotiation, preparation and carrying out of this Agreement and the Closing. Purchaser shall bear and pay the cost of recording the Deed and other documents to be delivered hereunder. Purchaser shall not be responsible for the payment of any New York City or New York State transfer taxes. This Paragraph 14 shall survive the Closing.

15.    Notices

As used in this Agreement, "notice" or "Notice" shall mean any notice, demand, request, consent, approval or other communication required or permitted to be given hereunder

{00270078.DOC;3}                    9

or which is given with respect to this Agreement, and, except as otherwise provided in this Agreement, all notices shall be in writing and shall be sent by (i) registered or certified mail, return receipt requested, postage pre-paid, (ii) overnight express mail, (iii) Federal Express or (iv) personal delivery (provided written receipt therefor is obtained) addressed to the party to be notified at the addresses and the addressees set forth below or to such other addresses and/or addressees as such party shall have specified most recently by like notice.

Any notice to be given to Trustee or to Escrow Agent shall be sent to:

> John S. Pereira, Esq.
> 150 East 58th Street, 14th Floor
> New York, New York 10155

With a copy to Trustee's attorneys:

> Dreier LLP.
> 499 Park Avenue
> New York, New York 10022
> Attention: John P. Campo, Esq.

Any notice to be given to Purchaser shall be sent to:

> 125th Street Owner, LLC
> c/o Shapiro & Shapiro, LLP
> 1300 Flatbush Avenue
> Brooklyn, New York 11201
> *Telephone: 718-434-8800*
> *Fax: 718-434-8700*
> *Email: sshapiro@shapirolawyers.net*

With a copy to Purchaser's attorneys:

> Abe Rappaport, Esq.
> 195 Route 46 West
> Suite 11
> Totowa, New Jersey 07512
>
> Telephone: (973) 785-1799
>
> Fax No. : (973) 785-4777

Notice given as provided above shall be deemed duly given (i) 3 days after sending, if sent by registered or certified mail, (ii) 1 business day after sending, if sent by overnight express mail or by Federal Express, or (iii) on the date of delivery, if delivered by personal delivery, as the case may be. Notices may be given by and to attorneys for the respective parties.

16.    <u>Trustee's Exculpation; Limitation of Purchaser's Remedies</u>

(i)    Trustee is entering into this Agreement strictly in his capacity as trustee of Debtor's Chapter 11 proceeding in the Bankruptcy Court. Under no circumstances shall Trustee be liable in his personal capacity for payment or performance of any of Trustee's obligations hereunder.

(ii)    If Trustee (a) is unable to transfer title to Purchaser in accordance with this Agreement, (b) terminates this Agreement pursuant to the terms of paragraph 13, or (c) the Bankruptcy Court denies authorization for any reason whatsoever, and decrees that the Trustee is unable to or may not sell the Property. Trustee's sole liability shall be to refund all Deposit money paid by Purchaser on account of this Agreement. Upon such refund this Agreement shall be considered cancelled, and neither Trustee nor Purchaser shall have any further rights or obligations hereunder, except obligations under this Agreement which expressly survive the Closing or other termination of this Agreement.

(iii)    Purchaser acknowledges that, prior to the Closing, Trustee shall have sole and complete discretion with respect to all matters relating to management and operation of the Property, including, without limitation, any election, in Trustee's sole discretion, not to manage, operate, insure, secure or otherwise safeguard all or any portion of the Property. Notwithstanding the above, the Trustee shall not after the date hereof, lease, amend or renew any lease for any part of the Property, enter into any service agreement (unless such service agreement is terminated at or prior to the Closing Date), or otherwise encumber the Property.

17.    <u>Broker</u>

Purchaser represents and warrants to Trustee, that Purchaser has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties, the negotiation or execution of this Agreement or the closing of the transactions contemplated herein. Purchaser hereby indemnifies, defends and holds harmless Trustee from and against any and all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, resulting from the Purchaser's breach of its representation, warranty, covenant and agreement under this Paragraph 17. This Paragraph 17 shall survive the Closing or other termination of this Agreement.

18.    <u>Escrow Agent</u>

(i)    The Deposit shall be held in escrow by Escrow Agent in an interest-bearing account until the first to occur of: (a) the Closing, (b) seven (7) business days after Escrow Agent has received Notice given by Purchaser to Escrow Agent, stating that this Agreement has been terminated by Purchaser in accordance with its terms, upon which date the Deposit and all interest earned thereon, if any, shall be paid to Purchaser, provided that within such seven (7) day period Escrow Agent does not receive Notice to the contrary from Trustee, (c) seven (7) business days after Escrow Agent shall have given Notice to Purchaser that Escrow Agent has received Notice given by Trustee stating that this Agreement has been terminated by Trustee, upon which date the Deposit and all interest earned thereon, if any, shall be paid to Trustee, provided that within such seven-day period Escrow Agent does not receive Notice to the

contrary from Purchaser, or (d) joint Notice, executed by Trustee and Purchaser, is received by Escrow Agent, in which event Escrow Agent shall release the Deposit and all interest earned thereon, if any, in accordance with the instructions therein contained. In the event of a dispute arising with respect to the rights of Trustee or Purchaser to receive the Deposit and/or any interest earned thereon, Escrow Agent shall have the right to pay the sum held in escrow into court and commence an action in interpleader in order to obtain a judicial determination as to the party legally entitled to receive the funds.

(ii)     Escrow Agent shall not be liable for any error in judgment or for any act done or omitted by it in good faith, or for any mistake of fact or law and is released and exculpated from all liability hereunder, except for willful misconduct.

(iii)     Escrow Agent shall not be required to take notice of any default by Trustee or Purchaser or to take any action with respect thereto, except as provided in this Paragraph 18.

(iv)     Escrow Agent shall incur no liability in acting upon any signature, notice, request, waiver, consent, receipt, or other paper or document believed by Escrow Agent to be genuine and Escrow Agent may assume that any person purporting to give Escrow Agent any notice or advice in accordance with the provisions hereof has been duly authorized to do so, and Trustee and Purchaser each hereby jointly and severally indemnifies, defends, holds harmless Escrow Agent from and against any and all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, Escrow Agent may suffer or incur as Escrow Agent hereunder unless caused by Escrow Agent's willful refusal or willful failure to act pursuant to the terms hereof.

(v)     Escrow Agent shall not be under any obligation to take any legal action in connection with this Agreement or towards its enforcement or to appear in, prosecute or defend any action or legal proceeding which, in the opinion of Escrow Agent, would or might involve Escrow Agent in any cost, expense, loss or liability unless, and as often as required by Escrow Agent, Escrow Agent shall be furnished with security and indemnity satisfactory to Escrow Agent against all such costs, expenses, losses or liability.

(vi)     Escrow Agent shall be entitled to consult with other counsel in connection with its duties hereunder. Purchaser and Trustee each jointly and severally agrees to reimburse Escrow Agent for its costs and expenses, including, without limitation, attorneys' fees (either paid to retained attorneys or representing the fair value of legal services rendered by Escrow Agent to itself) incurred as a result of any dispute or litigation concerning this escrow arrangement.

This Paragraph 18 shall survive the Closing or other termination of this Agreement.

19.     This paragraph is intentionally omitted.

20.     Pending Litigation

(i)     Purchaser acknowledges that the Trustee is currently in litigation concerning the title to the Property. The parties agree that the obligations under this agreement

are conditioned upon the entry of an Order authorizing the Trustee to sell the Property to Purchaser free and clear of all liens, claims and encumbrances.

21. **Counterparts; Captions**

This Agreement and all instruments and documents to be delivered hereunder may be executed in counterparts, each of which shall be deemed an original. The captions in this Agreement are for convenience and reference only and shall not be utilized in the interpretation of this Agreement.

22. **Entire Agreement**

This Agreement (including all schedules annexed hereto) contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto. This Agreement may not be modified, changed or supplemented, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto. This Paragraph 22 shall survive the Closing or other termination of this Agreement.

23. **Waivers; Extensions**

No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts. Each of the parties hereby authorizes its attorneys to agree on its behalf in writing to any changes in dates and time periods provided for in this Agreement.

24. **Assignment; Successors and Assigns**

Purchaser's interest under this Agreement may only be assigned with Trustee's prior written consent, which consent may not be unreasonably withheld. In the event that Trustee consents to an assignment, the individual or entity executing this Agreement shall remain liable for all of Purchaser's obligations hereunder, including, without limitation, obligations which survive the Closing. Such assignment shall not become effective until (i) notice of assignment, including identity of the assignee and an address for notices to the assignee, has been provided to Trustee, (ii) the assignee has delivered to Trustee a signed assumption of the terms of this Agreement and any related agreements entered into by Purchaser and (iii) Trustee delivers to Purchaser its prior written consent. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of Purchaser, Trustee, and their respective successors and assigns.

25. **Pronouns**

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the parties may require.

26. <u>No Recording</u>

Purchaser shall not record this Agreement or a memorandum thereof against the title to the Property.

27. <u>Governing Law</u>

This Agreement shall be governed by and construed in accordance with the laws of the State of New York and applicable provisions of the Bankruptcy Code.

28. <u>Purchaser's Warranty of Authority.</u>

Purchaser hereby represents and warrants that (i) it has full right, power and authority to execute this Agreement, (ii) such execution has been duly authorized and (iii) that it is bound hereby.

29. <u>Merger</u>

The acceptance of the Deed by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Trustee's part to be performed hereunder, except for those which this Agreement specifically provides shall survive the Closing.

30. <u>Rent Arrears</u>

Any rent or rent arrears due Trustee shall be collected by the Purchaser and shall be promptly turned over to Trustee as and when collected, in accordance with subparagraph 10(i)(c). It is understood and agreed that any rents collected after the Closing shall first be applied to current rent and then to any rent arrears. Upon written request from Trustee from time to time, to the then owner, an accounting of the rents collected (or remaining uncollected) shall be given to Trustee. Trustee reserves the right between contract and Closing to institute any proceedings to recover any part of the premises in the event of any default by the various tenants of any of the terms of their tenancies. Trustee shall execute at Closing an assignment of rent arrears to Purchaser in order for Purchaser to collect said arrears (but not with respect to any plenary rent arrear actions instituted prior to Closing which Trustee shall be entitled to continue to maintain), with the understanding that such arrears shall be paid to Trustee in accordance with this provision. This Paragraph 30 shall survive the Closing.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

TRUSTEE:

By: _____
JOHN S. PEREIRA, as Chapter 11
Trustee of 65-67 East 125th St. Realty Corp.


PURCHASER:
125th Street Owner LLC

By: _____
Name: Saadia Shapiro
Title: Manager
Tax ID Number:


*NOTE: If the drawer's name on the Deposit check is other than the named Purchaser, then the following must be completed and signed by the drawer of the check:*

The undersigned hereby acknowledges that the delivery of the Deposit and the payment of the same represents a material benefit to the undersigned, and if the undersigned is a partnership, corporation or limited liability, was authorized by all necessary partnership, corporate or limited liability company action.

Drawer's Name (if entity):

By: _____
Name:
Title:

The undersigned hereby acknowledges receipt of Purchaser's $260,000 check *wire transfer* payable to the order of Escrow Agent on account of the Deposit and agrees to hold same pursuant to the provisions of Paragraph 18 of the foregoing Agreement:

Escrow Agent:

DREIER LLP

By: _____
A Partner

{00270078.DOC;5}                    15

PURCHASER'S ACKNOWLEDGMENT

IN NEW YORK STATE

State of New York        )

County of   K_ngs       )

On the _13_ day of _August_ in the year 2007, before me, the undersigned, personally appeared ___Sandra Shapiro___, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

**ARTHUR GUTMAN**
**Notary Public, State of New York**
**No# 02GU6164097**
**Qualified in Kings County**
**Commission Expires April 9, 2011**

_Arthur Gutman_
_____
*(signature and office of individual taking acknowledgment)*

OUTSIDE NEW YORK STATE

State of             )

On the ____ day of _____ in the year 2007, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
*(signature and office of individual taking acknowledgment)*

Schedule A

Legal Description

# PRIMARY LAND SERVICES, LLC

### Title No. PY13955NY   (369-NY-04849)

### S C H E D U L E   A

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 125th Street, distant 215 feet westerly from the corner formed by the intersection of the westerly side of Park formerly known 4th Avenue, as widened, with the said northerly side of 125th Street and;

RUNNING THENCE northerly parallel with Park Avenue, and part of the distance through a party wall, 99 feet 11 inches to the center line of the block;

THENCE westerly along said centre line of block, and parallel with 125th Street 25 feet;

THENCE southerly again parallel with park Avenuem 99 feet 11 inches to the northerly side of 125th Street; and

THENCE easterly along the said northerly side of 125th Street, 25 feet to the point or place of BEGINNING.

**FOR CONVEYANCING ONLY**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of and adjoining said premises.

## Schedule B

### Permitted Encumbrances

1.      All present and future zoning, building and environmental laws, ordinances, codes, restrictions and regulations of all other governmental (including, without limitation, local, state and federal) authorities having jurisdiction over the Property, all zoning variances and special exceptions, if any, and all present or future violations thereof, if any.

2.      Any state of facts a current land title survey of the Land, Improvements and/or Personalty would disclose provided that the same does not render title unmarketable.

3.      All presently existing rights, easements and agreements, whether or not of record, over, across, under or affecting the Land, Improvements and/or Personalty provided that the same does not render title unmarketable.

4.      The rights of any tenants or occupants in possession of or having rights in and to the Property either now or at Closing, provided the Trustee does not consent to or enter into any lease with respect to the property without the Purchaser's prior consent.

5.      All violations of building, fire, sanitary, environmental, housing and similar laws, ordinances, rules, regulations and orders of governmental authorities having jurisdiction over the Property, whether or not noted or issued at the date hereof or at the date of Closing, and including, without limitation, sidewalk violations (except that the Trustee shall pay all monetary fines already assessed in connection with such violations).

6.      Real Estate Taxes shall be apportioned in accordance with this Agreement and Purchaser shall take subject to all of the same which are not yet due and payable.

7.      Standard printed exceptions contained in the title report with respect to the Property issued by Primary and/or contained in the Title Report.

8.      Possible lack of or revocable nature of the right, if any, to maintain or use any space, facilities or appurtenances outside the building lines, whether on, over or under the ground, including, without limitation, all vaults, signs, loading platforms, intake valves or pipes and chutes, if any.

9.      Consents by Trustee, Debtor or any former owner of the Property for the erection of any structure or structures on, under or above any streets on which the Property may abut.

10.     Any unpaid vault taxes unless the same are a lien on the Property at the time of Closing.

11.     Any mortgage or encumbrance which, by the terms of this Agreement, Purchaser has expressly agreed to assume or take subject to.

## Schedule C

**Non-Monetary Encumbrances Required to be Removed by Trustee**

NONE

<u>Schedule D</u>

<u>Trustee's Deed of Real Estate</u>

This Indenture made the _____ day of __, 2007, between John S. Pereira, as Chapter 11 trustee in bankruptcy of the estate of 65-67 East 125th St. Realty Corp., bankrupt, party of the first part, having an address at 150 East 58th Street, New York, New York, and _____, party of the second part, having an address at _____;

WITNESSETH the party of the first part by virtue of the power and authority given in and by an order of the United States Bankruptcy Court for the Southern District of _____, dated the _____ day of _____, 2007, and in consideration of Two Million, Six Hundred Thousand Dollars ($2,600,000.00), lawful money of the United States paid by the party of the second part, does hereby grant, convey and release unto the party of the second part, his/its heirs, successors and assigns forever, all the estate which _____ had, at the time of the filing of the petition in bankruptcy by him, in said United States Bankruptcy Court for the Southern District of New York, in that certain property set forth on Schedule A hereto and the appurtenances thereto which the party of the first part has or has power to convey or dispose of, as Chapter 11 trustee in bankruptcy of Maywood Capital Corp., et al, bankrupt.

TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, its heirs, successors and assigns forever.

IN WITNESS WHEREOF the party of the first part has hereunto set his hand and seal the day and year first above written.

_____
As and only as Chapter 11 trustee
in bankruptcy of the estate of 65-67 East 125th St.
Realty Corp., bankrupt, and not individually.

State of New York                    )

County of New York                 )

On the _____ day of _____ in the year 2007, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
*(signature and office of individual taking acknowledgment)*

<u>Schedule E</u>

<u>Leases and Contracts</u>

1.     All residential leases affecting the Property.

2.     All commercial or store leases affecting the Property.

3.     All union contracts affecting the Property.

4.     All service contracts affecting the Property.

Exhibit "C"

**MAYWOOD** - 77 East 125th Street, New York, New York

<u>CONTRACT OF SALE</u>

AGREEMENT made as of the 24th day of August, 2007, by and between JOHN S. PEREIRA, as trustee ("<u>Trustee</u>") of 77 East 125th St. Realty LLC, the debtor ("<u>Debtor</u>") in a Chapter 11 proceeding Case No. 05-10961 (RDD) (one of the cases procedurally consolidated in In re: Maywood Capital Corp., et al, Consolidated Case No. 05-10987 (RDD)) pending in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") and 125th Street Owner LLC ("<u>Purchaser</u>").

<u>W I T N E S S E T H</u>

1.    <u>Agreement to Purchase; Description of Property</u>

Trustee hereby agrees to sell to Purchaser, and Purchaser hereby agrees to purchase from Trustee, upon the terms and conditions hereinafter contained, all of the estate, right and title of Trustee in and to (i) those certain lots, pieces and parcels of land, situate, lying and being in the County of New York, State of New York, as more particularly described in Schedule A annexed hereto and the appurtenances thereto and more particularly described as 77 East 125th Street, New York, New York (collectively, the "<u>Land</u>"); (ii) all buildings and improvements located on the Land and the appurtenances thereto (collectively, the "<u>Improvements</u>"); and (iii) all fixtures located on and used in connection with the operation and maintenance of the Land and/or Improvements (collectively, the "<u>Personalty</u>"). The Land, Improvements and Personalty are hereinafter sometimes collectively called the "<u>Property</u>."

2.    <u>Consideration</u>

The consideration for the purchase of the Property is Two Million, Two Hundred Eighty Eight Thousand Dollars ($2,288,000.00) (the "<u>Purchase Price</u>"), without offset or reduction (except as expressly provided for herein), payable by Purchaser as follows:

(i)    Two Hundred Twenty Eight Thousand Eight Hundred Dollars ($228,800.00) (the "<u>Deposit</u>") upon execution and delivery of this Agreement, by check of Purchaser, subject to collection, payable to the order of Dreier, LLP, as Escrow Agent (the "<u>Escrow Agent</u>"). Upon Closing (as hereinafter defined) any interest earned on the Deposit shall belong to the Trustee and shall not be credited against the Purchase Price at Closing.

(ii)    Two Million, Fifty Nine Thousand Two Hundred Dollars ($2,059,200.00) upon Closing, by unendorsed certified check of Purchaser or official bank check drawn on a bank which is a member of the N.Y. Clearing House Association or otherwise satisfactory to the Trustee.

(iii)    In addition to the Purchase Price, Purchaser shall also pay the net apportionments and adjustments set forth in Paragraph 10 hereof.

(iv)    At Trustee's request (made by facsimile transmission if Trustee so elects), made no later than two business days prior to the Closing, Purchaser shall provide at the Closing

{00274543.DOC;2}

separate unendorsed certified or official bank checks, aggregating the amount to be paid to Trustee at Closing, made payable to those parties which Trustee so requests.

(v)    Trustee shall, to the extent required by the Bankruptcy Court or the Order (as hereinafter defined), pay at Closing or escrow a portion of the Purchase Price at Closing to pay any and all State and/or local transfer, conveyance or gains tax imposed upon closing of title to the Property.

3.    Bankruptcy Court Approval

(i)    The obligations of Trustee and Purchaser under this Agreement are expressly conditioned upon entry of an order (and its becoming final and unappealable or, in the event of an appeal, no stay pending appeal being granted) by the Bankruptcy Court approving or authorizing this Agreement or approving or authorizing the Trustee to execute, deliver and perform this Agreement and containing the terms described below (the "Order"). In the event the Bankruptcy Court fails to enter the Order within 120 days after the full execution hereof, Purchaser may terminate this Agreement by notice to the Trustee.

(ii)    The Order must be in a form reasonably acceptable to Trustee and Purchaser's title insurer and/or Primary Land Services LLC. The Order shall provide that all liens, claims and encumbrances affecting the Property, other than the Permitted Encumbrances (as hereinafter defined), shall be subject and subordinate in lien and priority to this Agreement, and shall, if valid, attach to the proceeds of sale (net of all Trustee commissions, attorney fees and all other expenses of the sale) payable pursuant to this Agreement (all such liens and encumbrances shall hereinafter be referred to as "Subordinate Liens and Encumbrances"). If this Agreement fails to close for any reason, then such liens and encumbrances shall affect the Property in accordance with their terms. After the agreement is fully executed and the deposit has been paid, the Trustee shall promptly file a motion in the Bankruptcy Court to obtain such Order.

(iii)    If Purchaser shall terminate this Agreement pursuant to this Paragraph 3, then this Agreement shall be null and void and the Escrow Agent shall promptly return the Deposit previously paid by Purchaser hereunder, together with all accrued interest thereon, if any, and upon such return of funds to Purchaser, there shall be no further liabilities or obligations upon either of the parties hereto except for those which by the express terms hereof survive such a termination.

4.    Time of the Essence

In the event that Purchaser fails to timely close the transaction contemplated by this Agreement in accordance with the terms of this Agreement, Trustee shall have the option of terminating this Agreement, time being of the essence with respect to Purchaser's obligations hereunder (subject to Paragraph 11). In the event of such termination, all payments made by Purchaser to Trustee prior to such termination (including, without limitation, the Deposit delivered to the Escrow Agent), together with accrued interest, if any, (the "Prior Payments") shall be retained by Trustee as liquidated damages (and not as a penalty) for all loss, damage and expense suffered by Trustee, including, without limitation, the loss of its bargain, and neither

party hereto shall have any further right or obligation to the other except for those which by the express terms hereof survive such a termination (but Purchaser's liability with respect to those obligations which survive such termination shall not be limited to the amount of the Prior Payments).

5.     <u>Release of Environmental Claims</u>

On and after Closing, Purchaser agrees to defend, indemnify, hold harmless, release and discharge Trustee from and against any and all liability relating to or arising from any environmental, dangerous, hazardous and/or toxic condition, substance, material and/or waste which currently exists or which may exist in the future on the Property (collectively, "<u>Environmental Claims</u>"), including, without limitation, any claims made pursuant to 42 U.S.C. §9601 <u>et seq.</u> and any claims made for contribution, indemnity and reimbursement. This Paragraph 5 shall survive the Closing.

6.     <u>The Closing</u>

(i)     The Property shall be transferred and conveyed by Trustee to Purchaser and Purchaser shall pay the balance of the Purchase Price (the "**Closing**") on the date (the "**Closing Date**") set by Trustee, which date shall be a day not less than forty (40) days following the entry of the Order, unless both the Trustee and Purchaser agree to an earlier date.

(ii)     The Closing shall be held in the office of Trustee's counsel, or at the office of Purchaser's lender or lender's counsel (if the same is required by the lender, and provided such office is located in the City of New York), or at such other mutually convenient location as may be agreed upon by the parties hereto.

7.     <u>Permitted Encumbrances; Other Matters</u>
      <u>Omitted by Purchaser's Title Insurer</u>

Subject to subparagraphs 7(i) and (ii) below, upon the Closing Trustee shall convey and Purchaser shall accept, the Property, without any warranties by Trustee, subject only to the matters set forth in Schedule B annexed hereto (collectively, the "<u>Permitted Encumbrances</u>").

(i)     Purchaser shall, if Purchaser desires a title report or title insurance on the Property: (a) promptly order a title report (the "<u>Title Report</u>") from (and at Closing, purchase title insurance through) Primary Land Services, LLC ("<u>Primary</u>") or from a title insurance company licensed to do business in the State of New York; (b) cause the Title Report to be issued to Purchaser promptly after the date of execution of this Agreement; (c) cause a copy of the Title Report and any amendments, supplements and endorsements to the Title Report to be issued to Trustee's attorney simultaneously with the issuance of the same to Purchaser; and (d) notify Trustee of any defect in or objection to title that is noted in the Title Report or any amendment, supplement or endorsement thereto, and is objected to by Purchaser, other than the Permitted Encumbrances, the Subordinate Liens and Encumbrances and/or a Schedule C Lien (as hereinafter defined), which notice must be given promptly after Purchaser receives the Title Report or amendment, supplement or endorsement thereto that first notes such defect or objection. Trustee shall be permitted reasonable adjournments of the Closing Date to remove

such defects or objections. Trustee shall use reasonable efforts to remove all such title exceptions but shall not be obligated to expend any funds with respect to the same and the Trustee's inability to remove such defects shall not be deemed a breach hereof. In the event that Trustee elects not to remove such defects or objections, then Trustee shall give Purchaser written notice of Trustee's election not to remove the same and Purchaser shall have the option, exercisable within 10 days after receipt of Trustee's notice to elect to either (x) purchase the Property subject to said defects or objections without any offset or deduction against the Purchase Price, or (y) terminate the agreement. Prior to the date of this Agreement, Trustee had ordered and given to Purchaser a copy of a title report and commitment on the Property from Primary, and will incur cancellation charges in the event title insurance on the Property is not subsequently purchased through Primary. Accordingly, in the event that Purchaser does not purchase title insurance on the Property through Primary, Purchaser shall reimburse Trustee at the Closing for any cancellation fees (up to the amount of $500) associated with Trustee's cancellation of its title insurance commitment from Primary.

(ii)    If the Property shall be subject at the time of the Closing to any liens or encumbrances, the removal or satisfaction of which prior to the Closing Trustee has expressly assumed responsibility for removing or satisfying hereunder, as shown on Schedule C hereto (each, a "Schedule C Lien") (other than the Subordinate Liens and Encumbrances which are deemed removed as a matter of law), then Purchaser shall (unless Trustee has offered and Purchaser agrees to accept an offset against the Purchase Price on account of any such items) provide at the Closing separate unendorsed certified or official bank checks, as requested, aggregating no more than the amount due Trustee at that date, to facilitate the satisfaction of any of such liens or encumbrances. In addition, Trustee shall have the right at the Closing to direct that Purchaser's title insurer to escrow a portion of the closing proceeds, as reasonably necessary, in order to enable such insurer to omit any liens or encumbrances which Purchaser is not obligated to take title subject to (other than the Subordinate Liens and Encumbrances which are hereby deemed removed as a matter of law) from Purchaser's title insurance policy, if any, and any lien or encumbrance so omitted shall be deemed removed and/or satisfied. In the event that Purchaser is not obtaining a title insurance policy or Purchaser's title company refuses to omit any liens or encumbrances which Purchaser is not obligated to take title subject to (other than the Subordinate Liens and Encumbrances which are hereby deemed removed as a matter of law), then any such liens and encumbrances shall be deemed removed and/or satisfied if Primary issues a title commitment omitting the same.

8.    Access to the Property

Purchaser shall be afforded access from time to time to the Property for the purposes of inspection and the taking of measurements. Purchaser shall be permitted to make searches of governmental records as it reasonably deems necessary with respect to the Property, and Trustee agrees to cooperate with Purchaser and to issue any consents or authorizations reasonably required therefor, provided that Trustee shall not be required to incur any expense in connection therewith. Purchaser's access to the Property shall be conditional upon the following:

(i)    Such access to the Property must be at reasonable times, with reasonable prior notice to and the prior consent of Trustee, and Trustee may require that his representative(s) accompany Purchaser during such access to the Property.

(ii)    Purchaser, upon Trustee's request, shall produce evidence, prior to Purchaser's entry onto the Property, of insurance policies in such amounts as may be reasonably determined by Trustee as adequate for liability and workers' compensation and other risks that may arise from such entry upon and activities on the Property, and shall name Trustee, and any other parties designated by Trustee, as additional insureds. Such insurance shall not be cancelable unless at least thirty (30) days' prior written notice has been given to Trustee. Prior to Purchaser's entry onto the Property, Purchaser shall also provide Trustee with such indemnities and assurances as are requested by Trustee in order to protect Trustee from liabilities and risks which may arise from such entry. Subject to Paragraph 9 below, Trustee shall be solely entitled to the proceeds of any property and casualty insurance, if any, carried by Trustee with respect to the Property. Purchaser shall be solely responsible for carrying, at any time during the term of this Agreement, any property and casualty insurance it desires with respect to the Property. Notwithstanding the above to the contrary, Purchaser shall not have to provide the above-described insurance in connection with any entry onto the Property by the Purchaser or its agents for non-invasive inspection purposes.

(iii)    Any entry upon and activities on the Property shall be entirely at Purchaser's own risk, and Purchaser shall indemnify, defend and hold harmless Trustee from and against all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, that Trustee may incur by reason of claims based upon or connected with any such entry upon and activities on the Property. Without limitation, Purchaser shall promptly repair any damage caused by the activities of Purchaser or its agents and shall restore the Property to its condition prior to Purchaser's entry thereon. This subparagraph 8(iii) shall survive the Closing or other termination of this Agreement.

9.    <u>As-Is; Complete Agreement</u>

(i)    Purchaser has inspected the Property and is thoroughly acquainted with its condition. Purchaser agrees to purchase the Property "as is" and in its present condition, subject to reasonable use, wear, tear, fire or casualty loss, vandalism and natural deterioration between now and the Closing (but subject further to subparagraphs 9(ii) and (iii) below). Purchaser shall take the Property subject to all violations of law (except for any monetary penalties that have already been assessed in connection with any such violations) or municipal ordinances, orders or requirements promulgated by any governmental department having authority as to lands, housing, buildings, fire, health, labor, environment, highways, use, land use and other similar conditions affecting the Property. Purchaser acknowledges that neither Trustee nor any agent or representative or purported agent or representative of Trustee has made, and Trustee is not liable for or bound in any manner by, any express or implied warranties, guaranties, statements, inducements, representations or information pertaining to the Property, or any part thereof, the physical condition, environmental, dangerous, hazardous and/or toxic condition, income, expenses or operation thereof, compliance with the rent control laws, the Rent Stabilization Law or the Rent Stabilization Code, or any laws or regulations associated therewith, the uses which can be made of the Property or any other matter or thing with respect thereto. Without limiting the foregoing, Purchaser acknowledges and agrees that Trustee is not liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations, real estate brokers' "set-ups" or any other information respecting the Property, furnished by Trustee or any

broker, employee, agent, consultant or other person representing or purportedly representing Trustee.

(ii)    In the event that the Property sustains fire or casualty loss between the date hereof and the Closing, then Trustee shall have the right to terminate this Agreement by giving Purchaser notice of its election to so terminate within thirty (30) days after Trustee becomes aware of the occurrence of such fire or casualty loss, provided, however, that in the event Trustee has given notice of its election to terminate in accordance with this sentence, Purchaser shall have the option, on 10 days written notice, to elect to close on the property without any offset or deduction to the purchase price. Purchaser shall be entitled to receive the proceeds of any applicable insurance and Purchaser agrees to cooperate with Trustee in settling any such claim.

(iii)    Notwithstanding subparagraph 9(ii) above to the contrary, in the event that the Property sustains fire or casualty loss between the date hereof and the Closing in excess of $114,400.00 (a "Loss") (as determined by the reasonable estimate of Trustee's consultant made within 30 days after any such Loss) and Trustee (a) does not elect to repair the Property to substantially the same condition as it existed in immediately prior to such Loss (which election shall be made in a notice to Purchaser within 15 days after Trustee's consultant delivers its written estimate to Trustee) or (b) Trustee elects to repair the Property to substantially the same condition as it existed in immediately prior to such Loss (and Purchaser fails to deliver Purchaser's Waiver (as hereinafter defined)) but Trustee does not substantially complete said repairs within 6 months after said Loss, then Purchaser shall have the right to terminate this Agreement by giving written notice to Trustee of its election to so terminate within 15 days after (x) Trustee gives its notice that it elects not to repair the Loss or (y) the expiration of the 6 month period described above during which Trustee failed to substantially complete the repairs, as the case may be (and upon such termination the Deposit, along with any accrued interest, shall be promptly returned to Purchaser).

In the event that Trustee (A) so elects not to repair said Loss and Purchaser fails to exercise its termination right in the time provided for above (time being of the essence) or (B) so elects to repair said Loss and Purchaser, within 5 days after receipt of Trustee's election to repair said Loss (time being of the essence), delivers to Trustee a written waiver ("Purchaser's Waiver") of its termination rights under this subparagraph 9(iii) (in which case Trustee shall not make any repairs), then subparagraph 9(ii) shall control with respect to such Loss. However, in the event that Trustee so elects to repair said Loss (and Purchaser fails to deliver Purchaser's Waiver) but Trustee fails to substantially complete the repairs within the required 6 month period and Purchaser fails to exercise its termination right in the time provided for above (time being of the essence), then the Closing shall occur on a date not less than 10 business days after the repairs are substantially complete.

10.    Apportionments and Offsets to the Purchase Price.

(i)    The following apportionments and adjustments shall be made at the Closing, as of 11:59 P.M. of the day immediately preceding the Closing Date. All such apportionments and adjustments, if in favor of Purchaser, shall be offset against the Purchase Price, provided that if such aggregate offsets exceed the Purchase Price, Purchaser shall not in

any event be entitled to any credits or refunds in addition to Purchaser's offset against the Purchase Price:

(a)    Real estate taxes, assessments and water, sewer and vault charges, if any (collectively, "Real Estate Taxes") on the basis of the fiscal period for which assessed. Real Estate Taxes paid (or to be paid out of the Closing proceeds) by Trustee and pertaining in whole or in part to the period following the Closing shall be Purchaser's obligation and an apportionment shall be made therefor. If the Closing shall occur before a new tax rate is fixed, then the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. If there is a water meter on the Property, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing, which obligation shall survive the Closing. In the event that any assessment is payable in installments, then all installments payable on or after Closing shall be Purchaser's responsibility.

(b)    Any fuel then existing on the Property based upon the greater of (1) its then fair market value or (2) the original cost of the same.

(c)    Any rents received under any leases affecting the Property to the extent such rents relate to leases which Purchaser is required to assume pursuant to this Agreement. Any rents received by Purchaser subsequent to Closing shall be applied first to current rent and then to the time period prior to the Closing and shall be promptly forwarded to Trustee upon Purchaser's receipt of the same, but Purchaser shall only be obligated to forward to Trustee one month's worth of arrearages for each tenant plus any pro-rata amount due Trustee for rents collected which relate to the month in which the Closing occurred. This subparagraph 10(i)(c) shall survive the Closing.

(d)    In the event that Purchaser fails to purchase title insurance from Primary or orders the Title Report from a title insurance company other than through Primary, then Purchaser shall pay Trustee the applicable amount(s) specified in subparagraph 7(i).

(e)    Trustee agrees to deliver to Purchaser at Closing any security deposit which Trustee has in his possession relating to any lease which is being assumed by Purchaser pursuant to this Agreement and which, as reflected in Trustee's records, has not prior to Closing been applied to a default under said lease or otherwise lawfully applied under said lease or returned to the tenant thereunder. Purchaser hereby agrees to defend, indemnify, hold harmless, release and discharge Trustee from and against any claims by tenants or others with respect to security deposits, including claims made for contribution, indemnity and reimbursement; this sentence shall survive the Closing.

(f)    Any payments made under the contracts shown on Schedule E, which Purchaser is required to assume pursuant to this Agreement, including, without limitation, payments of union benefits and wages, if any.

(g)    Any payments of benefits and wages of any non-union superintendent of the Property or any similar employee.

(ii)    Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at the Closing shall be promptly corrected, which obligations shall survive the Closing but, with respect to any sum owed Purchaser, the same shall not survive the conclusion of the administration of the Debtor's estate (and shall survive prior to such conclusion only to the extent monies are then currently available to pay the same).

(iii)    Trustee shall not be obligated to accept more than $2,000.00 in the aggregate at Closing in cash or uncertified checks.  Any amounts owed in excess of $2,000.00 must be paid in accordance with subparagraph 2(ii).

(iv)    Except as otherwise herein provided, the customs with respect to title closings recommended by the Real Estate Board of New York shall apply to the apportionments at the Closing.

11.    Conditions of Closing

The obligation of Trustee to close title in accordance with this Agreement is expressly conditioned upon Purchaser having made all required payments and having complied with all of its non-monetary obligations under this Agreement, provided that with respect to non-monetary obligations, Purchaser shall be given notice of any failure to comply with the same and shall be given the lesser of (i) fifteen (15) days' notice or (ii) the amount of time left to Closing (as previously set by Trustee), to cure its failure to comply with such non-monetary obligations. The obligation of Purchaser to close title in accordance with this Agreement is expressly conditioned upon the Bankruptcy Court approving the Contracts of Sale between the Trustee and Purchaser herein for the properties located at 65-67 East 125th Street, New York, New York and 79 East 125th Street, New York, New York and Trustee's being prepared to close under such additional Contracts of Sale.

12.    Closing Documents

(i)    Trustee shall deliver to Purchaser at the Closing:

(a)    A deed, substantially in accordance with the form annexed hereto as Schedule D or such other form of deed as the Order shall direct (the "Deed").

(b)    Actual possession of the Property, subject to any tenancies or any other rights to use or occupy any portion of the Property as set forth on Schedule B as Permitted Encumbrances.

(c)    All original leases and any other documents related thereto, rent records, registration forms and rent histories for all tenants to the extent they are in Trustee's possession (the "Lease Documents") or a letter directing Trustee's managing agent to deliver the Lease Documents to Purchaser upon presentation of said letter to Trustee's managing agent.

(d)    An appropriate non-foreign affidavit pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended, sufficient to provide an exemption under Subdivision (b) thereof.

(e)      An assignment of rent arrears in accordance with Paragraph 29.

(ii)      Purchaser and Trustee shall execute, acknowledge and deliver to each other such other instruments and documents, if any, to which either party may be entitled pursuant to any of the other provisions of this Agreement or which are required by law.

(iii)      Purchaser agrees to pay at or subsequent to the Closing, all sales taxes which may become due and payable in connection with the sale hereunder of any Personalty, and indemnifies, defends and holds harmless Trustee, from all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, for such sales taxes, whether asserted before or after the Closing. This subparagraph shall survive the Closing.

(iv)      Purchaser shall assume and execute an assumption agreement with respect to all residential leases affecting the Property. Purchaser shall also assume and execute an assignment and assumption agreement with respect to all non-residential leases and contracts shown on Schedule E hereto for which Trustee receives Bankruptcy Court approval to assume and assign to Purchaser.

(v)      Purchaser shall execute the appropriate documentation indicating that Purchaser (or Purchaser's lender) is the designated settlement/reporting agent for the purposes of the preparation and filing of the Form 1099-S (if such form is required under the Internal Revenue Code, as amended).

13.      Condemnation

If, at any time prior to the Closing, the Trustee receives notice that all or a material part of the Property shall be taken in the exercise of the power of eminent domain by any governmental authority (a "Taking"), then Purchaser shall have the option to terminate this Agreement by giving notice to the Trustee within 20 days after the Trustee provides a copy of such Notice to the Purchaser. In the event that Purchaser does not elect to terminate this Agreement, then in such event the Trustee shall not without the consent of Purchaser enter into any agreement concerning any condemnation award to which Trustee may be entitled as a consequence of such taking, and shall assign to Purchaser at the Closing all of Trustee's right, title and interest to any such award.

14.      Fees and Disbursements of Counsel, etc.

Each of the parties hereto shall bear and pay the fees and disbursements of its own counsel, accountants and other advisors in connection with the negotiation, preparation and carrying out of this Agreement and the Closing. Purchaser shall bear and pay the cost of recording the Deed and other documents to be delivered hereunder. Purchaser shall not be responsible for the payment of any New York City or New York State transfer taxes. This Paragraph 14 shall survive the Closing.

15.      Notices

As used in this Agreement, "notice" or "Notice" shall mean any notice, demand, request, consent, approval or other communication required or permitted to be given hereunder

or which is given with respect to this Agreement, and, except as otherwise provided in this Agreement, all notices shall be in writing and shall be sent by (i) registered or certified mail, return receipt requested, postage pre-paid, (ii) overnight express mail, (iii) Federal Express or (iv) personal delivery (provided written receipt therefor is obtained) addressed to the party to be notified at the addresses and the addressees set forth below or to such other addresses and/or addressees as such party shall have specified most recently by like notice.

Any notice to be given to Trustee or to Escrow Agent shall be sent to:

> John S. Pereira, Esq.
> 150 East 58th Street, 14th Floor
> New York, New York 10155

With a copy to Trustee's attorneys:

> Dreier LLP.
> 499 Park Avenue
> New York, New York 10022
> Attention: John P. Campo, Esq.

Any notice to be given to Purchaser shall be sent to:

> 125th Street Owner LLC
> c/o Shapiro & Shapiro, LLP
> 1300 Flatbush Avenue
> Brooklyn, New York 11201
> *Telephone: 718-434-8800*
> *Fax: 718-434-8700*
> *Email: sshapiro@shapirolawyers.net*

With a copy to Purchaser's attorneys:

> Abe Rappaport, Esq.
> 195 Route 46 West
> Suite 11
> Totowa, New Jersey 07512
>
> Telephone: (973) 785-1799
>
> Fax No. : (973) 785-4777

Notice given as provided above shall be deemed duly given (i) 3 days after sending, if sent by registered or certified mail, (ii) 1 business day after sending, if sent by overnight express mail or by Federal Express, or (iii) on the date of delivery, if delivered by personal delivery, as the case may be. Notices may be given by and to attorneys for the respective parties.

{00274543.DOC;2}                                    10

16. <u>Trustee's Exculpation; Limitation of Purchaser's Remedies</u>

(i)     Trustee is entering into this Agreement strictly in his capacity as trustee of Debtor's Chapter 11 proceeding in the Bankruptcy Court. Under no circumstances shall Trustee be liable in his personal capacity for payment or performance of any of Trustee's obligations hereunder.

(ii)    If Trustee (a) is unable to transfer title to Purchaser in accordance with this Agreement, (b) terminates this Agreement pursuant to the terms of paragraph 13, or (c) the Bankruptcy Court denies authorization for any reason whatsoever, and decrees that the Trustee is unable to or may not sell the Property. Trustee's sole liability shall be to refund all Deposit money paid by Purchaser on account of this Agreement. Upon such refund this Agreement shall be considered cancelled, and neither Trustee nor Purchaser shall have any further rights or obligations hereunder, except obligations under this Agreement which expressly survive the Closing or other termination of this Agreement.

(iii)   Purchaser acknowledges that, prior to the Closing, Trustee shall have sole and complete discretion with respect to all matters relating to management and operation of the Property, including, without limitation, any election, in Trustee's sole discretion, not to manage, operate, insure, secure or otherwise safeguard all or any portion of the Property. Notwithstanding the above, the Trustee shall not after the date hereof, lease, amend or renew any lease for any part of the Property, enter into any service agreement (unless such service agreement is terminated at or prior to the Closing Date), or otherwise encumber the Property.

17. <u>Broker</u>

Purchaser represents and warrants to Trustee, that Purchaser has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties, the negotiation or execution of this Agreement or the closing of the transactions contemplated herein. Purchaser hereby indemnifies, defends and holds harmless Trustee from and against any and all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, resulting from the Purchaser's breach of its representation, warranty, covenant and agreement under this Paragraph 17. This Paragraph 17 shall survive the Closing or other termination of this Agreement.

18. <u>Escrow Agent</u>

(i)     The Deposit shall be held in escrow by Escrow Agent in an interest-bearing account until the first to occur of: (a) the Closing, (b) seven (7) business days after Escrow Agent has received Notice given by Purchaser to Escrow Agent, stating that this Agreement has been terminated by Purchaser in accordance with its terms, upon which date the Deposit and all interest earned thereon, if any, shall be paid to Purchaser, provided that within such seven (7) day period Escrow Agent does not receive Notice to the contrary from Trustee, (c) seven (7) business days after Escrow Agent shall have given Notice to Purchaser that Escrow Agent has received Notice given by Trustee stating that this Agreement has been terminated by Trustee, upon which date the Deposit and all interest earned thereon, if any, shall be paid to Trustee, provided that within such seven-day period Escrow Agent does not receive Notice to the

contrary from Purchaser, or (d) joint Notice, executed by Trustee and Purchaser, is received by Escrow Agent, in which event Escrow Agent shall release the Deposit and all interest earned thereon, if any, in accordance with the instructions therein contained. In the event of a dispute arising with respect to the rights of Trustee or Purchaser to receive the Deposit and/or any interest earned thereon, Escrow Agent shall have the right to pay the sum held in escrow into court and commence an action in interpleader in order to obtain a judicial determination as to the party legally entitled to receive the funds.

(ii)      Escrow Agent shall not be liable for any error in judgment or for any act done or omitted by it in good faith, or for any mistake of fact or law and is released and exculpated from all liability hereunder, except for willful misconduct.

(iii)     Escrow Agent shall not be required to take notice of any default by Trustee or Purchaser or to take any action with respect thereto, except as provided in this Paragraph 18.

(iv)     Escrow Agent shall incur no liability in acting upon any signature, notice, request, waiver, consent, receipt, or other paper or document believed by Escrow Agent to be genuine and Escrow Agent may assume that any person purporting to give Escrow Agent any notice or advice in accordance with the provisions hereof has been duly authorized to do so, and Trustee and Purchaser each hereby jointly and severally indemnifies, defends, holds harmless Escrow Agent from and against any and all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, Escrow Agent may suffer or incur as Escrow Agent hereunder unless caused by Escrow Agent's willful refusal or willful failure to act pursuant to the terms hereof.

(v)      Escrow Agent shall not be under any obligation to take any legal action in connection with this Agreement or towards its enforcement or to appear in, prosecute or defend any action or legal proceeding which, in the opinion of Escrow Agent, would or might involve Escrow Agent in any cost, expense, loss or liability unless, and as often as required by Escrow Agent, Escrow Agent shall be furnished with security and indemnity satisfactory to Escrow Agent against all such costs, expenses, losses or liability.

(vi)     Escrow Agent shall be entitled to consult with other counsel in connection with its duties hereunder. Purchaser and Trustee each jointly and severally agrees to reimburse Escrow Agent for its costs and expenses, including, without limitation, attorneys' fees (either paid to retained attorneys or representing the fair value of legal services rendered by Escrow Agent to itself) incurred as a result of any dispute or litigation concerning this escrow arrangement.

This Paragraph 18 shall survive the Closing or other termination of this Agreement.

19.     This paragraph is intentionally omitted.

20.     Pending Litigation

(i)      Purchaser acknowledges that the Trustee is currently in litigation concerning the title to the Property. The parties agree that the obligations under this agreement

are conditioned upon the entry of an Order authorizing the Trustee to sell the Property to Purchaser free and clear of all liens, claims and encumbrances.

21.  <u>Counterparts; Captions</u>

This Agreement and all instruments and documents to be delivered hereunder may be executed in counterparts, each of which shall be deemed an original. The captions in this Agreement are for convenience and reference only and shall not be utilized in the interpretation of this Agreement.

22.  <u>Entire Agreement</u>

This Agreement (including all schedules annexed hereto) contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto. This Agreement may not be modified, changed or supplemented, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto. This Paragraph 22 shall survive the Closing or other termination of this Agreement.

23.  <u>Waivers; Extensions</u>

No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts. Each of the parties hereby authorizes its attorneys to agree on its behalf in writing to any changes in dates and time periods provided for in this Agreement.

24.  <u>Assignment; Successors and Assigns</u>

Purchaser's interest under this Agreement may only be assigned with Trustee's prior written consent, which consent may not be unreasonably withheld. In the event that Trustee consents to an assignment, the individual or entity executing this Agreement shall remain liable for all of Purchaser's obligations hereunder, including, without limitation, obligations which survive the Closing. Such assignment shall not become effective until (i) notice of assignment, including identity of the assignee and an address for notices to the assignee, has been provided to Trustee, (ii) the assignee has delivered to Trustee a signed assumption of the terms of this Agreement and any related agreements entered into by Purchaser and (iii) Trustee delivers to Purchaser its prior written consent. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of Purchaser, Trustee, and their respective successors and assigns.

25.  <u>Pronouns</u>

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the parties may require.

{00274543.DOC;2}                                    13

26.   No Recording

Purchaser shall not record this Agreement or a memorandum thereof against the title to the Property.

27.   Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of New York and applicable provisions of the Bankruptcy Code.

28.   Purchaser's Warranty of Authority.

Purchaser hereby represents and warrants that (i) it has full right, power and authority to execute this Agreement, (ii) such execution has been duly authorized and (iii) that it is bound hereby.

29.   Merger

The acceptance of the Deed by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Trustee's part to be performed hereunder, except for those which this Agreement specifically provides shall survive the Closing.

30.   Rent Arrears

Any rent or rent arrears due Trustee shall be collected by the Purchaser and shall be promptly turned over to Trustee as and when collected, in accordance with subparagraph 10(i)(c). It is understood and agreed that any rents collected after the Closing shall first be applied to current rent and then to any rent arrears. Upon written request from Trustee from time to time, to the then owner, an accounting of the rents collected (or remaining uncollected) shall be given to Trustee. Trustee reserves the right between contract and Closing to institute any proceedings to recover any part of the premises in the event of any default by the various tenants of any of the terms of their tenancies. Trustee shall execute at Closing an assignment of rent arrears to Purchaser in order for Purchaser to collect said arrears (but not with respect to any plenary rent arrear actions instituted prior to Closing which Trustee shall be entitled to continue to maintain), with the understanding that such arrears shall be paid to Trustee in accordance with this provision. This Paragraph 30 shall survive the Closing.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

TRUSTEE:

By: _____

JOHN S. PEREIRA, as Chapter 11
Trustee of 77 East 125th St. Realty Corp.


PURCHASER:
125th Street Owner LLC

By: _____

Name: Saadia Shapiro
Title: Manager
Tax Id Number:

*NOTE: If the drawer's name on the Deposit check is other than the named Purchaser, then the following must be completed and signed by the drawer of the check:*

The undersigned hereby acknowledges that the delivery of the Deposit and the payment of the same represents a material benefit to the undersigned, and if the undersigned is a partnership, corporation or limited liability, was authorized by all necessary partnership, corporate or limited liability company action.

Drawer's Name (if entity):

By: _____
      Name:
      Title:

The undersigned hereby acknowledges receipt of Purchaser's $ *228,800* ~~check~~ wire transfer payable to the order of Escrow Agent on account of the Deposit and agrees to hold same pursuant to the provisions of Paragraph 18 of the foregoing Agreement.

Escrow Agent:

DREIER LLP

By: _____
      A Partner

PURCHASER'S ACKNOWLEDGMENT

IN NEW YORK STATE

State of New York          )

County of  Kings           )

On the _13_ day of _August_ in the year 2007, before me, the undersigned, personally appeared _Scadin  Shupiro_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

**ARTHUR GUTMAN**
**Notary Public, State of New York**
**No# 02GU6164097**
**Qualified in Kings County**
**Commission Expires April 9, 2011**

_____
*(signature and office of individual taking acknowledgment)*

OUTSIDE NEW YORK STATE

State of            )

On the ____ day of _____ in the year 2007, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
*(signature and office of individual taking acknowledgment)*

Schedule A

Legal Description

**Schedule A Description**

Title Number EA-9860-NY/2003

Page   1

## PARCEL A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City of New York, in the County and State of New York, bounded and described as follow:

BEGINNING at a point on the northerly side of 125th Street, distant 118 feet westerly from the corner formed by the intersection of the northerly side of 125th Street with the westerly side of Park (formerly Fourth) Avenue;

RUNNING THENCE northerly parallel with Park Avenue, 99 feet 11 inches to the center line of the block;

THENCE westerly along the center line of the block, 22 feet;

THENCE southerly again parallel with Park Avenue, 99 feet 11 inches to the northerly side of 125th Street;

THENCE easterly along the said northerly side of 125th Street, 22 feet to the point or place of BEGINNING.

## PARCEL B

Schedule B

Permitted Encumbrances

1.    All present and future zoning, building and environmental laws, ordinances, codes, restrictions and regulations of all other governmental (including, without limitation, local, state and federal) authorities having jurisdiction over the Property, all zoning variances and special exceptions, if any, and all present or future violations thereof, if any.

2.    Any state of facts a current land title survey of the Land, Improvements and/or Personalty would disclose provided that the same does not render title unmarketable.

3.    All presently existing rights, easements and agreements, whether or not of record, over, across, under or affecting the Land, Improvements and/or Personalty provided that the same does not render title unmarketable.

4.    The rights of any tenants or occupants in possession of or having rights in and to the Property either now or at Closing, provided the Trustee does not consent to or enter into any lease with respect to the property without the Purchaser's prior consent.

5.    All violations of building, fire, sanitary, environmental, housing and similar laws, ordinances, rules, regulations and orders of governmental authorities having jurisdiction over the Property, whether or not noted or issued at the date hereof or at the date of Closing, and including, without limitation, sidewalk violations (except that the Trustee shall pay all monetary fines already assessed in connection with such violations).

6.    Real Estate Taxes shall be apportioned in accordance with this Agreement and Purchaser shall take subject to all of the same which are not yet due and payable.

7.    Standard printed exceptions contained in the title report with respect to the Property issued by Primary and/or contained in the Title Report.

8.    Possible lack of or revocable nature of the right, if any, to maintain or use any space, facilities or appurtenances outside the building lines, whether on, over or under the ground, including, without limitation, all vaults, signs, loading platforms, intake valves or pipes and chutes, if any.

9.    Consents by Trustee, Debtor or any former owner of the Property for the erection of any structure or structures on, under or above any streets on which the Property may abut.

10.   Any unpaid vault taxes unless the same are a lien on the Property at the time of Closing.

11.   Any mortgage or encumbrance which, by the terms of this Agreement, Purchaser has expressly agreed to assume or take subject to.

{00274543.DOC;2}                              18

Schedule C

Non-Monetary Encumbrances Required to be Removed by Trustee

NONE

Schedule D

Trustee's Deed of Real Estate

This Indenture made the _____ day of __, 2007, between John S. Pereira, as Chapter 11 trustee in bankruptcy of the estate of 77 East 125th St. Realty Corp., bankrupt, party of the first part, having an address at 150 East 58th Street, New York, New York, and _____, party of the second part, having an address at _____;

WITNESSETH the party of the first part by virtue of the power and authority given in and by an order of the United States Bankruptcy Court for the Southern District of _____, dated the _____ day of _____, 2007, and in consideration of Two Million, Six Hundred Thousand Dollars ($2,288,000.00), lawful money of the United States paid by the party of the second part, does hereby grant, convey and release unto the party of the second part, his/its heirs, successors and assigns forever, all the estate which _____ had, at the time of the filing of the petition in bankruptcy by him, in said United States Bankruptcy Court for the Southern District of New York, in that certain property set forth on Schedule A hereto and the appurtenances thereto which the party of the first part has or has power to convey or dispose of, as Chapter 11 trustee in bankruptcy of Maywood Capital Corp., et al, bankrupt.

TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, its heirs, successors and assigns forever.

IN WITNESS WHEREOF the party of the first part has hereunto set his hand and seal the day and year first above written.

_____
As and only as Chapter 11 trustee
in bankruptcy of the estate of 77 East 125th St.
Realty Corp., bankrupt, and not individually.

State of New York          )

County of New York         )

On the _____ day of _____ in the year 2007, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
*(signature and office of individual taking acknowledgment)*

<u>Schedule B</u>

<u>Leases and Contracts</u>

1.    All residential leases affecting the Property.

2.    All commercial or store leases affecting the Property.

3.    All union contracts affecting the Property.

4.    All service contracts affecting the Property.

Exhibit "D"

**MAYWOOD** - 79 East 125th Street, New York, New York

<u>CONTRACT OF SALE</u>

AGREEMENT made as of the 24th day of August, 2007, by and between JOHN S. PEREIRA, as trustee ("<u>Trustee</u>") of 79 East 125th St. Realty LLC, the debtor ("<u>Debtor</u>") in a Chapter 11 proceeding Case No. 05-10961 (RDD) (one of the cases procedurally consolidated in In re: Maywood Capital Corp., et al, Consolidated Case No. 05-10987 (RDD)) pending in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") and 125th Street Owner LLC ("<u>Purchaser</u>").

<u>W I T N E S S E T H</u>

1.     <u>Agreement to Purchase; Description of Property</u>

Trustee hereby agrees to sell to Purchaser, and Purchaser hereby agrees to purchase from Trustee, upon the terms and conditions hereinafter contained, all of the estate, right and title of Trustee in and to (i) those certain lots, pieces and parcels of land, situate, lying and being in the County of New York, State of New York, as more particularly described in Schedule A annexed hereto and the appurtenances thereto and more particularly described as 79 East 125th Street, New York, New York (collectively, the "<u>Land</u>"); (ii) all buildings and improvements located on the Land and the appurtenances thereto (collectively, the "<u>Improvements</u>"); and (iii) all fixtures located on and used in connection with the operation and maintenance of the Land and/or Improvements (collectively, the "<u>Personalty</u>"). The Land, Improvements and Personalty are hereinafter sometimes collectively called the "<u>Property</u>."

2.     <u>Consideration</u>

The consideration for the purchase of the Property is Two Million, Nine Hundred Twelve Thousand Dollars ($2,912,000.00) (the "<u>**Purchase Price**</u>"), without offset or reduction (except as expressly provided for herein), payable by Purchaser as follows:

(i)     Two Hundred Ninety One Thousand Two Hundred Dollars ($291,200.00) (the "<u>**Deposit**</u>") upon execution and delivery of this Agreement, by check of Purchaser, subject to collection, payable to the order of Dreier, LLP, as Escrow Agent (the "<u>**Escrow Agent**</u>"). Upon Closing (as hereinafter defined) any interest earned on the Deposit shall belong to the Trustee and shall not be credited against the Purchase Price at Closing.

(ii)     Two Million, Six Hundred Twenty Thousand Eight Hundred Dollars ($2,620,800.00) upon Closing, by unendorsed certified check of Purchaser or official bank check drawn on a bank which is a member of the N.Y. Clearing House Association or otherwise satisfactory to the Trustee.

(iii)     In addition to the Purchase Price, Purchaser shall also pay the net apportionments and adjustments set forth in Paragraph 10 hereof.

(iv)     At Trustee's request (made by facsimile transmission if Trustee so elects), made no later than two business days prior to the Closing, Purchaser shall provide at the Closing

separate unendorsed certified or official bank checks, aggregating the amount to be paid to Trustee at Closing, made payable to those parties which Trustee so requests.

(v)     Trustee shall, to the extent required by the Bankruptcy Court or the Order (as hereinafter defined), pay at Closing or escrow a portion of the Purchase Price at Closing to pay any and all State and/or local transfer, conveyance or gains tax imposed upon closing of title to the Property.

3.     Bankruptcy Court Approval

(i)     The obligations of Trustee and Purchaser under this Agreement are expressly conditioned upon entry of an order (and its becoming final and unappealable or, in the event of an appeal, no stay pending appeal being granted) by the Bankruptcy Court approving or authorizing this Agreement or approving or authorizing the Trustee to execute, deliver and perform this Agreement and containing the terms described below (the "Order").  In the event the Bankruptcy Court fails to enter the Order within 120 days after the full execution hereof, Purchaser may terminate this Agreement by notice to the Trustee.

(ii)     The Order must be in a form reasonably acceptable to Trustee and Purchaser's title insurer and/or Primary Land Services LLC.  The Order shall provide that all liens, claims and encumbrances affecting the Property, other than the Permitted Encumbrances (as hereinafter defined), shall be subject and subordinate in lien and priority to this Agreement, and shall, if valid, attach to the proceeds of sale (net of all Trustee commissions, attorney fees and all other expenses of the sale) payable pursuant to this Agreement (all such liens and encumbrances shall hereinafter be referred to as "Subordinate Liens and Encumbrances").  If this Agreement fails to close for any reason, then such liens and encumbrances shall affect the Property in accordance with their terms.  After the agreement is fully executed and the deposit has been paid, the Trustee shall promptly file a motion in the Bankruptcy Court to obtain such Order.

(iii)     If Purchaser shall terminate this Agreement pursuant to this Paragraph 3, then this Agreement shall be null and void and the Escrow Agent shall promptly return the Deposit previously paid by Purchaser hereunder, together with all accrued interest thereon, if any, and upon such return of funds to Purchaser, there shall be no further liabilities or obligations upon either of the parties hereto except for those which by the express terms hereof survive such a termination.

4.     Time of the Essence

In the event that Purchaser fails to timely close the transaction contemplated by this Agreement in accordance with the terms of this Agreement, Trustee shall have the option of terminating this Agreement, time being of the essence with respect to Purchaser's obligations hereunder (subject to Paragraph 11).  In the event of such termination, all payments made by Purchaser to Trustee prior to such termination (including, without limitation, the Deposit delivered to the Escrow Agent), together with accrued interest, if any, (the "Prior Payments") shall be retained by Trustee as liquidated damages (and not as a penalty) for all loss, damage and expense suffered by Trustee, including, without limitation, the loss of its bargain, and neither

party hereto shall have any further right or obligation to the other except for those which by the express terms hereof survive such a termination (but Purchaser's liability with respect to those obligations which survive such termination shall not be limited to the amount of the Prior Payments).

    5.    <u>Release of Environmental Claims</u>

On and after Closing, Purchaser agrees to defend, indemnify, hold harmless, release and discharge Trustee from and against any and all liability relating to or arising from any environmental, dangerous, hazardous and/or toxic condition, substance, material and/or waste which currently exists or which may exist in the future on the Property (collectively, "<u>Environmental Claims</u>"), including, without limitation, any claims made pursuant to 42 U.S.C. §9601 <u>et seq</u>. and any claims made for contribution, indemnity and reimbursement. This Paragraph 5 shall survive the Closing.

    6.    <u>The Closing</u>

(i)    The Property shall be transferred and conveyed by Trustee to Purchaser and Purchaser shall pay the balance of the Purchase Price (the "**Closing**") on the date (the "**Closing Date**") set by Trustee, which date shall be a day not less than forty (40) days following the entry of the Order, unless both the Trustee and Purchaser agree to an earlier date.

(ii)    The Closing shall be held in the office of Trustee's counsel, or at the office of Purchaser's lender or lender's counsel (if the same is required by the lender, and provided such office is located in the City of New York), or at such other mutually convenient location as may be agreed upon by the parties hereto.

    7.    Permitted Encumbrances; Other Matters
            Omitted by Purchaser's Title Insurer

Subject to subparagraphs 7(i) and (ii) below, upon the Closing Trustee shall convey and Purchaser shall accept, the Property, without any warranties by Trustee, subject only to the matters set forth in Schedule B annexed hereto (collectively, the "<u>Permitted Encumbrances</u>").

(i)    Purchaser shall, if Purchaser desires a title report or title insurance on the Property: (a) promptly order a title report (the "<u>Title Report</u>") from (and at Closing, purchase title insurance through) Primary Land Services, LLC ("<u>Primary</u>") or from a title insurance company licensed to do business in the State of New York; (b) cause the Title Report to be issued to Purchaser promptly after the date of execution of this Agreement; (c) cause a copy of the Title Report and any amendments, supplements and endorsements to the Title Report to be issued to Trustee's attorney simultaneously with the issuance of the same to Purchaser; and (d) notify Trustee of any defect in or objection to title that is noted in the Title Report or any amendment, supplement or endorsement thereto, and is objected to by Purchaser, other than the Permitted Encumbrances, the Subordinate Liens and Encumbrances and/or a Schedule C Lien (as hereinafter defined), which notice must be given promptly after Purchaser receives the Title Report or amendment, supplement or endorsement thereto that first notes such defect or objection. Trustee shall be permitted reasonable adjournments of the Closing Date to remove

such defects or objections. Trustee shall use reasonable efforts to remove all such title exceptions but shall not be obligated to expend any funds with respect to the same and the Trustee's inability to remove such defects shall not be deemed a breach hereof. In the event that Trustee elects not to remove such defects or objections, then Trustee shall give Purchaser written notice of Trustee's election not to remove the same and Purchaser shall have the option, exercisable within 10 days after receipt of Trustee's notice to elect to either (x) purchase the Property subject to said defects or objections without any offset or deduction against the Purchase Price, or (y) terminate the agreement. Prior to the date of this Agreement, Trustee had ordered and given to Purchaser a copy of a title report and commitment on the Property from Primary, and will incur cancellation charges in the event title insurance on the Property is not subsequently purchased through Primary. Accordingly, in the event that Purchaser does not purchase title insurance on the Property through Primary, Purchaser shall reimburse Trustee at the Closing for any cancellation fees (up to the amount of $500) associated with Trustee's cancellation of its title insurance commitment from Primary.

(ii)     If the Property shall be subject at the time of the Closing to any liens or encumbrances, the removal or satisfaction of which prior to the Closing Trustee has expressly assumed responsibility for removing or satisfying hereunder, as shown on Schedule C hereto (each, a "Schedule C Lien") (other than the Subordinate Liens and Encumbrances which are deemed removed as a matter of law), then Purchaser shall (unless Trustee has offered and Purchaser agrees to accept an offset against the Purchase Price on account of any such items) provide at the Closing separate unendorsed certified or official bank checks, as requested, aggregating no more than the amount due Trustee at that date, to facilitate the satisfaction of any of such liens or encumbrances. In addition, Trustee shall have the right at the Closing to direct that Purchaser's title insurer to escrow a portion of the closing proceeds, as reasonably necessary, in order to enable such insurer to omit any liens or encumbrances which Purchaser is not obligated to take title subject to (other than the Subordinate Liens and Encumbrances which are hereby deemed removed as a matter of law) from Purchaser's title insurance policy, if any, and any lien or encumbrance so omitted shall be deemed removed and/or satisfied. In the event that Purchaser is not obtaining a title insurance policy or Purchaser's title company refuses to omit any liens or encumbrances which Purchaser is not obligated to take title subject to (other than the Subordinate Liens and Encumbrances which are hereby deemed removed as a matter of law), then any such liens and encumbrances shall be deemed removed and/or satisfied if Primary issues a title commitment omitting the same.

8.     Access to the Property

Purchaser shall be afforded access from time to time to the Property for the purposes of inspection and the taking of measurements. Purchaser shall be permitted to make searches of governmental records as it reasonably deems necessary with respect to the Property, and Trustee agrees to cooperate with Purchaser and to issue any consents or authorizations reasonably required therefor, provided that Trustee shall not be required to incur any expense in connection therewith. Purchaser's access to the Property shall be conditional upon the following:

(i)     Such access to the Property must be at reasonable times, with reasonable prior notice to and the prior consent of Trustee, and Trustee may require that his representative(s) accompany Purchaser during such access to the Property.

(ii)     Purchaser, upon Trustee's request, shall produce evidence, prior to Purchaser's entry onto the Property, of insurance policies in such amounts as may be reasonably determined by Trustee as adequate for liability and workers' compensation and other risks that may arise from such entry upon and activities on the Property, and shall name Trustee, and any other parties designated by Trustee, as additional insureds.  Such insurance shall not be cancelable unless at least thirty (30) days' prior written notice has been given to Trustee.  Prior to Purchaser's entry onto the Property, Purchaser shall also provide Trustee with such indemnities and assurances as are requested by Trustee in order to protect Trustee from liabilities and risks which may arise from such entry.  Subject to Paragraph 9 below, Trustee shall be solely entitled to the proceeds of any property and casualty insurance, if any, carried by Trustee with respect to the Property.  Purchaser shall be solely responsible for carrying, at any time during the term of this Agreement, any property and casualty insurance it desires with respect to the Property.  Notwithstanding the above to the contrary, Purchaser shall not have to provide the above-described insurance in connection with any entry onto the Property by the Purchaser or its agents for non-invasive inspection purposes.

(iii)     Any entry upon and activities on the Property shall be entirely at Purchaser's own risk, and Purchaser shall indemnify, defend and hold harmless Trustee from and against all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, that Trustee may incur by reason of claims based upon or connected with any such entry upon and activities on the Property.  Without limitation, Purchaser shall promptly repair any damage caused by the activities of Purchaser or its agents and shall restore the Property to its condition prior to Purchaser's entry thereon.  This subparagraph 8(iii) shall survive the Closing or other termination of this Agreement.

9.     As-Is; Complete Agreement

(i)     Purchaser has inspected the Property and is thoroughly acquainted with its condition.  Purchaser agrees to purchase the Property "as is" and in its present condition, subject to reasonable use, wear, tear, fire or casualty loss, vandalism and natural deterioration between now and the Closing (but subject further to subparagraphs 9(ii) and (iii) below).  Purchaser shall take the Property subject to all violations of law (except for any monetary penalties that have already been assessed in connection with any such violations) or municipal ordinances, orders or requirements promulgated by any governmental department having authority as to lands, housing, buildings, fire, health, labor, environment, highways, use, land use and other similar conditions affecting the Property.  Purchaser acknowledges that neither Trustee nor any agent or representative or purported agent or representative of Trustee has made, and Trustee is not liable for or bound in any manner by, any express or implied warranties, guaranties, statements, inducements, representations or information pertaining to the Property, or any part thereof, the physical condition, environmental, dangerous, hazardous and/or toxic condition, income, expenses or operation thereof, compliance with the rent control laws, the Rent Stabilization Law or the Rent Stabilization Code, or any laws or regulations associated therewith, the uses which can be made of the Property or any other matter or thing with respect thereto.  Without limiting the foregoing, Purchaser acknowledges and agrees that Trustee is not liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations, real estate brokers' "set-ups" or any other information respecting the Property, furnished by Trustee or any

broker, employee, agent, consultant or other person representing or purportedly representing Trustee.

(ii)    In the event that the Property sustains fire or casualty loss between the date hereof and the Closing, then Trustee shall have the right to terminate this Agreement by giving Purchaser notice of its election to so terminate within thirty (30) days after Trustee becomes aware of the occurrence of such fire or casualty loss, provided, however, that in the event Trustee has given notice of its election to terminate in accordance with this sentence, Purchaser shall have the option, on 10 days written notice, to elect to close on the property without any offset or deduction to the purchase price. Purchaser shall be entitled to receive the proceeds of any applicable insurance and Purchaser agrees to cooperate with Trustee in settling any such claim.

(iii)    Notwithstanding subparagraph 9(ii) above to the contrary, in the event that the Property sustains fire or casualty loss between the date hereof and the Closing in excess of $145,600.00 (a "Loss") (as determined by the reasonable estimate of Trustee's consultant made within 30 days after any such Loss) and Trustee (a) does not elect to repair the Property to substantially the same condition as it existed in immediately prior to such Loss (which election shall be made in a notice to Purchaser within 15 days after Trustee's consultant delivers its written estimate to Trustee) or (b) Trustee elects to repair the Property to substantially the same condition as it existed in immediately prior to such Loss (and Purchaser fails to deliver Purchaser's Waiver (as hereinafter defined)) but Trustee does not substantially complete said repairs within 6 months after said Loss, then Purchaser shall have the right to terminate this Agreement by giving written notice to Trustee of its election to so terminate within 15 days after (x) Trustee gives its notice that it elects not to repair the Loss or (y) the expiration of the 6 month period described above during which Trustee failed to substantially complete the repairs, as the case may be (and upon such termination the Deposit, along with any accrued interest, shall be promptly returned to Purchaser).

In the event that Trustee (A) so elects not to repair said Loss and Purchaser fails to exercise its termination right in the time provided for above (time being of the essence) or (B) so elects to repair said Loss and Purchaser, within 5 days after receipt of Trustee's election to repair said Loss (time being of the essence), delivers to Trustee a written waiver ("Purchaser's Waiver") of its termination rights under this subparagraph 9(iii) (in which case Trustee shall not make any repairs), then subparagraph 9(ii) shall control with respect to such Loss. However, in the event that Trustee so elects to repair said Loss (and Purchaser fails to deliver Purchaser's Waiver) but Trustee fails to substantially complete the repairs within the required 6 month period and Purchaser fails to exercise its termination right in the time provided for above (time being of the essence), then the Closing shall occur on a date not less than 10 business days after the repairs are substantially complete.

10.    Apportionments and Offsets to the Purchase Price

(i)    The following apportionments and adjustments shall be made at the Closing, as of 11:59 P.M. of the day immediately preceding the Closing Date. All such apportionments and adjustments, if in favor of Purchaser, shall be offset against the Purchase Price, provided that if such aggregate offsets exceed the Purchase Price, Purchaser shall not in

any event be entitled to any credits or refunds in addition to Purchaser's offset against the Purchase Price:

      (a)    Real estate taxes, assessments and water, sewer and vault charges, if any (collectively, "Real Estate Taxes") on the basis of the fiscal period for which assessed. Real Estate Taxes paid (or to be paid out of the Closing proceeds) by Trustee and pertaining in whole or in part to the period following the Closing shall be Purchaser's obligation and an apportionment shall be made therefor. If the Closing shall occur before a new tax rate is fixed, then the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. If there is a water meter on the Property, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing, which obligation shall survive the Closing. In the event that any assessment is payable in installments, then all installments payable on or after Closing shall be Purchaser's responsibility. ·

      (b)    Any fuel then existing on the Property based upon the greater of (1) its then fair market value or (2) the original cost of the same.

      (c)    Any rents received under any leases affecting the Property to the extent such rents relate to leases which Purchaser is required to assume pursuant to this Agreement. Any rents received by Purchaser subsequent to Closing shall be applied first to current rent and then to the time period prior to the Closing and shall be promptly forwarded to Trustee upon Purchaser's receipt of the same, but Purchaser shall only be obligated to forward to Trustee one month's worth of arrearages for each tenant plus any pro-rata amount due Trustee for rents collected which relate to the month in which the Closing occurred. This subparagraph 10(i)(c) shall survive the Closing.

      (d)    In the event that Purchaser fails to purchase title insurance from Primary or orders the Title Report from a title insurance company other than through Primary, then Purchaser shall pay Trustee the applicable amount(s) specified in subparagraph 7(i).

      (e)    Trustee agrees to deliver to Purchaser at Closing any security deposit which Trustee has in his possession relating to any lease which is being assumed by Purchaser pursuant to this Agreement and which, as reflected in Trustee's records, has not prior to Closing been applied to a default under said lease or otherwise lawfully applied under said lease or returned to the tenant thereunder. Purchaser hereby agrees to defend, indemnify, hold harmless, release and discharge Trustee from and against any claims by tenants or others with respect to security deposits, including claims made for contribution, indemnity and reimbursement; this sentence shall survive the Closing.

      (f)    Any payments made under the contracts shown on Schedule E, which Purchaser is required to assume pursuant to this Agreement, including, without limitation, payments of union benefits and wages, if any.

      (g)    Any payments of benefits and wages of any non-union superintendent of the Property or any similar employee.

{00274551.DOC;2}          7

(ii)     Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at the Closing shall be promptly corrected, which obligations shall survive the Closing but, with respect to any sum owed Purchaser, the same shall not survive the conclusion of the administration of the Debtor's estate (and shall survive prior to such conclusion only to the extent monies are then currently available to pay the same).

(iii)     Trustee shall not be obligated to accept more than $2,000.00 in the aggregate at Closing in cash or uncertified checks. Any amounts owed in excess of $2,000.00 must be paid in accordance with subparagraph 2(ii).

(iv)     Except as otherwise herein provided, the customs with respect to title closings recommended by the Real Estate Board of New York shall apply to the apportionments at the Closing.

11.     Conditions of Closing

The obligation of Trustee to close title in accordance with this Agreement is expressly conditioned upon Purchaser having made all required payments and having complied with all of its non-monetary obligations under this Agreement, provided that with respect to non-monetary obligations, Purchaser shall be given notice of any failure to comply with the same and shall be given the lesser of (i) fifteen (15) days' notice or (ii) the amount of time left to Closing (as previously set by Trustee), to cure its failure to comply with such non-monetary obligations. The obligation of Purchaser to close title in accordance with this Agreement is expressly conditioned upon the Bankruptcy Court approving the Contracts of Sale between the Trustee and Purchaser herein for the properties located at 65-67 East 125th Street, New York, New York and 77 East 125th Street, New York, New York and Trustee's being prepared to close under such additional Contracts of Sale.

12.     Closing Documents

(i)     Trustee shall deliver to Purchaser at the Closing:

(a)     A deed, substantially in accordance with the form annexed hereto as Schedule D or such other form of deed as the Order shall direct (the "Deed").

(b)     Actual possession of the Property, subject to any tenancies or any other rights to use or occupy any portion of the Property as set forth on Schedule B as Permitted Encumbrances.

(c)     All original leases and any other documents related thereto, rent records, registration forms and rent histories for all tenants to the extent they are in Trustee's possession (the "Lease Documents") or a letter directing Trustee's managing agent to deliver the Lease Documents to Purchaser upon presentation of said letter to Trustee's managing agent.

(d)     An appropriate non-foreign affidavit pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended, sufficient to provide an exemption under Subdivision (b) thereof.

(e)    An assignment of rent arrears in accordance with Paragraph 29.

(ii)    Purchaser and Trustee shall execute, acknowledge and deliver to each other such other instruments and documents, if any, to which either party may be entitled pursuant to any of the other provisions of this Agreement or which are required by law.

(iii)    Purchaser agrees to pay at or subsequent to the Closing, all sales taxes which may become due and payable in connection with the sale hereunder of any Personalty, and indemnifies, defends and holds harmless Trustee, from all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, for such sales taxes, whether asserted before or after the Closing. This subparagraph shall survive the Closing.

(iv)    Purchaser shall assume and execute an assumption agreement with respect to all residential leases affecting the Property. Purchaser shall also assume and execute an assignment and assumption agreement with respect to all non-residential leases and contracts shown on Schedule E hereto for which Trustee receives Bankruptcy Court approval to assume and assign to Purchaser.

(v)    Purchaser shall execute the appropriate documentation indicating that Purchaser (or Purchaser's lender) is the designated settlement/reporting agent for the purposes of the preparation and filing of the Form 1099-S (if such form is required under the Internal Revenue Code, as amended).

13.    Condemnation

If, at any time prior to the Closing, the Trustee receives notice that all or a material part of the Property shall be taken in the exercise of the power of eminent domain by any governmental authority (a "Taking"), then Purchaser shall have the option to terminate this Agreement by giving notice to the Trustee within 20 days after the Trustee provides a copy of such Notice to the Purchaser. In the event that Purchaser does not elect to terminate this Agreement, then in such event the Trustee shall not without the consent of Purchaser enter into any agreement concerning any condemnation award to which Trustee may be entitled as a consequence of such taking, and shall assign to Purchaser at the Closing all of Trustee's right, title and interest to any such award.

14.    Fees and Disbursements of Counsel, etc.

Each of the parties hereto shall bear and pay the fees and disbursements of its own counsel, accountants and other advisors in connection with the negotiation, preparation and carrying out of this Agreement and the Closing. Purchaser shall bear and pay the cost of recording the Deed and other documents to be delivered hereunder. Purchaser shall not be responsible for the payment of any New York City or New York State transfer taxes. This Paragraph 14 shall survive the Closing.

15.    Notices

As used in this Agreement, "notice" or "Notice" shall mean any notice, demand, request, consent, approval or other communication required or permitted to be given hereunder

or which is given with respect to this Agreement, and, except as otherwise provided in this Agreement, all notices shall be in writing and shall be sent by (i) registered or certified mail, return receipt requested, postage pre-paid, (ii) overnight express mail, (iii) Federal Express or (iv) personal delivery (provided written receipt therefor is obtained) addressed to the party to be notified at the addresses and the addressees set forth below or to such other addresses and/or addressees as such party shall have specified most recently by like notice.

Any notice to be given to Trustee or to Escrow Agent shall be sent to:

      John S. Pereira, Esq.
      150 East 58th Street, 14th Floor
      New York, New York  10155

With a copy to Trustee's attorneys:

      Dreier LLP.
      499 Park Avenue
      New York, New York  10022
      Attention:  John P. Campo, Esq.

Any notice to be given to Purchaser shall be sent to:

      125th Street Owner LLC
      c/o Shapiro & Shapiro, LLP
      1300 Flatbush Avenue
      Brooklyn, New York 11201
      *Telephone: 718-434-8800*
      *Fax: 718-434-8700*
      *Email: sshapiro@shapirolawyers.net*

With a copy to Purchaser's attorneys:

      Abe Rappaport, Esq.
      195 Route 46 West
      Suite 11
      Totowa, New Jersey 07512

      Telephone:  (973) 785-1799

      Fax No. :  (973) 785-4777

Notice given as provided above shall be deemed duly given (i) 3 days after sending, if sent by registered or certified mail, (ii) 1 business day after sending, if sent by overnight express mail or by Federal Express, or (iii) on the date of delivery, if delivered by personal delivery, as the case may be.  Notices may be given by and to attorneys for the respective parties.

{00274551.DOC;2}                   10

16.    Trustee's Exculpation; Limitation of Purchaser's Remedies

(i)    Trustee is entering into this Agreement strictly in his capacity as trustee of Debtor's Chapter 11 proceeding in the Bankruptcy Court. Under no circumstances shall Trustee be liable in his personal capacity for payment or performance of any of Trustee's obligations hereunder.

(ii)    If Trustee (a) is unable to transfer title to Purchaser in accordance with this Agreement, (b) terminates this Agreement pursuant to the terms of paragraph 13, or (c) the Bankruptcy Court denies authorization for any reason whatsoever, and decrees that the Trustee is unable to or may not sell the Property. Trustee's sole liability shall be to refund all Deposit money paid by Purchaser on account of this Agreement. Upon such refund this Agreement shall be considered cancelled, and neither Trustee nor Purchaser shall have any further rights or obligations hereunder, except obligations under this Agreement which expressly survive the Closing or other termination of this Agreement.

(iii)    Purchaser acknowledges that, prior to the Closing, Trustee shall have sole and complete discretion with respect to all matters relating to management and operation of the Property, including, without limitation, any election, in Trustee's sole discretion, not to manage, operate, insure, secure or otherwise safeguard all or any portion of the Property. Notwithstanding the above, the Trustee shall not after the date hereof, lease, amend or renew any lease for any part of the Property, enter into any service agreement (unless such service agreement is terminated at or prior to the Closing Date), or otherwise encumber the Property.

17.    Broker

Purchaser represents and warrants to Trustee, that Purchaser has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties, the negotiation or execution of this Agreement or the closing of the transactions contemplated herein. Purchaser hereby indemnifies, defends and holds harmless Trustee from and against any and all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, resulting from the Purchaser's breach of its representation, warranty, covenant and agreement under this Paragraph 17. This Paragraph 17 shall survive the Closing or other termination of this Agreement.

18.    Escrow Agent

(i)    The Deposit shall be held in escrow by Escrow Agent in an interest-bearing account until the first to occur of: (a) the Closing, (b) seven (7) business days after Escrow Agent has received Notice given by Purchaser to Escrow Agent, stating that this Agreement has been terminated by Purchaser in accordance with its terms, upon which date the Deposit and all interest earned thereon, if any, shall be paid to Purchaser, provided that within such seven (7) day period Escrow Agent does not receive Notice to the contrary from Trustee, (c) seven (7) business days after Escrow Agent shall have given Notice to Purchaser that Escrow Agent has received Notice given by Trustee stating that this Agreement has been terminated by Trustee, upon which date the Deposit and all interest earned thereon, if any, shall be paid to Trustee, provided that within such seven-day period Escrow Agent does not receive Notice to the

contrary from Purchaser, or (d) joint Notice, executed by Trustee and Purchaser, is received by Escrow Agent, in which event Escrow Agent shall release the Deposit and all interest earned thereon, if any, in accordance with the instructions therein contained. In the event of a dispute arising with respect to the rights of Trustee or Purchaser to receive the Deposit and/or any interest earned thereon, Escrow Agent shall have the right to pay the sum held in escrow into court and commence an action in interpleader in order to obtain a judicial determination as to the party legally entitled to receive the funds.

(ii)    Escrow Agent shall not be liable for any error in judgment or for any act done or omitted by it in good faith, or for any mistake of fact or law and is released and exculpated from all liability hereunder, except for willful misconduct.

(iii)    Escrow Agent shall not be required to take notice of any default by Trustee or Purchaser or to take any action with respect thereto, except as provided in this Paragraph 18.

(iv)    Escrow Agent shall incur no liability in acting upon any signature, notice, request, waiver, consent, receipt, or other paper or document believed by Escrow Agent to be genuine and Escrow Agent may assume that any person purporting to give Escrow Agent any notice or advice in accordance with the provisions hereof has been duly authorized to do so, and Trustee and Purchaser each hereby jointly and severally indemnifies, defends, holds harmless Escrow Agent from and against any and all losses, costs, expenses, claims, damages and liabilities, including, without limitation, attorneys' fees, Escrow Agent may suffer or incur as Escrow Agent hereunder unless caused by Escrow Agent's willful refusal or willful failure to act pursuant to the terms hereof.

(v)    Escrow Agent shall not be under any obligation to take any legal action in connection with this Agreement or towards its enforcement or to appear in, prosecute or defend any action or legal proceeding which, in the opinion of Escrow Agent, would or might involve Escrow Agent in any cost, expense, loss or liability unless, and as often as required by Escrow Agent, Escrow Agent shall be furnished with security and indemnity satisfactory to Escrow Agent against all such costs, expenses, losses or liability.

(vi)    Escrow Agent shall be entitled to consult with other counsel in connection with its duties hereunder. Purchaser and Trustee each jointly and severally agrees to reimburse Escrow Agent for its costs and expenses, including, without limitation, attorneys' fees (either paid to retained attorneys or representing the fair value of legal services rendered by Escrow Agent to itself) incurred as a result of any dispute or litigation concerning this escrow arrangement.

This Paragraph 18 shall survive the Closing or other termination of this Agreement.

19.    This paragraph is intentionally omitted.

20.    Pending Litigation

(i)    Purchaser acknowledges that the Trustee is currently in litigation concerning the title to the Property. The parties agree that the obligations under this agreement

are conditioned upon the entry of an Order authorizing the Trustee to sell the Property to Purchaser free and clear of all liens, claims and encumbrances.

21.    Counterparts; Captions

This Agreement and all instruments and documents to be delivered hereunder may be executed in counterparts, each of which shall be deemed an original. The captions in this Agreement are for convenience and reference only and shall not be utilized in the interpretation of this Agreement.

22.    Entire Agreement

This Agreement (including all schedules annexed hereto) contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto. This Agreement may not be modified, changed or supplemented, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto. This Paragraph 22 shall survive the Closing or other termination of this Agreement.

23.    Waivers; Extensions

No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts. Each of the parties hereby authorizes its attorneys to agree on its behalf in writing to any changes in dates and time periods provided for in this Agreement.

24.    Assignment; Successors and Assigns

Purchaser's interest under this Agreement may only be assigned with Trustee's prior written consent, which consent may not be unreasonably withheld. In the event that Trustee consents to an assignment, the individual or entity executing this Agreement shall remain liable for all of Purchaser's obligations hereunder, including, without limitation, obligations which survive the Closing. Such assignment shall not become effective until (i) notice of assignment, including identity of the assignee and an address for notices to the assignee, has been provided to Trustee, (ii) the assignee has delivered to Trustee a signed assumption of the terms of this Agreement and any related agreements entered into by Purchaser and (iii) Trustee delivers to Purchaser its prior written consent. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of Purchaser, Trustee, and their respective successors and assigns.

25.    Pronouns

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the parties may require.

26. <u>No Recording</u>

Purchaser shall not record this Agreement or a memorandum thereof against the title to the Property.

27. <u>Governing Law</u>

This Agreement shall be governed by and construed in accordance with the laws of the State of New York and applicable provisions of the Bankruptcy Code.

28. <u>Purchaser's Warranty of Authority.</u>

Purchaser hereby represents and warrants that (i) it has full right, power and authority to execute this Agreement, (ii) such execution has been duly authorized and (iii) that it is bound hereby.

29. <u>Merger</u>

The acceptance of the Deed by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Trustee's part to be performed hereunder, except for those which this Agreement specifically provides shall survive the Closing.

30. <u>Rent Arrears</u>

Any rent or rent arrears due Trustee shall be collected by the Purchaser and shall be promptly turned over to Trustee as and when collected, in accordance with subparagraph 10(i)(c). It is understood and agreed that any rents collected after the Closing shall first be applied to current rent and then to any rent arrears. Upon written request from Trustee from time to time, to the then owner, an accounting of the rents collected (or remaining uncollected) shall be given to Trustee. Trustee reserves the right between contract and Closing to institute any proceedings to recover any part of the premises in the event of any default by the various tenants of any of the terms of their tenancies. Trustee shall execute at Closing an assignment of rent arrears to Purchaser in order for Purchaser to collect said arrears (but not with respect to any plenary rent arrear actions instituted prior to Closing which Trustee shall be entitled to continue to maintain), with the understanding that such arrears shall be paid to Trustee in accordance with this provision. This Paragraph 30 shall survive the Closing.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

TRUSTEE:

By: _____

JOHN S. PEREIRA, as Chapter 11
Trustee of 79 East 125th St. Realty Corp.


PURCHASER:
125th Street Owner LLC

By: _____
Name: Saadia Shapiro
Title:  Manager
Tax Id Number:

*NOTE:  If the drawer's name on the Deposit check is other than the named Purchaser, then the following must be completed and signed by the drawer of the check:*

The undersigned hereby acknowledges that the delivery of the Deposit and the payment of the same represents a material benefit to the undersigned, and if the undersigned is a partnership, corporation or limited liability, was authorized by all necessary partnership, corporate or limited liability company action.

Drawer's Name (if entity):


By:_____
Name:
Title:

The undersigned hereby acknowledges receipt of Purchaser's $291,200 check wire transfer payable to the order of Escrow Agent on account of the Deposit and agrees to hold same pursuant to the provisions of Paragraph 18 of the foregoing Agreement:

Escrow Agent:

DREIER LLP

By:_____
A Partner

{00274551.DOC;2}                                     15

PURCHASER'S ACKNOWLEDGMENT

IN NEW YORK STATE

State of New York          )

County of   Kings          )


On the 13 day of August in the year 2007, before me, the undersigned, personally appeared Saadia Shapiro, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

ARTHUR GUTMAN
Notary Public, State of New York
No.# 02GU6164097
Qualified in Kings County
Commission Expires April 9, 2011

Arthur Gutman
*(signature and office of individual taking acknowledgment)*


OUTSIDE NEW YORK STATE

State of                    )


On the ____ day of _____ in the year 2007, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_____
*(signature and office of individual taking acknowledgment)*

{00274551.DOC;2}                    16

Schedule A

Legal Description

## PRIMARY LAND SERVICES, LLC

### Title No. PY13957NY   (369-NY-04851)

### S C H E D U L E   A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, New York City, more particularly bounded and described as follows:

BEGINNING at a point on the northerly side of 125th Street distant Ninety feet one inch westerly from the corner formed by the intersection of the northerly side of 125th Street with the westerly side of Park Avenue;

RUNNING THENCE westerly along the northerly side of 125th Street, twenty-seven feet eleven inches;

RUNNING THENCE northerly parallel with the westerly side of Park Avenue, Ninety-nine feet eleven inches to the center line of the block;

RUNNING THENCE easterly along said center line of the block, parallel with the northerly side of 125th Street twenty-seven feet eleven inches;

RUNNING THENCE southerly and again parallel with the westerly side of Park Avenue ninety-nine feet eleven inches to the point or place of BEGINNING.

**FOR CONVEYANCING ONLY**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of and adjoining said premises.

Schedule B

Permitted Encumbrances

1.     All present and future zoning, building and environmental laws, ordinances, codes, restrictions and regulations of all other governmental (including, without limitation, local, state and federal) authorities having jurisdiction over the Property, all zoning variances and special exceptions, if any, and all present or future violations thereof, if any.

2.     Any state of facts a current land title survey of the Land, Improvements and/or Personalty would disclose provided that the same does not render title unmarketable.

3.     All presently existing rights, easements and agreements, whether or not of record, over, across, under or affecting the Land, Improvements and/or Personalty provided that the same does not render title unmarketable.

4.     The rights of any tenants or occupants in possession of or having rights in and to the Property either now or at Closing, provided the Trustee does not consent to or enter into any lease with respect to the property without the Purchaser's prior consent.

5.     All violations of building, fire, sanitary, environmental, housing and similar laws, ordinances, rules, regulations and orders of governmental authorities having jurisdiction over the Property, whether or not noted or issued at the date hereof or at the date of Closing, and including, without limitation, sidewalk violations (except that the Trustee shall pay all monetary fines already assessed in connection with such violations).

6.     Real Estate Taxes shall be apportioned in accordance with this Agreement and Purchaser shall take subject to all of the same which are not yet due and payable.

7.     Standard printed exceptions contained in the title report with respect to the Property issued by Primary and/or contained in the Title Report.

8.     Possible lack of or revocable nature of the right, if any, to maintain or use any space, facilities or appurtenances outside the building lines, whether on, over or under the ground, including, without limitation, all vaults, signs, loading platforms, intake valves or pipes and chutes, if any.

9.     Consents by Trustee, Debtor or any former owner of the Property for the erection of any structure or structures on, under or above any streets on which the Property may abut.

10.     Any unpaid vault taxes unless the same are a lien on the Property at the time of Closing.

11.     Any mortgage or encumbrance which, by the terms of this Agreement, Purchaser has expressly agreed to assume or take subject to.

Schedule C

Non-Monetary Encumbrances Required to be Removed by Trustee

NONE

Schedule D

Trustee's Deed of Real Estate

   This Indenture made the _____ day of __, 2007, between John S. Pereira, as Chapter 11 trustee in bankruptcy of the estate of 79 East 125th St. Realty Corp., bankrupt, party of the first part, having an address at 150 East 58th Street, New York, New York, and _____, party of the second part, having an address at _____ ;

   WITNESSETH the party of the first part by virtue of the power and authority given in and by an order of the United States Bankruptcy Court for the Southern District of _____, dated the _____ day of _____, 2007, and in consideration of Two Million, Six Hundred Thousand Dollars ($2,912,000.00), lawful money of the United States paid by the party of the second part, does hereby grant, convey and release unto the party of the second part, his/its heirs, successors and assigns forever, all the estate which _____ had, at the time of the filing of the petition in bankruptcy by him, in said United States Bankruptcy Court for the Southern District of New York, in that certain property set forth on Schedule A hereto and the appurtenances thereto which the party of the first part has or has power to convey or dispose of, as Chapter 11 trustee in bankruptcy of Maywood Capital Corp., et al, bankrupt.

   TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, its heirs, successors and assigns forever.

   IN WITNESS WHEREOF the party of the first part has hereunto set his hand and seal the day and year first above written.

           _____
           As and only as Chapter 11 trustee
           in bankruptcy of the estate of 79 East 125th St.
           Realty Corp., bankrupt, and not individually.

State of New York      )

County of New York     )

On the _____ day of _____ in the year 2007, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

           _____
           *(signature and office of individual taking acknowledgment)*

Schedule E

Leases and Contracts

1.    All residential leases affecting the Property.

2.    All commercial or store leases affecting the Property.

3.    All union contracts affecting the Property.

4.    All service contracts affecting the Property.

Exhibit "E"

DREIER LLP
John P. Campo (JC-5241)
John S. Kinzey (JK-4951)
499 Park Avenue
New York, NY 10022
Tel: 212-424-8000

**Hearing Date: December 10, 2007**
**at 10:00 a.m.**
**Objections Date: December 3, 2007**
**at 4:00 p.m.**

*Counsel for John S. Pereira, Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | x Chapter 11 Cases<br>: Case No. 05-10987 (RDD)<br>:<br>: (Jointly Administered)<br>: Case Nos. 04-17047, 05-10944 to<br>: 05-10987, 05-11521, 05-11523,<br>x 05-17778 (RDD) |
| MAYWOOD CAPITAL CORP., et al. | |
| Debtors. | |

**CHAPTER 11 TRUSTEE'S MOTION SEEKING COURT APPROVAL OF THE SALE OF TRUSTEE'S RIGHT, TITLE AND INTEREST OF CERTAIN REAL PROPERTY AND IMPROVEMENTS LOCATED AT 65-67 EAST 125TH ST., NEW YORK, NEW YORK, 77 EAST 125TH ST., NEW YORK, NEW YORK, AND 79 EAST 125TH ST., NEW YORK, NEW YORK, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, PURSUANT TO 11 U.S.C. §§ 363, 506(c) AND 1146(c) OF THE BANKRUPTCY CODE**

**TO THE HONORABLE ROBERT D. DRAIN UNITED STATES BANKRUPTCY JUDGE:**

John S. Pereira, as Chapter 11 Trustee (the "Trustee") of the above-captioned, jointly-administered debtors (the "Debtors"), by and through undersigned counsel, moves (the "Motion") for an order (i) allowing the Trustee to sell certain real property and improvements located at 65-67 East 125th St., New York, New York, ("65-67 East 125th St. Property"), 77 East 125th St., New York, New York ("77 East 125th St. Property") and 79 East 125th St., New York, New York ("79 East 125th St. Property", each individually, the "Property", and collectively the "Properties"), each pursuant to a contract of sale (the "Contracts") with 125th Street Owner LLC,

(the "Purchaser"); (ii) authorizing the sale of the Properties to be free and clear of all liens, claims, interests and encumbrances, except the Permitted Encumbrances (as defined in the Contracts), with all such liens, claims, interests and encumbrances attaching to the net proceeds of sale, in their order of priority and to the extent of their validity, net of all Trustee commissions, attorneys' fees and expenses, and all other expenses of the sale, pursuant to 11 U.S.C. §§ 363(b) and (f) and 506(c) of the Bankruptcy Code; (iii) allowing the Trustee to sell the estates' right, title and interest in the Properties without paying any transfer, stamping or recording taxes (the "Transfer Taxes") imposed by the New York City Department of Finance, pursuant to 11 U.S.C. § 1146(c) of the Bankruptcy Code, provided that the Trustee escrows an amount sufficient to pay the Transfer Taxes in the event he is unable to confirm a plan of reorganization for the debtor entities that own the properties, in which event such Transfer Taxes are to be paid to the New York City Department of Finance; (iv) directing the New York County Register's Office to accept the deeds of sale for the Properties for recordation, notwithstanding that neither the Trustee nor Purchaser will have paid the Transfer Taxes; (v) authorizing the Trustee to recover the reasonable, necessary costs and expenses of preparing, preserving, maintaining and disposing of the Properties pursuant to 11 U.S.C. § 506(c) of the Bankruptcy Code; (vi) determining that the Purchaser is a good faith purchaser and thereby entitled to the protections afforded by 11 U.S.C. § 363(m) of the Bankruptcy Code, and respectfully represents as follows:

1.      The forty-eight Debtors in these procedurally consolidated cases filed voluntary Chapter 11 petitions on three separate dates: November 2, 2004; February 19, 2005; March 10, 2005; and September 12, 2005. The Chapter 11 petition for the debtors (65-67 East 125th Street Realty Corp., 77 East 125th Street Realty LLC and 79 East 125th Street Realty LLC) on whose behalf the Trustee will convey each of the respective Properties were each filed on February 19,

2005. On March 23, 2005, the Court ordered the joint administration of the Debtors' cases and directed the appointment of a Chapter 11 Trustee for the Debtors.

2.    By order dated March 24, 2005, the Court approved, pursuant to 11 U.S.C. § 1104(d), the appointment of John S. Pereira as the Chapter 11 Trustee (the "Trustee"), which included his appointment as the Chapter 11 Trustee for the estates of 65-67 East 125th St, 77 East 125th St. and 79 East 125th St. Following the Trustee's appointment, he has been in possession and control of each Property.

3.    By this Motion, the Trustee seeks authorization to sell each Property to the Purchaser pursuant to the respective Contracts, at the sale (the "Sale") to be held before this Court at the hearing on this Motion (the "Hearing Date") with respect to the Property, free and clear of all liens, claims, interests and encumbrances, except the Permitted Encumbrances (as defined in the contract of sale) with all such liens, claims, interests and encumbrances attaching to the net proceeds of sale, in their order of priority and to the extent of their validity, net of all Trustee commissions, attorneys' fees and expenses, and all other expenses of the sale, pursuant to 11 U.S.C. §§ 363(b) and (f) and 506(c) of the Bankruptcy Code.

4.    In the event the Purchaser of the Properties fails to timely close, the Trustee shall have the option of terminating the Contract. In the event of such termination, the Trustee shall retain all payments made by the Purchaser to the Trustee prior to such termination (including without limitation the Deposit, as defined in the Contract), together with interest, as liquidated damages (and not as a penalty).

5.    The Properties are the subject of pending fraudulent conveyance actions before this Court in which the Trustee has sued to recover the Properties from the Irgangs and their

related LLCs. The litigation is currently *sub judice* before the Court, and the parties thereto submitted their post-trial submissions on October 26, 2007.

6.     In consideration for entering into the Contracts notwithstanding that the litigation was pending, and agreeing to remit the deposits under the Contracts at the time of their execution, the Purchaser has requested that the Contracts, which the Trustee believes are at fair market value, not be subject to higher or better offers.

### The Contracts
#### (a) *65-67 East 125th St. Property*

7.     The Trustee has entered into the Contract with the Purchaser, for the sale of the 65-67 East 125th St. Property. The pertinent terms of the Contract, annexed hereto as Exhibit A, are as follows:

(a)     The Trustee shall sell the 65-67 East 125th St Property to the Purchaser for Two Million, Six Hundred Thousand and no/100 Dollars ($2,600,000.00) payable as follows: (i) the Purchaser has delivered by check Two Hundred Sixty Thousand and no/100 Dollars ($260,000.00) (the "Deposit") to Dreier LLP, as escrow agent ("Escrow Agent"); (ii) the Purchaser shall pay, by certified check, Two Million, Three Hundred Forty Thousand and no/100 Dollars ($2,340,000.00) to the Trustee upon Closing; and (iii) the Purchaser shall further pay any apportionments or adjustments agreed to in the Contract upon Closing.

(b)     The Contract is conditioned upon the entry of an order (and it becoming final and non-appealable or in the event of an appeal, no stay pending appeal being granted) by the Court approving or authorizing the Contract (the "Order").

(c)    If the Court does not enter the Order approving and authorizing the Contract within 120 days of the execution of the Contract by all parties, the Purchaser may terminate the Contract on notice to the Trustee.

(d)    The Order shall provide that all valid liens, claims and encumbrances affecting the 65-67 East 125th St Property, except Permitted Encumbrances (as defined in the Contract), shall be subject and subordinate in lien and priority to the Contract, and shall, if valid, attach to the proceeds of the sale of the 65-67 East 125th St. Property (net of all Trustee commissions, attorneys' fees and expenses, and all other expenses of the sale) in their order of priority and to the extent of their validity.

(e)    If the Purchaser fails to timely complete the sale in accordance with the terms of the Contract, time being of the essence with respect to the obligations of the Purchaser, the Trustee shall have the option to terminate the Contract and shall retain all payments made by the Purchaser to the Trustee prior to such termination (including, without limitation, the Deposit delivered to the Escrow Agent), together with interest, as liquidated damages (and not as a penalty) for all loss, damages and expenses suffered by the Trustee.

(f)    The Purchaser, upon closing, shall defend, indemnify, hold harmless, release and discharge the Trustee from and against any and all liability relating to or arising from any environmental, dangerous, hazardous and/or toxic condition, substance, material and/or waste which currently

exists or which may exist in the future on the 65-67 East 125th St. Property.

(g)     The Property shall be transferred and conveyed by the Trustee to the Purchaser and the Purchaser shall pay the balance of the purchase price ($2,340,000.00) on the date set by the Trustee, which date shall be a day not less than forty (40) days following the entry of the Order, or such earlier date as agreed upon by the parties.

(h)     The Purchaser agrees to purchase the 65-67 East 125th St. Property "as is" and in its present condition, subject to reasonable use, wear, tear, fire or casualty loss, violations of law or municipal ordinances, and without any warranties of any kind.

(i)     The Purchaser may only assign the Contract with the Trustee's prior written consent, which consent may be withheld in the Trustee's sole discretion.

(j)     The obligation of the Purchaser to close, among other conditions, is conditioned upon the Court approving the contracts of sale between the Trustee and the Purchaser for the 77 East 125th Street Property and the 79 East 125th Street Property.

### (b) *77 East 125th Street Property*

8.      The Trustee has entered into the Contract with the Purchaser for the sale of the 77 East 125th Street Property.  The pertinent terms of the Contract, annexed hereto as Exhibit B, are as follows:

(a)     The Trustee shall sell the 77 East 125th Street Property to the Purchaser, subject to higher or better offers, for Two Million, Two Hundred Eighty Eight Thousand Dollars ($2,288,000.00) payable as follows: (i) the Purchaser has delivered by check Two Hundred Twenty Eight Thousand Eight Hundred Dollars ($228,800.00) (the "Deposit") to Dreier LLP, as escrow agent ("Escrow Agent"); (ii) the Purchaser shall pay, by certified check, Two Million, Fifty Nine Thousand Two Hundred Dollars ($2,0590,200.00) to the Trustee upon Closing; and (iii) the Purchaser shall further pay any apportionments or adjustments agreed to in the Contract upon Closing.

(b)     The Contract is conditioned upon the entry of an order (and it becoming final and non-appealable or in the event of an appeal, no stay pending appeal being granted) by the Court approving or authorizing the Contract (the "Order").

(c)     If the Court does not enter the Order approving and authorizing the Contract within 120 days of the execution of the Contract by all parties, the Purchaser may terminate the Contract on notice to the other party.

(d)     The Order shall provide that all valid liens, claims and encumbrances affecting the 77 East 125th St Property, except Permitted Encumbrances (as defined in the Contract), shall be subject and subordinate in lien and priority to the Contract, and shall, if valid, attach to the proceeds of the sale of the 77 East 125th St. Property (net of all Trustee commissions,

attorneys' fees and expenses, and all other expenses of the sale) in their order of priority and to the extent of their validity.

(e)     If the Purchaser fails to timely complete the sale in accordance with the terms of the Contract, time being of the essence with respect to the obligations of the Purchaser, the Trustee shall have the option to terminate the Contract and shall retain all payments made by the Purchaser to the Trustee prior to such termination (including, without limitation, the Deposit delivered to the Escrow Agent), together with interest, as liquidated damages (and not as a penalty) for all loss, damages and expenses suffered by the Trustee.

(f)     The Purchaser, upon closing, shall defend, indemnify, hold harmless, release and discharge the Trustee from and against any and all liability relating to or arising from any environmental, dangerous; hazardous and/or toxic condition, substance, material and/or waste which currently exists or which may exist in the future on the 77 East 125th St. Property.

(g)     The Property shall be transferred and conveyed by the Trustee to the Purchaser and the Purchaser shall pay the balance of the purchase price ($2,340,000.00) on the date set by the Trustee; which date shall be a day not less than forty (40) days following the entry of the Order, or such earlier date as agreed upon by the parties.

(h)     The Purchaser agrees to purchase the 77 East 125th St. Property "as is" and in its present condition, subject to reasonable use, wear, tear, fire or

casualty loss, violations of law or municipal ordinances, and without any
warranties of any kind.

(i)    The Purchaser may only assign the Contract with the Trustee's prior
written consent, which consent may be withheld in the Trustee's sole
discretion.

(j)    The obligation of the Purchaser to close is conditioned upon the Court
approving the contracts of sale between the Trustee and the Purchaser for
the 65-67 East 125th Street Property and the 79 East 125th Street
Property.

### (c) *79 East 125th St. Property*

9.    The Trustee has entered into the Contract with the Purchaser for the sale of the 79
East 125th St. Property.  The pertinent terms of the Contract, annexed hereto as Exhibit C , are as
follows:

(a)    The Trustee shall sell the 79 East 125th St. Property to the Purchaser,
subject to higher or better offers, for Two Million, Nine Hundred Twelve
Thousand Dollars ($2,912,000.00) payable as follows: (i) the Purchaser
has delivered by check Two Hundred Ninety One Thousand Two Hundred
Dollars ($291,200.00) (the "Deposit") to Dreier LLP, as escrow agent
("Escrow Agent"); (ii) the Purchaser shall pay, by certified check, Two
Million, Six Hundred Twenty Eight Thousand Eight Hundred Dollars
($2,620,800.00) to the Trustee upon Closing; and (iii) the Purchaser shall
further pay any apportionments or adjustments agreed to in the Contract
upon Closing.

(b)    The Contract is conditioned upon the entry of an order (and it becoming final and non-appealable or in the event of an appeal, no stay pending appeal being granted) by the Court approving or authorizing the Contract (the "Order").

(c)    If the Court does not enter the Order approving and authorizing the Contract within 120 days of the execution of the Contract by all parties, the Purchaser may terminate the Contract on notice to the other party.

(d)    The Order shall provide that all valid liens, claims and encumbrances affecting the 79 East 125th St Property, except Permitted Encumbrances (as defined in the Contract), shall be subject and subordinate in lien and priority to the Contract, and shall, if valid, attach to the proceeds of the sale of the 79 East 125th St. Property (net of all Trustee commissions, attorneys' fees and expenses, and all other expenses of the sale) in their order of priority and to the extent of their validity.

(e)    If the Purchaser fails to timely complete the sale in accordance with the terms of the Contract, time being of the essence with respect to the obligations of the Purchaser, the Trustee shall have the option to terminate the Contract and shall retain all payments made by the Purchaser to the Trustee prior to such termination (including, without limitation, the Deposit delivered to the Escrow Agent), together with interest, as liquidated damages (and not as a penalty) for all loss, damages and expenses suffered by the Trustee.

(f)     The Purchaser, upon closing, shall defend, indemnify, hold harmless, release and discharge the Trustee from and against any and all liability relating to or arising from any environmental, dangerous, hazardous and/or toxic condition, substance, material and/or waste which currently exists or which may exist in the future on the 79 East 125th St. Property.

(g)     The Property shall be transferred and conveyed by the Trustee to the Purchaser and the Purchaser shall pay the balance of the purchase price ($2,340,000.00) on the date set by the Trustee, which date shall be a day not less than forty (40) days following the entry of the Order, or such earlier date as agreed upon by the parties.

(h)     The Purchaser agrees to purchase the 79 East 125th St. Property "as is" and in its present condition, subject to reasonable use, wear, tear, fire or casualty loss, violations of law or municipal ordinances, and without any warranties of any kind.

(i)     The Purchaser may only assign the Contract with the Trustee's prior written consent, which consent may be withheld in the Trustee's sole discretion.

(j)     The obligation of the Purchaser to close is conditioned upon the Court approving the contracts of sale between the Trustee and the Purchaser for the 65-67 East 125th Street Property and the 77 East 125th Street Property.

### Grounds for Relief

10.     11 U.S.C. § 363(b)(1) of the Bankruptcy Code governs transactions outside the ordinary course of business of the debtor and provides that a debtor in possession may enter into

such transactions after notice and a hearing. When a proposed use, sale or lease of assets is outside the ordinary course of business, 11 U.S.C. § 363(b)(1) requires that the transaction have a business justification. *In re Lionel Corp.,* 722 F.2d 1063, 1070 (2d Cir. 1983). That is, the debtor in possession or trustee must satisfy its fiduciary duty to the debtor, creditors and equity holders, that there is some articulated business justification for using, selling or leasing the property outside the ordinary course of business. *Id. See also In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984) (debtor in possession is "required to justify the proposed [transaction] with sound business reasons"); *In re St. Petersburg Hotel Assoc. Ltd.,* 37 B.R. 341, 343 (Bankr. M.D. Fla. 1983) (section 363 "also impliedly requires the Court to find that it is good business judgment for the Debtor to enter into" the transaction at issue). As the Second Circuit held in *Lionel,* the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders alike. Moreover, section 363(f) of the Bankruptcy Code authorizes the sale free and clear of liens and interests if, among other reasons, the price at which such property is to be sold is greater then the aggregate value of all liens on such property, or if such interest is in a *bona fide* dispute. *See* 11 U.S.C. § 363(f). Section 365(a) of the Bankruptcy Code provides in pertinent part that the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor. Finally, section 506(c) of the Bankruptcy Code authorizes a trustee to recover the costs and expenses of preserving or disposing of property subject to an allowed secured claim. *See* 11 U.S.C. § 506(c). In the instant case, the Trustee has sufficient business justification for the sale of the Properties to the Purchaser, under the terms set forth in the Contracts. The sale of the Properties will provide substantial funds to the Debtors' estates for distribution to their creditors.

11.    The price for which each Property is being sold reflects the current market conditions of New York real estate. The Trustee believes that these conditions favor the sale of each Property at this time. The Trustee has determined in his business judgment that sale into the current market, pursuant to the terms of each Contract, should lead to the best results for the Debtor's estate.

12.    Accordingly, the Trustee seeks an Order authorizing the Trustee to sell each Property pursuant to the terms of the respective Contract, attached hereto as Exhibits A through C, and free and clear of all liens, claims, interests and encumbrances, except the Permitted Encumbrances (as defined in the Contract), with all such liens, claims, interests and encumbrances to attach to the net proceeds of the sale of the Property, in their order of priority and to the extent of their validity, pursuant to 11 U.S.C. §§ 363(b), (f) and (m) of the Bankruptcy Code.

13.    The Trustee further seeks an Order allowing the Trustee to recover the reasonable, necessary costs and expenses of preserving, preparing, maintaining, and disposing of each Property pursuant to 11 U.S.C. § 506(c) of the Bankruptcy Code.

14.    The Trustee respectfully submits that, at the closing on the sale of each Property, the Trustee should not be required to pay any transfer, stamping or recording taxes imposed by the New York City Department of Finance, pursuant to 11 U.S.C. § 1146(c) of the Bankruptcy Code. The Trustee will escrow the funds necessary to pay the above taxes.

15.    The Trustee avers that the net proceeds generated by the sale of each Property will be used to fund a distribution to creditors in these cases. Without such sale, the Trustee would be unable to propose a plan(s) of reorganization for the Debtors' estates.

16.     Inasmuch as the relevant law is set forth above, the Trustee respectfully requests that the Court waive the requirement of the separate memorandum of law.

17.     The Trustee will serve this Motion and all attachments upon (i) the United States Trustee; (ii) all parties that have contacted the Trustee expressing interest in the Properties, (iii) all parties that have filed a notice of appearance in this case, (iv) scheduled creditors of the relevant Debtor entities, (v) all parties that have filed claims against the relevant Debtor entities, (vi) any lienholders on each Property, and (vii) counsel for the Irgangs. The Trustee submits that the above constitutes adequate notice within the meaning of Rule 2002 of the Federal Rule of Bankruptcy Procedure.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an Order (i) approving the sale of each Property to the respective Purchaser in accordance with the terms of the Contract (ii) authorizing the Property to be sold free and clear of liens, claims, interests and encumbrances, except the Permitted Encumbrances (as defined in the Contract), with liens, claims, interests and encumbrances to attach to the net proceeds of the sale of the Property pursuant to 11 U.S.C. §§ 363(b) and (f) of the Bankruptcy Code, to the extent of their validity and in their order of priority; (iii) allowing the Trustee to sell his right, title and interest in the Properties without paying any Transfer Taxes imposed by the New York City Department of Finance, pursuant to 11 U.S.C. § 1146(c) of the Bankruptcy Code, provided that the Trustee escrows an amount sufficient to pay the Transfer Taxes in the event he is unable to confirm a plan of reorganization for the debtor entities that own the Properties, in which event such Transfer Taxes are to be paid to the New York City Department of Finance; (iv) directing the New York County Register's Office to accept the deed of sale for the Properties for recordation, notwithstanding that neither the Trustee nor Purchaser will have paid the Transfer Taxes; (v)

authorizing the Trustee to recover the reasonable, necessary costs and expenses of preparing, preserving, maintaining and disposing of the Properties pursuant to 11 U.S.C. § 506(c) of the Bankruptcy Code; (vi) determining that the Purchaser is a good faith purchaser and is thereby entitled to the protections afforded by 11 U.S.C. § 363(m) of the Bankruptcy Code; and (vii) granting such other and further relief as is just and proper.

Dated: New York, New York
      November 9, 2007

DREIER LLP

By: /s/ John P. Campo
      John P. Campo (JC-5241)
      John S. Kinzey (JK-4951)
      499 Park Avenue
      New York, NY 10022
      Tel: 212-328-6100

Counsel for John S. Pereira, Chapter 11 Trustee

Exhibit "F"

1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 05-10987

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   MAYWOOD CAPITAL, INC.

9

10          Debtor.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              U.S. Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              December 10, 2007

19              2:09 p.m.

20

21   B E F O R E:

22   HON. ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25

2

1

2    Chapter 11 Trustee's Motion Seeking Court Approval Of The Sale

3    Of Trustee's Right, Title And Interest Of Certain Real Property

4    And Improvements Located at 65-67 East 125th St., New York, New

5    York, 77 East 125th St., New York.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sharona Shapiro

3

1

2   A P P E A R A N C E S :

3   DREIER, LLP

4        Attorneys for John Pereira, the Chapter 11 Trustee

5        499 Park Avenue

6        New York, New York 10022

7

8   BY:   JOHN CAMPO, ESQ.

9

10  COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

11       25 Main Street

12       Hackensack, New Jersey 07602

13

14  BY:   LAURENCE MAY, ESQ.

15        LEO V. LEYVA, ESQ.

16        JAMES T. KIM, ESQ.

17

18  PEREIRA & SINISI, LLP

19       150 East 58th Street

20       New York, New York  10155

21

22  BY:   JOHN. S. PEREIRA, ESQ.

23

24

25

VERITEXT/NEW YORK REPORTING COMPANY

```
                                                                    4
 1

 2    FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

 3          Attorneys for Vornado Realty

 4          One New York Plaza

 5          New York, New York 10004

 6

 7    BY:   GREGG L. WEINER, ESQ.

 8

 9    FINKEL, GOLDSTEIN, ROSENBLOOM & NASH LLP

10          Attorneys for Maywood/Commercial Mortgage Corp.

11          26 Broadway

12          New York, New York 10004

13

14    BY:   J. TED DONOVAN, ESQ.

15

16    SILBERSTEIN & ASSOCIATES

17          12 Marshall Street

18          Boston, MA   02108

19

20    BY:   GAIL FRADIN SILBERSTEIN, ESQ.

21

22

23

24

25
```

5

1              P R O C E E D I N G S

2              THE COURT:  Please be seated.  There's a little

3    confusion in the calendar that was printed out.  We can't

4    exactly explain why, but the three matters that I have on for

5    today, to my knowledge, are the Maywood Capital matter in

6    respect of the trustee's motion seeking approval of the sale of

7    the trustee's right on certain properties, Avet, cash

8    collateral hearing and Centro La Esperanza.  So if someone's

9    here for something other than that, I apologize.  But that's

10   all that we have on for today.  Okay.  Maywood Capital.

11             MR. CAMPO:  Good afternoon, Your Honor.

12             THE COURT:  Good afternoon.

13             MR. CAMPO:  John Campo, Dreier LLP on behalf of John

14   Pereira, the Chapter 11 Trustee of Maywood Capital, Corp. and

15   its related entities.

16             THE COURT:  You can give your appearances when you

17   speak.

18             MR. CAMPO:  Okay.  Your Honor, this afternoon we're

19   here in connection with the trustee's motion to sell under

20   Section 363, free and clear of liens, claims and encumbrances

21   and interest, three properties located at 65-67 East 125th

22   Street, 77 East 125th Street, and 79 East 125th Street.

23             Your Honor, the original contract vendee with respect

24   to the property, of which Mr. Shapiro was a principal, who's

25   here in court, that contract is at 7.8 million dollars.

6

1    Your Honor, this morning the trustee received another

2    offer for the properties from Rudd Development Group LLC at 8.8

3    million dollars, Your Honor, and is prepared and has executed

4    with notice to the original contract vendee, after he was given

5    an opportunity to do so, another contract with respect to these

6    properties, which allocates that 8.8 million dollars on the

7    same pro rata scale as the original 7.8.  This contract,

8    however, provides for two percent bid protection as a breakup

9    fee for Rudd Development if Rudd Development isn't the highest

10   and best offer, and this contract is subject to higher and

11   better offers.

12    In addition, Your Honor, Vornado Realty has contacted

13   the trustee, and they're here represented by Fried Frank today,

14   and they have expressed an interest and have advised the

15   trustee that they are prepared to make a bid of at least nine

16   million dollars for these three properties.

17    So I wanted to fully apprise the Court of these facts

18   that have developed over the last two days, literally over the

19   weekend.  And the contract with Rudd literally being executed

20   at about 12:45 this afternoon.

21    THE COURT:  Well, if Vornado's real, that would seem

22   to be higher and better than the Rudd one.

23    MR. CAMPO:  It would, Your Honor.  Now, Vornado has

24   given us an indication that they would --

25    THE COURT:  When you say the contract, is it

7

1    otherwise on the same terms and conditions as the --

2          MR. CAMPO:  Identical, Your Honor.

3          THE COURT:  Identical, except for the purchase price

4    and the name of the purchaser?

5          MR. CAMPO:  Separate purchase prices for each of the

6    properties allocated, according to the square footage of each

7    of these properties, Your Honor.  There's no secret of what's

8    going to happen on 125th Street.  These properties, these

9    buildings -- which now, Your Honor, two of them are completely

10   vacant, one of them has, I believe, three residential tenants

11   in it -- are really being sold for their square footage.

12   There's a total of 75 by 100 square feet.

13          Now, we did not shop the properties, Your Honor.  It

14   was our agreement with Mr. Shapiro, given the fact that he

15   entered into these contracts back in August before Your Honor

16   even tried this case with respect to the Irgangs and the

17   fraudulent transfers, that we would not shop.  We didn't shop

18   it, but bidders have sought us out, Your Honor.

19          Mr. Pereira, as a fiduciary, obviously advised Mr.

20   Shapiro of his fiduciary duty.  He advised Mr. Shapiro that he

21   could not turn his head to an extra million dollars just for

22   these properties alone and that he would have to entertain that

23   offer if it turned out to be real.

24          Mr. Shapiro was given the opportunity to become the

25   stalking horse, if he so chose.  He declined.  But he is

8

1   obviously here, and he's prepared to consider, although he may

2   request some additional time to consider whether he wants to

3   bid against the 8.8 million dollar offer.

4          THE COURT:  Well, isn't there a nine million dollar

5   offer there?

6          MR. CAMPO:  Well, the nine million dollar offer, Your

7   Honor, hasn't been -- there's no deposit for the nine million

8   dollar offer.  We have a deposit for the 8.8 million dollar

9   offer.  I think at this point the Vornado offer would have to

10  be firmed up that it's real, and potentially either we could

11  have a hearing on those higher and better offers today, or if

12  the parties and the Court --

13         THE COURT:  Well, as I read the agreement, although

14  there's a time of the essence provision, the deadline in the

15  agreement is that it needs -- the bankruptcy court order needs

16  to be entered within 120 days of the date of the agreement.

17         MR. CAMPO:  The full execution of that agreement,

18  Your Honor, which was August 24.  That's when --

19         THE COURT:  Right.  So that would be in February.

20         MR. CAMPO:  No.  No, I'm sorry.  It's 120 days from

21  the execution, Your Honor, not 180.

22         THE COURT:  Oh, okay, I'm sorry.

23         MR. CAMPO:  It's 120.

24         THE COURT:  I see.

25         MR. CAMPO:  Which would have been December 24th.

9

1          THE COURT:  Okay.

2          MR. CAMPO:  That is the reason why we brought this

3    matter on, Your Honor --

4          THE COURT:  All right, but you still have --

5          MR. CAMPO:  Notwithstanding that Your Honor hadn't --

6          THE COURT:  But you still have some time.  I mean, we

7    don't have to have a hearing today, in other words.

8          MR. CAMPO:  We do not have to have a sale hearing

9    today.  That is correct.  In fact, Your Honor, the deal with

10   Rudd is that the -- well, when you say we don't have to -- I

11   mean, under the Shapiro contract, Your Honor, we would have to

12   have an order entered by December 24.

13         THE COURT:  Right.

14         MR. CAMPO:  Under the Rudd contract we have to have

15   an order entered by January -- I believe it's either 16th or

16   17th.  So that gives us a little more time.  We haven't had any

17   formal discussions with the Vornado group regarding what their

18   timeframe would be.

19         But suffice it to say, Your Honor, from the trustee's

20   standpoint, given what's happening with real estate, and

21   potentially what may happen with respect to other market

22   conditions, we would like to proceed and have the sale of these

23   properties as soon as possible, because this is a significant

24   amount of money that would be there for the estates.

25         THE COURT:  Well, I understand that.  But as soon as

10

1    possib -- I mean, I guess the question is whether the trustee

2    wants to test the market some, particularly given that you've

3    gotten these two proposals sort of at the last minute.  And by

4    some, there's obviously some time between now and year end or

5    not.  And particularly in light of the contingency in the

6    transaction, which is the determination that the trustee has

7    right, title and interest.

8            MR. CAMPO:  That is correct, Your Honor.

9            THE COURT:  So, I mean, maybe you want to talk to Mr.

10    Pereira, but it seems to me, particularly given the distinction

11    between the Vernado and the Rudd proposals, one having a

12    breakup fee and one not, that you may want to firm at least

13    that up and come back later this week or next week --

14            MR. CAMPO:  I think what I'm hearing, Your Honor --

15            THE COURT:  -- having adjourned this hearing.

16            MR. CAMPO:  -- suggests that possibly you want to

17    consider whether or not we also have formal bidding procedures?

18            THE COURT:  Well, that's up to the trustee.

19            MR. CAMPO:  Is that up to the trustee?

20            THE COURT:  I don't believe you necessarily need to

21    have a lengthy shopping period here, because I think the

22    trustee's claim to these buildings and the existence of this

23    property is pretty well known in the marketplace, as evidenced

24    by these two proposals.

25          As far as bidding procedures are concerned, the Court

11

1    guidelines are out there.  And in the absence of an order

2    approving bidding procedures, I would follow the court

3    guidelines, which I think are pretty clear in terms of an

4    auction itself, as opposed to, you know, the events leading up

5    to an auction where there's some discretion in the trustee.

6    And people know how to conduct an auction in bankruptcy court,

7    and certainly the trustee does; he's done it countless times.

8           MR. CAMPO:  Countless times, Your Honor.  Your

9    Honor --

10          THE COURT:  I want to -- I do want to make sure --

11   and I believe this is the case, but I just want to confirm

12   it -- that the trustee's not being cute here.  He's not selling

13   his right, title, and interest.

14          MR. CAMPO:  Oh, no, Your Honor.

15          THE COURT:  He's going to sell the buildings.

16          MR. CAMPO:  He's selling the fee, Your Honor.  In

17   fact --

18          THE COURT:  And the sale is contingent upon the

19   trustee having the fee to sell, and if he doesn't then the

20   deposit goes back.

21          MR. CAMPO:  That's correct, Your Honor.

22          THE COURT:  And that's it.  That's the extent of the

23   damages.

24          MR. CAMPO:  There's no question the trustee's not

25   being cute.

12

1          THE COURT:  Okay.

2          MR. CAMPO:  Everybody's aware of the litigation.

3          THE COURT:  Right.

4          MR. CAMPO:  Everybody understands that the trustee --

5     when the trustee sells his right, title, and interest, if Your

6     Honor hasn't determined in the approval of the sale that the

7     trustee is going to be successful in connection with the

8     action, obviously you wouldn't approve it.  I think our

9     response is pretty --

10          THE COURT:  Well, that's not necessarily the case.

11          MR. CAMPO:  Okay.

12          THE COURT:  Because the only damages is the return of

13     the deposit.  And, again, under Orion Pictures -- this is a

14     summary proceeding.  I have the adversary in front of me, and

15     that's what I'm going to decide, whether or not the trustee has

16     the buildings.  The sale is whether it's an exercise of good

17     business judgment to sell the properties in this way.  And I

18     can, a la Orion Pictures, give some analysis as to the

19     trustee's likelihood of success.  And the trustee has

20     correctly, I think, provided for this.

21          It is less of a significant analysis, because the

22     closing's supposed to happen promptly.  It can only happen if

23     the trustee owns the property.  And if the trustee doesn't own

24     the property, because it turns out I rule in the Irgang's

25     favor, all that happens is the deposit goes back with the

13

1    interest earned on it.

2         So I think it makes sense to move ahead quickly.  I

3    am going to rule promptly.  I told everyone I intended to rule

4    either right before New Years or shortly thereafter.  So there

5    will be a decision shortly.  And if the trustee wanted to go

6    out and find a purchaser, pending that determination, that was

7    a great idea.

8         MR. CAMPO:  Okay.

9         THE COURT:  And the only wrinkle here is whether he

10   still wants to keep beating the bushes a little bit.  And I

11   think, you know, for a little bit it makes sense, given these

12   two offers.

13        MR. CAMPO:  Your Honor, I --

14        THE COURT:  If you want to adj -- I have two other

15   matters on.  If you want to adjourn and talk with the

16   prospective bidders some more after talking with your client,

17   that's fine too.

18        MR. CAMPO:  That would be fine, Your Honor.  I was

19   going to ask if we could do that.

20        THE COURT:  Yeah, that's fine.

21        MR. CAMPO:  If that would not be too much to ask Your

22   Honor to --

23        THE COURT:  No, that would be great.  That's fine.

24        MR. CAMPO:  -- to do that.  All right.  Thank you,

25   Your Honor.

14

1         THE COURT:  Thank you.

2         MR. CAMPO:  Your Honor, does Your Honor want copies

3   of the contracts that have been entered into now with the --

4         MR. SPEAKER:  I was just saying --

5         MR. CAMPO:  Do you want copies of the Rudd contracts

6   now too?  Or I can give them to you when I --

7         THE COURT:  I don't think I need them right now.

8         MR. CAMPO:  Okay.

9         THE COURT:  I don't think I need them.

10        MR. CAMPO:  Thank you.

11        THE COURT:  Yeah.  You can use the conference room

12  here.

13        MR. CAMPO:  That would be fine.  Thank you.

14        THE COURT:  Oh, and I'm sorry, Mr. Campo, I haven't

15  forgotten that the Irgangs have made their offer too.

16        MR. CAMPO:  Pardon?

17        THE COURT:  I haven't forgotten that the Irgangs have

18  made their offer too.  And I'm telling you that I think it

19  makes sense to continue to beat the bushes.

20        MR. CAMPO:  Thank you, Your Honor.

21        THE COURT:  Okay.

22     (Hearing adjourned at 2:23 p.m. and resumed at 4:01 p.m.)

23        THE CLERK:  Please be seated.

24        THE COURT:  Okay.  We're back on the record in

25  Maywood Capital.  Mr. Campo, what do you have to report?

15

1          MR. CAMPO:  All right.  Your Honor, the following,

2    Your Honor.  I have met with all the prospective bidders of the

3    property, including the Irgangs.  We've met.  The trustee has

4    met.  I've also consulted with the trustee.  And what we would

5    like to do, because I think there's a general consensus among

6    everybody, would be to schedule a hearing, at which time we

7    would conduct an auction here in the court.  We're going to use

8    the local rules, Your Honor.  We don't think we need to have

9    anything more elaborate in terms of bid procedure.

10          We are going to ask Your Honor, at this point we

11    have, obviously we have four potential bidders.  We have the

12    original contract vendee, which is Mr. Shapiro and his LLCs.

13    We have Frederick Rudd and the Rudd Development Group, who

14    signed the contract with the trustee today at 8.8 million with

15    a two percent breakup fee.  We have Vornado, who has -- is not

16    interested in being the stalking horse.  And we also had the

17    Irgangs.

18          What we do want to do, Your Honor, so that all the

19    bidders are here when we come back, would be to ask the Court

20    to approve the trustee giving the bid protection of two percent

21    to the current contract vendee that has signed the highest bid

22    contract, which is the 8.8 million dollars, to Rudd.  And then

23    come before the Court for the sale on the return date.

24          Again, there will be no ability to use the stalking

25    horse as a credit bid.  Any protection if the bidder -- if Rudd

16

1  is going to bid they're going to bid dollar for dollar against

2  the other bidders, including Vornado.  And at that point

3  whatever the highest bid is, we'd ask the Court to approve it,

4  assuming Your Honor is going to approve the sale in the first

5  instance, based upon the pending -- obviously, the pending

6  litigation.

7          THE COURT:  And the stalking fee would be paid only

8  out of the proceeds of --

9          MR. CAMPO:  It would be paid --

10          THE COURT:  -- a higher and better transaction that

11  closes --

12          MR. CAMPO:  Only out of a higher and better

13  transaction.  It's limited to the two percent of the 8.8, which

14  is 176,000 dollars.  And the minimum bid, to be higher than

15  that, would be at least two percent higher.  So the estate

16  would still net 8.8 million dollars out of that transaction.

17          THE COURT:  And thereafter all bids would be equal.

18  There would be no credit --

19          MR. CAMPO:  There will be no credit bidding.  All

20  bids will be equal.  Now, I understand that Mr. May may want to

21  say something with respect to what type of a proposal the

22  Irgangs may be willing to make.  But it's our view that at this

23  point, Your Honor, this is got to be an apples to apples type

24  of a bid, and everybody should be bidding in dollars.

25          THE COURT:  Okay.

17

1          MR. CAMPO:  And, obviously, there is no bid

2    protection ultimate fee paid to the Rudd Group, if for any

3    reason the Court didn't approve a sale.

4          THE COURT:  Or the sale didn't close.

5          MR. CAMPO:  Right.  If the sale -- if the Court --

6          THE COURT:  Because it would payable only out of the

7    proceeds of a closed sale.

8          MR. CAMPO:  That's correct.  It has to be out of a

9    closed sale.  That's correct.

10         THE COURT:  Okay.  All right.  Well, I have the 21st

11   free, Friday the 21st.

12         MR. SPEAKER:  Fine.

13         MR. CAMPO:  I think we are --

14         THE COURT:  I have -- I mean, I have other dates that

15   are earlier than that.  But I thought that was the --

16         MR. SPEAKER:  We're going to be here.

17         MR. CAMPO:  Yeah, we are.  But, I mean, wouldn't you

18   rather have it on a different day if we could?  You want to do

19   it on the 21st.

20         MR. SPEAKER:  Absolutely.

21         MR. CAMPO:  All right, Your Honor, that will work.

22         THE COURT:  And that would be at 10 o'clock.

23         MR. CAMPO:  At 10 a.m, Your Honor?

24         THE COURT:  Yes.  Now, I can conduct the auction

25   here.  I can also conduct it -- it would in any event be in the

18

1    courtroom.  It can also be conducted by the trustee with a

2    court reporter in the conference room.  And that's my normal

3    practice.  And that way, I find it's more efficient.

4                MR. CAMPO:  You mean your normal practice would be to

5    have the trustee conduct it in the conference room?

6                THE COURT:  Right.  With a court reporter in the

7    conference room, that he would bring down.  And then confirm

8    the results of the auction.

9                MR. CAMPO:  And then just confirm the sale before the

10   Court afterwards?

11               THE COURT:  Right.  And then people --

12               MR. CAMPO:  If that's the way the Court --

13               THE COURT:  -- can raise their issues as to whether

14   they actually think they're higher and better or not.

15               MR. CAMPO:  Okay.

16               THE COURT:  And I imagine that's when Mr. May would

17   raise his issue.  And, obviously, I believe that the trustee

18   should be able to and should consider a bid by the Irgangs that

19   takes into account, as the Irgangs take into account, the risks

20   to the estate of my not ruling in the trustee's favor in the

21   avoidance litigation, based on the current proposal that was in

22   the Irgang's objection, particularly in light of the increased

23   consideration that you described to me this morning.  But I've

24   made no analysis beyond that.  I haven't calibrated any risk

25   yet.

19

1          MR. CAMPO:  Okay.  I understand you.

2          THE COURT:  In the first instance that's for the

3  trustee to do.

4          MR. CAMPO:  Of course, Your Honor.  And --

5          THE COURT:  But I can tell you that just based on

6  those two data points, the bid that was made by the Irgangs in

7  their objection, and the Rudd bid, I believe the Rudd bid does

8  deserve to serve as the stalking horse.

9          MR. CAMPO:  Okay.  Very good.  Your Honor, I guess --

10  and I'm not saying this is the appropriate time, but I'm

11  assuming that I'll be hearing from Mr. May about what the

12  Irgang's proposal is.  And at some point we'll come --

13          THE COURT:  Well, as a matter of efficiency, that

14  probably makes sense.

15          MR. CAMPO:  Well, we --

16          THE COURT:  I mean, he could make it at the auction

17  too.  But it's always harder to conduct an auction when you're

18  comparing apples to oranges.  And I'd advise Mr. May to be in

19  some consultation with you beforehand.  If he doesn't want to

20  do that, the trustee will have to do the best he can, you know,

21  with the facts he's given at the auction.

22          MR. CAMPO:  Okay.

23          MR. MAY:  Your Honor, well, we'll try to cooperate

24  with Mr. Pereira and Mr. Campo to try to make the auction as

25  efficient as possible.  I am assuming, however, that no one

20

1    else, prior to the date of the auction, will be making

2    additional bids and that all the bidding will take place at

3    that point in time.  So we would be, I guess, on a bit of a

4    different track if we were making a proposal to Mr. Campo

5    before the auction.

6            THE COURT:  My sense is that that's correct, because

7    you're going to have to explain the proposal more.  It's not

8    going to follow the form of this contract.

9            MR. MAY:  Right.  Okay.

10           THE COURT:  In other words.  I mean, everyone else is

11    bidding off of this particular contract, which the Rudd Group

12    has adopted, with the change in the purchase price, and yours

13    isn't.  So that's why yours would be different.

14           MR. MAY:  Well, okay, so we understand.  And we'll be

15    prepared in an appropriate way to try to make this an efficient

16    auction --

17           THE COURT:  Okay.

18           MR. MAY:  -- even though we may not be bidding in the

19    same fashion.

20           THE COURT:  Okay.

21           MR. CAMPO:  Your Honor, there's a couple other

22    housekeeping items I'd like to clarify.  Number one, Vornado

23    group has asked for me to confirm a statement that I had made

24    earlier which was that there are three residential tenants in

25    one of the buildings, and that's all there are.  And I believe

21

1    that Mr. May and Mr. Irgang can confirm --

2             MR. MAY:  That's correct, Your Honor.

3             MR. CAMPO:  -- that these -- and could we just get

4    for the record which building has the three residential

5    tenants?

6             MS. SPEAKER:  79.

7             MR. SPEAKER:  79 East 125th Street.

8             MR. CAMPO:  Okay.  And, Your Honor, we also had an

9    understanding with Mr. May, which I seriously doubt he would

10   ever go back on, which is that the Irgangs will continue to

11   agree not to do anything whatsoever to encumber these

12   properties, including entering into any leases with any parties

13   until there's a hearing and a determination as to whether or

14   not the trustee can sell.

15            MR. MAY:  Yeah, I believe that's --

16            THE COURT:  That's sort of been the rule of the case.

17            MR. MAY:  Yeah, it's already subject to, I think, an

18   order of the Court.

19            MR. CAMPO:  I agree.

20            MR. MAY:  So, I mean --

21            MR. CAMPO:  I agree.

22            MR. MAY:  I mean, there's no need to even burden the

23   record with it.

24            MR. CAMPO:  It's just of particular concern to some

25   of the prospective bidders.

22

1        THE COURT:  The other parties want to hear that.

2        MR. MAY:  Okay.

3        MR. CAMPO:  Yes.

4        THE COURT:  But that's certainly my understanding.

5        MR. CAMPO:  That is, Your Honor, and that is correct.

6   And that is why I said it, because the other parties wanted to

7   understand it.

8        THE COURT:  Right.

9        MR. CAMPO:  Also, Your Honor, if we could get, to the

10  extent that -- for the three residential tenants at 79, copies

11  of the leases, if they are under the lease agreements.

12       THE COURT:  Okay.

13       MR. CAMPO:  And if we could get those delivered to us

14  by tomorrow so that we can share that with any of the other --

15  with the prospective bidders.

16       MR. MAY:  We'll -- I have to talk to the client, but

17  we'll commit to getting them to you.  If we can't get them

18  tomorrow --

19       THE COURT:  They're nodding --

20       MR. MAY:  -- we'll get them on Thursday.

21       THE COURT:  They're nodding their assent to getting

22  the leases.

23       MR. MAY:  Okay.

24       THE COURT:  If they're locked in a safe somewhere and

25  you can't find the key, I understand.

23

1          MR. MAY:  Okay.

2          THE COURT:  But I would assume that you can get them.

3          MR. CAMPO:  And then lastly, Your Honor, to the

4   extent that any of the bidders want to gain access to the

5   property for purposes, before the bidding procedure takes place

6   on the 21st, before the bidding takes place, to visually

7   inspect the property, that Mr. May has agreed that on

8   reasonable notice that access would be given to those.

9          MR. MAY:  And all I request, Your Honor, is that if

10  any other bidder wants to see the property, that they either e-

11  mail me or Mr. Kim, my partner, and that we'll make

12  arrangements for a time that makes sense for both parties, to

13  get them in there.

14         THE COURT:  Okay.  That's very reasonable.

15         MR. CAMPO:  Okay.  And, Your Honor, we have just met

16  with all of the bidders and we've obviously advised all of them

17  or affirmed that obviously they should not be speaking with one

18  another, that nobody should be having any conversations with

19  any other bidders with respect to the properties.

20         THE COURT:  Right.  That's a given in bankruptcy

21  auctions.  The ultimate thing that any winning buyer wants is a

22  finding that they acted in good faith and without any collusion

23  under Sections 363(m) and (n).  And I can't give that finding

24  if you all have talked with each other.  I always ask, when

25  there are multiple bidders, if there have been any such

24

1    conversations.  And so now you all know for sure.

2         Let me turn back, though, to the motion for approval

3    of the stalking horse protection for Rudd.  Based upon the

4    trustee's determination, which is an obvious one, given the

5    increase of the purchase price, and the benefit to the estates

6    of having a committed stalking horse purchaser to start off the

7    bidding at an auction.  And, finally, given the amount and

8    conditions upon which the breakup fee would be paid, I find

9    that the two percent breakup fee, payable out of the proceeds

10    of a closed higher and better transaction is fair and

11    reasonable and it's supported by sound business judgment.

12         So all parties are acting in reliance upon that.  If

13    Rudd actually wants an order memorializing that, although it's

14    part of the rules of the auction at this point, they should

15    circulate a copy to Mr. Campo and then submit it to Court.  But

16    in advance of any such order being admitted, that's the rule of

17    the auction and that claim will be allowed and paid out of the

18    proceeds of a higher and better transaction with another party

19    that closes.  And the bidding, if there is to be an additional

20    bid, will start at an amount in excess of the Rudd bid plus the

21    amount of the breakup fee.

22         MR. MAY:  All right.  One minor point of

23    clarification.  Subsequent bids after the initial bid, they

24    don't also have to be in the same bidding increments, I gather?

25         THE COURT:  That's really going to be up to the

25

1   trustee to set it.  I normally --

2          MR. CAMPO:  Your Honor, if I may, what we intend to

3   do, what the trustee will do is in accordance with the local

4   rules.  Although we are going to follow the local rules, we

5   will advise all of the parties who are present today if there's

6   going to be any incremental bidding.  And we'll give them ample

7   notice before the 21st if that's the way we're going to handle

8   it.  But, obviously, as Your Honor correctly points out, at the

9   day of the auction, the trustee, within his discretion, could

10  change that incremental bid in any amount.

11         THE COURT:  Right.  I normally permit, for an asset

12  of this size, something along the lines of, you know, a hundred

13  thousand increments.  But if it gets close, it could be fifty

14  thousand.  Or if the trustee wants to go to five hundred

15  thousand, just as long as it's clear to the parties what it's

16  going to be in advance for each round, is fine.

17         MR. CAMPO:  Okay.  And, Your Honor, and I want to say

18  first off, I appreciate the Court's indulgence today in

19  assisting us in giving us the time to work out some of these

20  details today.

21         I guess, Your Honor, the only other issue is then, I

22  guess, is obviously going to deal with the issue of resolving

23  the objection in which presuming -- does the Court plan to do

24  that as part of --

25         THE COURT:  Well, I think -- and maybe I hope you

26

1  could take this away from my remarks at the beginning of the

2  hearing.  The trustee cannot and doesn't intend to sell what he

3  doesn't own.

4          MR. CAMPO:  Correct.

5          THE COURT:  So this is a bid that, when it wins, will

6  be conditioned upon resolution of the trustee's adversary

7  proceeding against the Irgangs --

8          MR. CAMPO:  Correct.

9          THE COURT:  -- in which he says he should own these

10  three buildings.  Based on the contract and based on my

11  internal schedule for deciding that matter, where I've already

12  had the trial and now the briefing's fully closed, I expect to

13  issue a ruling in that trial no later than the end of January,

14  and hopefully before then.  The only caveat to that is if some

15  huge case files and gets me up to my eyeballs in other matters

16  then the schedule may slip a little bit.

17          But I appreciate the need to move promptly on this.

18  And both sides have submitted detailed proposed findings of

19  fact and conclusions of law.  And I think I can keep to that

20  schedule.  So for the bidder's planning purposes, they should

21  assume that they would be closing on the transaction, or they

22  would be able to close on the transaction, hopefully by the end

23  of January, if not then in early February.

24          I read the Irgang's objection, primarily to make sure

25  that they wanted to point out that fact that the trustee can't

28

1

2                        C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, court approved transcriber, certify that

5    the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8    Sharona Shapiro    Digitally signed by Sharona Shapiro
                        DN: cn=Sharona Shapiro, c=US
                        Reason: I am the author of this document
9    _____    Date: 2007.12.21 13:48:36 -05'00'    December 21, 2007

10   Signature of Transcriber                  Date

11

12   SHARONA SHAPIRO

13   typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit "G"

Isaac Nutovic (IN-2076)
Nutovic & Associates
488 Madison Avenue – 16th Floor
New York, New York 10022
(212) 421-9100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:

MAYWOOD CAPITAL CORP., et al.,

                                          Debtors.
------------------------------------------------------------x

125TH STREET OWNER LLC.,

                                          Plaintiff.

             vs.

JOHN S. PEREIRA, AS CHAPTER 11 TRUSTEE
  OF-- 65-67 EAST 125TH STREET REALTY
  CORP., 77 EAST 125TH STREET REALTY CORP.
  and 79 EAST 125TH STREET REALTY LLC,
  MICHAEL RUBIN,
  JOHN DOES 1-10 AND
  RUDD DEVELOPMENT GROUP LLC.,

                                          Defendants
------------------------------------------------------------x

Chapter 11
Case No. 05-10987 (RDD)

Adv. Pro. No.: 07-3224

## MOTION FOR PRELIMINARY INJUNCTION
## AND TEMPORARY RESTRAINING ORDER

Upon the accompanied declaration of Isaac Nutovic and Saadia Shapiro and

Plaintiff's Memorandum Of Law in Support of Motion for Preliminary Injunction and

Temporary Restraining Order dated December 19, 2007, Plaintiff, 125th Street Owner

LLC., by its attorneys, Nutovic & Associates, hereby moves, pursuant to Rule 65 of the

Federal Rules of Civil Procedure made applicable by Rule 7065 by the Federal Rules of

1

Bankruptcy Procedure, for a preliminary injunction and temporary restraining order, (i)

enjoining John Pereira, as Trustee of 65-67 East 125th Street Realty Corp., and 77 East

125th Street Realty Corp. and 79 East 125th Street Realty LLC., from conducting an

auction sale or taking any other steps to sell three properties which the Trustee contracted

to sell to Plaintiff; (ii) granting Plaintiff such other relief as may appear appropriate to

this Court.

Plaintiff requests that the Court schedule a hearing to consider the entry of a

temporary restraining order in accordance with the proposed order annexed.

Dated: New York, New York                 Nutovic & Associates
       December 19, 2007            Attorneys for 125th Street Owner LLC.

                                   *s/ Isaac Nutovic*
                                   Isaac Nutovic (IN2076)
                                   488 Madison Avenue
                                   16th Floor
                                   New York, New York 10022
                                   (212) 421-9100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

MAYWOOD CAPITAL CORP., et al.,                              Chapter 11
                                                            Case No. 05-10987 (RDD)

                                             Debtors.
-------------------------------------------------------------x

125TH STREET OWNER LLC.,

                                                            Adv. Pro. No.: 07-3224

                                             Plaintiff.


        vs.


JOHN S. PEREIRA, AS CHAPTER 11 TRUSTEE
  OF-- 65-67 EAST 125TH STREET REALTY
  CORP., 77 EAST 125TH STREET REALTY CORP.
  and 79 EAST 125TH STREET REALTY LLC,
  MICHAEL RUBIN, JOHN DOES 1-10 AND
  RUDD DEVELOPMENT GROUP LLC.,

                                             Defendants.
-------------------------------------------------------------x

## ORDER TO SHOW CAUSE WITH
## TEMPORARY RESTRAINING ORDER

         **UPON** the Complaint herein, the annexed declarations of Saadia Shapiro sand Isaac

Nutovic, attorney for 125th Street Owner LLC., (the "Plaintiff"), dated December 19, 2007, and

Plaintiff's Memorandum of Law in Support of Order To Show Cause and upon all other papers

and proceedings heretofore had, and it appearing that (i) the Trustee withdrew the Trustee's

Motion Seeking Court Approval Of The Sale Of Trustee's Right, Title And Interest Of Certain

Real Property and Improvements Located At 65-67 East 125th Street, New York, New York, 77

East 125th Street, New York, New York, And 79th East 125th Street, New York, New York, Free

1

and Clear of Liens, Claims, Interests And Encumbrances, Pursuant To 11 U.S.C. §§ 363, 506(c) And 1146(c) Of the Bankruptcy Code (the "Approval Motion") and (ii) an auction sale of the properties known as 65-67 East 125th Street, 77 East 125th Street, and 79 East 125th Street (the "Properties") is scheduled in this Court for December 21, 2007;

LET John Pereira, As Chapter 11 Trustee Of – 65-67 East 125th Street Realty Corp., 77 East 125th Street Realty Corp., and 79 East 125th Street Realty LLC., (the "Trustee") show cause before this Court in court room # 632, located at the United States Court House New York, New York 10004 on the ___ day of December, 2007, at ___ o'clock in the ___ noon of that day, or as soon thereafter as counsel can be heard, why an Order should not be made and entered herein:

    (i)    enjoining the Trustee from conducting an auction sale or taking any steps to transfer the Properties; and

    (ii)   granting Plaintiff such other and further relief as this Court deems just and proper under the circumstances.

**ORDERED**, that pending the hearing and determination of this motion, the Trustee is stayed and enjoining from conducting an auction sale or taking any steps to transfer the Properties; and it is

**ORDERED**, that Plaintiff shall post a bond in the amount of $_____ as security for costs and damages as may be incurred by the defendant Trustee for wrongful issuance of this order

**ORDERED**, that service by overnight mail of this order and the papers, upon which it is based, upon counsel to the Trustee, on or before the ___ day of December, 2007, shall be deemed sufficient service.

**ORDERED**, that papers in opposition to the relief requested by the Plaintiff shall be

2

filed and served upon counsel to Plaintiff so that they are received by no later than December

_____, 2007.

_____

U. S. Bankruptcy Judge

3

Isaac Nutovic (IN-2076)
Nutovic & Associates
488 Madison Avenue – 16th Floor
New York, New York 10022
(212) 421-9100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

|  |  |
|---|---|
| In re: | Chapter 11<br>Case No. 05-10987 (RDD) |

MAYWOOD CAPITAL CORP., et al.,

                                                         Debtors.
--------------------------------------------------------------x

125TH STREET OWNER LLC.,

                                                         Adv. Pro. No.: 07-3224

                                              Plaintiff.

                        vs.

JOHN S. PEREIRA, AS CHAPTER 11 TRUSTEE
  OF-- 65-67 EAST 125TH STREET REALTY
CORP., 77 EAST 125TH STREET REALTY CORP.
and 79 EAST 125TH STREET REALTY LLC,
MICHAEL "MIKE" RUBIN,
 JOHN DOES 1-10 AND
 RUDD DEVELOPMENT GROUP LLC.,

                                              Defendants
--------------------------------------------------------------x

## **SHAPIRO DECLARATION**

Saadia Shapiro, declaring under penalty of perjury pursuant to 28 U.S.C. § 1746

states as follows:

### **Introduction**

I am the manager of 125th Street Owner LLP (the "Plaintiff"), Plaintiff in this case.  I

make this declaration in support of Plaintiff's motion for a preliminary injunction and

temporary restraining order with personal knowledge of the facts stated.

1

In limited instances my knowledge is supplemented by facts appearing in the court record of these proceedings.

2.      On March 23, 2005, this Court ordered the joint administration of the Chapter 11 cases of forty eight different debtors under the above main caption and directed the appointment of a Chapter 11 Trustee for these debtors. The Chapter 11 petitions for the debtors involved in this adversary proceeding -- 65-67 East 125th Street Realty Corp., 77 East 125th Street Realty LLC and 79 East 125th Street Realty LLC (the "Debtors") -- were each filed on February 19, 2005.

3.      By order dated March 24, 2005, this Court approved the appointment of John S. Pereira (the Trustee") as the Chapter 11 Trustee for the procedurally consolidated debtors, which included his appointment as the Chapter 11 Trustee for the estates of the Debtors.

4.      In this action, Plaintiff seeks to enforce its rights under contracts (the "Contracts") with the Trustee for the sale of three properties (the "Properties"). At this juncture Plaintiff seeks to compel the Trustee to present the Contracts for approval by this Court before he is allowed to dispose of the Properties by auction sale or otherwise.

### The Contracts Of Sale

5.      In 2005, I approached the Trustee's attorney, John Campo, on several occasions regarding my interest in purchasing the Properties. (I had first called the Trustee himself, but was told to speak to his attorney). I explained that I owned, or was about to purchase, the lots in between the Properties and because of my unique geographical position would pay above market prices to obtain the Properties. Attached

as Exhibit A is a tax map which outlines the properties currently owned by me and the three Trustee Properties that are the subject of this action.

6.     These bankruptcy proceedings involve many more properties than the three parcels which are the subject of this action. I spent almost two years convincing, discussing, and negotiating with Trustee's counsel to segregate these three properties on 125th Street from the rest of the Trustee controlled properties.    The essence of my argument was twofold. My first point was that as owner of three contiguous properties in the very middle of the Trustee Properties, I would be willing to pay a premium for the Properties since they are not contiguous and would not have the same value to any other purchaser. My second point was a good neighbor argument.  I already had building plans for the four lots I owned; if I could expand my building project to include the Trustee's three abandoned* lots it would result in a betterment of the Harlem neighborhood on 125th Street.

7.     Counsel to the Trustee initially told me that the time was not right to sell the Properties. He explained that the Trustee was still in litigation seeking to recover title to the Properties. However, I told counsel to the Trustee that I would be prepared to enter into a contract, give the Trustee a deposit and have the closing take place if and when the Trustee prevailed in the litigation. I repeatedly sought and obtained reassurance from Trustee's counsel that in light of my willingness to have my deposit monies tied up at no interest for a potentially lengthy period of time the Trustee would not "shop" the deal further.

---

* The only currently occupied property of the Properties has three out of several apartments occupied by tenants who are not paying rent.

3

8.      To convince the Trustee that the price I would pay for the Properties was above market, I provided him with (i) information regarding the recent acquisition of the lots owned by me which were the same size as each of the Properties, (ii) bank appraisals on those lots which had been performed between the years 2004 and 2006 in connection with the purchase or re-financing of the properties (iii) other recent comparable sales of identically sized properties and (iv) other pertinent information, such as the new zoning rules negatively affecting these Properties.  The appraisals and comparable sales which I provided to him showed that the value of identically sized lots with identical zoning features and comparable buildings ranged from $1.675 million to $2.3 million.

9.      I would not have disclosed any of this information had Trustee's counsel not "lulled" me with specific assurances that I was the only logical and proper purchaser and that he would be properly fulfilling his duty as a Trustee by entering into a contract with me which would not be subject to other offers.

10.     After some negotiation we agreed that the price for the three Properties would be fixed at $7,800,000 -- or an average price of $2,600,000 for each property. In a time when real estate prices on 125th Street in Harlem were trending downwards as a result of an announced down-zoning of that section of the street, this represented an increase of $300,000 per lot, or 13%, over the highest of the most recent comparable sales of identically sized lots on the same block.  For the three Properties, this was a premium of approximately $900,000 over the highest prior market prices.

11.     In the course of negotiations, counsel to the Trustee repeatedly assured me that the Trustee did not see the need to look for other buyers and would not even entertain any other offers. The evidence of the appraisals and history of recent sales at significantly

lower values; the fact that the Properties were not yet in the Trustee's name and my willingness to leave my deposit without interest and wait an indeterminate period for the closing, all mitigated in favor of providing me with the assurance I sought.

12.    Accordingly the Trustee specifically agreed that the Contracts would not to be subject to other higher offers. This is reflected in the Contract's omission of a "higher or better offer" provision.  Such a provision *is* included in eight prior sales made by the Trustee in this case. See Paragraph 19 of each of the following docket entries in this case; ##107, 108, 109, 166 (Exhibits 2, 3, 4, and 5) and 377 (Exhibit A).  That paragraph which was deliberately omitted in the Contracts with Plaintiff read as follows:

Higher and/or Better Offers

(i)    This agreement is conditioned upon Trustee's not receiving, after notice and hearing, a higher or better offer which Trustee is prepared to accept and which the Bankruptcy Court shall approve, but Trustee agrees that no offer shall be deemed higher or better unless it provides for a Purchase Price equal to or greater than 105% of the amount stated as the Purchase Price in Paragraph 2. If such an offer is accepted by Trustee and approved or authorized by the Bankruptcy Court, whether or not this Agreement has previously been approved or authorized by the Bankruptcy Court, (a) this Agreement shall be null and void with respect to the named Purchaser referred to in the preamble of this Agreement and any assignee of the same, (b) the Deposit, together with any accrued interest, shall be returned to said Purchaser, and (c) neither party shall have any further rights or obligations hereunder, except rights or obligations under this Agreement which expressly survive the Closing or other termination of this Agreement.

(ii)    If Trustee elects to conduct an auction of the Property, then with respect to any offer at such auction that is received, accepted and approved in accordance with subparagraph 19(i) above, the offeror shall assume all the terms of this Agreement as Purchaser hereunder (as such terms, including those with respect to the Purchase Price, shall have been modified by the terms of the auction), and this Agreement shall not thereafter be conditioned upon or subject to Trustee's not receiving a higher or better offer.

13.    On August 21, 2007, the Trustee, and I executed the Contracts and I deposited $780,000 with the Trustee.  (Copies of the Contracts are annexed as part of Exhibit B, the Trustee's motion to seek approval of the Contracts.)

14.    Pursuant to the Contracts:

- Plaintiff agreed to pay $7,800,000 for the Properties for an average price of $2,600,000 which is $300,000 per lot above the highest of most recent comparable sales in a down-trending market

- Plaintiff agreed to leave a $780,000 deposit for an indeterminate period of time [paragraph 6. date set by Trustee not less than 40 days after Court approval]

- Interest on the deposit monies were not to be credited against the purchase price [paragraph 2(i)]

- The contracts were subject to Bankruptcy Court approval [paragraph 3], but were not made subject to other higher or better offers

- The Trustee agreed to "promptly" file a motion to obtain Bankruptcy Court approval of the contracts [paragraph 3(ii)]

- The Trustee was not penalized in any fashion if he was not able to obtain title to the Properties [paragraph 20]

15.    I am advised that implied in the Contracts was a covenant of good faith and fair dealing which required that the Trustee not permit or condone any act or conduct that would obstruct, frustrate or delay Plaintiff's contemplated purchase of the Properties.

### Subsequent Developments

16.    Although the Trustee had agreed to submit the Contracts for approval by the Bankruptcy Court "promptly" upon execution of the Contracts on August 21, 2007, it was not until November 12, 2007 that the Trustee actually filed a motion (the "Approval Motion") seeking approval of the Contracts. A copy of the Approval Motion is annexed as Exhibit B.  The Approval Motion did not contain any indication that the Contracts

6

were subject to higher or better offers for the Properties and specifically noted in paragraph 6 that the Plaintiff had requested that the Contracts not be subject to higher and better offer.

17.     The Approval Motion contained the following relevant paragraphs:

> "6. In consideration for entering into the Contracts notwithstanding that the litigation was pending, and agreeing to remit the deposits under the Contracts at the time of their execution, the Purchaser has requested that the Contracts, which the Trustee believes are at fair market value, not be subject to higher or better offers.
> ....
> 10. .......... In the instant case, the Trustee has sufficient business justification for the sale of the Properties to the Purchaser, under the terms set forth in the Contracts.
> ....
> 11. The price for which each Property is being sold reflects the current market conditions of New York real estate. The Trustee believes that these conditions favor the sale of each Property at this time. The Trustee has determined in his business judgment that sale into the current market, pursuant to the terms of each Contract, should lead to the best results for the Debtor's estate."

18.     In the intervening 80 days between execution of the Contracts and the filing of the Approval Motion, I and my real estate attorney, Abe Rappaport, made numerous phone calls and sent numerous emails to counsel to the Trustee complaining about the delay and inquiring as to the reasons. Counsel to the Trustee offered a variety of miscellaneous excuses which we found to be totally unsatisfactory. Because of the lengthy delay and the unsatisfactory excuses, I believe the Trustee and/or his counsel were, in that period, trying to ascertain whether there were any higher offers. This is buttressed by the emergence of Rudd Development Group LLC as the new proposed contract vendee for the Trustee's Properties, because Rudd shortly after the Contracts were signed had begun pestering me to sell the properties I owned on 125th street. The

timing of these calls suggests that Rudd became aware of the Contracts even before they became public knowledge.  Like me, Rudd was trying to string together six lots and it strains credulity to believe that Rudd was not notified by the Trustee of the existence of the signed Contracts before they became public and it strains credulity to believe that the information was not released to solicit a better offer.

19.     On or about late August or early September, 2007, shortly after the Contracts were signed but before they became public knowledge with the filing of the Approval Motion, I received a call from an individual who identified himself as Michael Rubin ("Rubin").  He asked whether I would sell him my properties on 125th Street and offered a price higher than the price I had paid.  I replied that the properties were not for sale.  Rubin later sent me an email reiterating the offer and identifying himself as the Associate Director of Management of Rudd Realty Management Corp.  Over the ensuing weeks Rubin called many more times; at one point he was calling almost every day.  Although I was aware of his calls, I did not take them. Even though the price offered by Rubin in his email represented a profit to me over what I had paid for those properties, I did not pursue the offer because I relied on the representations made by counsel to the Trustee and the enforceability of the Contracts upon their terms.  The very day before the hearing on the Trustee's Approval Motion, Rubin called me again with the same request and I again refused to discuss the sale of my properties.

20.     At some point after the Approval Motion was filed, the Trustee's counsel called me to say that another buyer for the properties had materialized and was offering an additional $1 million over the price I had agreed upon with the Trustee.  He did not

identify who the offer was from and suggested that I match the offer. I declined because I believed I had a binding contract.

21.    On December 10, 2007, an hour before  the hearing on the Approval Motion, counsel for the Trustee sent an email to me advising that "early this afternoon" the Trustee had signed new and conflicting contracts to sell the Properties with Rudd, notwithstanding his multiple representations to me about not entertaining other offers. Counsel to the Trustee advised that the price specified was $8,800,000 and that the new contracts contained "essentially" the same terms as the contracts with Plaintiff, except that they were subject to higher or better offers and that Rudd was entitled to a "break-up" fee of 2%.

22.    Counsel to the Trustee then appeared in Court and announced that he was not proceeding with the Approval Motion because the Trustee had signed another contract for the Properties at a better price with Rudd and wished instead to proceed with an auction sale. An auction sale was then scheduled for December 21, 2007.  Michael Rubin, attending on behalf of Rudd, introduced himself to me at the hearing.

### It Is Inequitable To Permit The Trustee To Auction Off the Properties

23.    Counsel to the Trustee has attempted to excuse his enormously bad faith conduct by claiming he was obligated by law to discharge his fiduciary duty to maximize the estate assets. My question to him is: did he not know that law when on numerous occasions he represented that "the properties are yours and we will not entertain other offers"? Did he not know he could not truthfully make that representation to me because another better offer might be made? If the Trustee's recent pronouncements of law are correct and he is _required_ to take higher offers and required to conduct auction sales

9

when it would be in the best interests of the estate, then (i) the inclusion of paragraph 19 in the eight other contracts of sale he put before this Court was meaningless (ii) the omission of that paragraph in Plaintiff's Contracts was also meaningless and (iii) his numerous representations to me that he would not entertain other offers were both false and meaningless. Given his experience in this field of law it is impossible to conclude that I was not defrauded.

24.    I am trusting that the Trustee is not correctly representing the law and that he is not free to negotiate with new buyers once he has signed a contract with me which precludes him from doing so. But even if the Trustee's statement of the law is incorrect, I was horribly abused by his misrepresentations of his intentions. Unless counsel to the Trustee suddenly discovered his fiduciary obligations after he repeatedly told me he would not entertain other offers, he knowingly and willfully deceived me.

25.    In hindsight it is easy to see how I was abused by the frequent misrepresentation by counsel to the Trustee that he would not be entertaining any other offers. By so stating over and over again, counsel to the Trustee induced me to fulfill his own agenda while taking advantage of my naïve forthrightness. By leading me to believe that the only two conditions to the fulfillment of the contracts, was court approval and a successful conclusion to the fraudulent transfer litigation, counsel to the Trustee was able to get me to provide extensive and detailed information as to real estate comparisons for the Properties and proprietary information such as appraisals of my own properties. Counsel to the Trustee induced me to do his work for him by telling me repeatedly: "the properties are yours and we will entertain no other offers." These exact words or words conveying the same meaning were told to me on numerous occasions.

26.     The segregation of the Properties for sale separate and apart from the properties of other debtors being administered by the Trustee is clearly the result of my work.  These three Properties are part of a much larger group of properties that are the subject of litigation between the Trustee and the Irgang family.  Had I not worked on this deal for two years and, entered into Contracts which are clearly above market, the Trustee would never be in a position to sell the Properties for even as much as $7.8 million.  It is inequitable for the Trustee not to have to abide normal standards of good faith and fair dealings upon which I relied; the Court should not permit the auction sale or any sale of the Properties to go forward and grant the Approval Motion.

27.     Bankruptcy trustees are not the only fiduciaries who are charged with maximizing assets under their care.  Other fiduciaries are not excused from their obligations of good faith and fair dealing; this trustee should not be excused either.

28.     I respectfully request that the Plaintiff's request for an injunction and temporary restraining order be granted.

Dated: December 19, 2007                       _____s/ Saadia Shapiro_____
                                                Saadia Shapiro

# Exhibit A

12-18-07:02:03PM:                                                    # 2/ 2



# Exhibit B

See Docket Entry No. 465 in this case.

Isaac Nutovic (IN-2076)
Nutovic & Associates
488 Madison Avenue – 16th Floor
New York, New York 10022
(212) 421-9100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:

MAYWOOD CAPITAL CORP., et al.,

                                              Debtors.
-------------------------------------------------------------x

125TH STREET OWNER LLC.,

                                              Plaintiff.

                    vs.

JOHN S. PEREIRA, AS CHAPTER 11 TRUSTEE
 OF-- 65-67 EAST 125TH STREET REALTY
CORP., 77 EAST 125TH STREET REALTY CORP.
and 79 EAST 125TH STREET REALTY LLC,
MICHAEL "MIKE" RUBIN,
 JOHN DOES 1-10 AND
 RUDD DEVELOPMENT GROUP LLC.,

                                              Defendants
-------------------------------------------------------------x

Chapter 11
Case No. 05-10987 (RDD)

Adv. Pro. No.: 07-3224

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY
INJUNCTION AND TEMPORARY RESTRAINING ORDER**

**Preliminary Statement**

Plaintiff, 125th Street Owner LLC., by its attorneys, Nutovic & Associates,

submits this memorandum of law in support of Plaintiff's motion for a preliminary

injunction and temporary restraining order, enjoining John Pereira, as Trustee of 65-67

East 125th Street Realty Corp., 77 East 125th Street Realty Corp. and 79 East 125th Street

1

Realty LLC., from conducting an auction sale or taking any other steps to sell three properties (the "Properties") which the Trustee contracted to sell to Plaintiff.

### Facts

The facts underlying Plaintiff's motion are detailed in the declaration of Saadia Shapiro, the Manager of Plaintiff, which accompanies this memorandum of law. Capitalized terms are as defined in that declaration. From the Shapiro declaration it appears that during the course of the negotiations of the Contracts, counsel to the Trustee, after having received several appraisals and comparables showing sales of identically sized properties at significantly lower prices than agreed to by Plaintiff, constantly reassured Plaintiff that "the Properties are yours and we are not entertaining any other offers." Although in connection with eight prior contracts to sell properties in this case, the Trustee had inserted a contractual provision requiring that they be subject to higher or better offers, such a provision was not contained in the Trustee's Contracts with Plaintiff. Nevertheless, after filing a motion seeking court approval of the Contracts with Plaintiff, the Trustee wrongfully withdrew the motion after receiving a higher offer. The Trustee has now scheduled an auction sale for the Properties for December 21, 2007.

### Argument

Plaintiff Meets The Standards For
Issuance Of A Preliminary Injunction
<u>And Temporary Restraining Order</u>

The standards for granting a temporary restraining order are the same as those which govern granting a preliminary injunction. *Alexander v. N.Y. City Taxi & Limousine Comm'n*, 07 Civ. 8175 (RMB), 2007 U.S. Dist. LEXIS 73642, (S.D.N.Y. September 28, 2007).

2

"A party seeking a preliminary injunction in this Circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."

*Quint v. CMHC*, 06-2889-pr, 2007 U.S. App. LEXIS 22421, (2d Cir. September 20, 2007) (citing *Random House, Inc. v. Rosetta Books LLC,* 283 F.3d 490, 491 (2d Cir. 2002) (*per curiam*)). The purpose of a preliminary injunction is to maintain the *status quo* until there can be a determination on the merits of the action. *Sierra Club v U.S. Army Corps of Engineers,* 732 .2d 253, 256 (2d Cir.1986)

*Irreparable Harm To Plaintiff.* Plaintiff will be irreparably harmed if an injunction is not issued and the Trustee is allowed to sell the Properties. The Properties are unique; their location abutting Plaintiff's affiliates' properties provides Plaintiff and its affiliates with a unique opportunity to place a larger building on the combined properties. If the Properties are sold, Plaintiff will have lost this opportunity. Plaintiff will be irreparably harmed if the *status quo* is not maintained. *See, Tom Doherty Associates, Inc v Saban Entertainment Inc.,* 869 F. Supp 1130, 1135 (S.D.N.Y 1994).

*Likelihood Of Success On The Merits.* Under New York law, every party to a signed agreement is charged with an implied covenant of good faith and fair dealing. See, e.g. *CSI Inv. Partners 11, L.P. v Cendant Corp*, 507 F. Supp 2d 384, 425 (S.D.N.Y. 2007). That covenant precludes each party from engaging in conduct that will deprive the other party of the benefits of its agreement. *Id*. Several cases have held that trustees who enter into agreements subject to court approval remain bound pending court approval of the agreement; other cases disagree.

Cases holding that a trustee or debtor is bound by agreements pending court approval include *In re Frye*, 216 B.R. 166, 172 (Bankr. E.D.Va 1997); *In re Cotton*, 136

3

B.R. 888, 890 (M.D. Ga. 1992); *rev'd on other grounds*, 992 F.2d 311 (11th Cir. 1993); *In re United Shipping Co.*, 1989 WL 12723 (Bankr. D. Minn. Feb 17, 1989); *In re Tidewater Group, Inc.*, 8 B.R. 930 (Bankr. N.D. Ga. 1981)). *See also, In re Martin,* 91 F. 3d. 389, 395 (3d Cir. 1996) (We have no quarrel with the district court's statement that the trustee was required to deal with the Myers with "honesty in fact in the conduct or transaction concerned ... and [to] refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." 1995 WL 389592 at * 11 (citations and quotations omitted). The *Restatement (Second) of Contracts* § 205 implies a duty of good faith and fair dealing for all contracts"); *In re Lyons Transportation Lines, Inc.*, 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994). The following cases have been cited for the contrary position: *In re Sparks*, 190 B.R. 842, 843 (Bankr. N.D. Ill. 1996) *In re Pugh*, 167 B.R. 251 (Bankr. M.D. Fla. 1994); *In re Rothwell,* 159 B.R. 374 (Bankr. D. Mass. 1993); *In re Lloyd Carr and Co.*, 617 F.2d 882, (1st Cir. 1980)(decided under 1898 Bankruptcy Act); *See also In re Wintex,* 158 B.R. 540 (D. Mass. 1992).

In an unreported decision, *In re Pintlar Corp.,* Civ. No. 97-0263-N-BLW, (D.Idaho 1998) (copy attached), the District Court affirmed the principle that a contract between a trustee and a third party which is subject to court approval is binding on both sides pending approval by the Bankruptcy Court. In the *Pintlar* case, the trustee of a litigation trust created by confirmation of a Chapter 11 plan, signed an agreement -- subject to court approval but not subject to higher offers -- to assign certain litigation rights to Nycal Corporation for $1 million. As required by the confirmed Chapter 11 plan, the trustees filed a motion with the Bankruptcy Court for the approval of that

agreement. After the agreement was signed the trustees entered into a second agreement with the targets of the litigation to settle the trustees' claim for $1.75 million. The trustees then abandoned their motion to sell the litigation rights to Nycal Corporation and brought the settlement agreement with the litigation targets before the Bankruptcy Court for approval. The Bankruptcy Court granted the trustees' motion to settle the claims over Nycal Corporation's objection.

Nycal Corporation subsequently sued the trustees, claiming a breach of the implied duty of good faith and fair dealing and sought damages. The trustees defended on the grounds that they had a fiduciary duty to pursue the higher bid. The Bankruptcy Court dismissed the complaint for failure to state a claim. On appeal, the District Court reversed, holding that by negotiating a new agreement with the litigation targets, the trustees had breached their contractual duties which were not abrogated by, or inconsistent with, the trustees' fiduciary obligations to maximize the estate.

The holding of *Pintlar* applies squarely to the facts presented in this case. Indeed, the facts here mitigate even more strongly against the Trustee than the trustees in that case. Here, the Trustee repeatedly reassured Plaintiff that "the properties are yours and we will entertain no other offers". The Trustee also deleted from the Contracts the provision -- contained in <u>eight</u> other contracts he signed selling properties in this case -- which would have allowed the Trustee to accept other offers or conduct an auction sale. Just as in *Pintlar*, the Trustee first filed a motion for approval of his agreement with Plaintiff; then, in complete derogation of his good faith duties, negotiated a new agreement with Rudd, signed it and took a deposit from Rudd to secure the new contracts. Just as in *Pintlar,* the Trustee here withdrew the Approval Motion preventing

the Contracts from going into effect. The precedent of the *Pintlar* decision is particularly compelling on these facts.

The courts which have found a trustee to be bound pending court approval are better reasoned. If a trustee is not bound by his agreements pending court approval, then the agreements are illusory, see, e.g., *Irving Trust Co. v Nationwide Leisure Corp.*, 562 F. Supp 960, 968 (S.D.N.Y. 1982) and the other parties to the agreement are similarly not bound. This would mean that a trustee in bankruptcy would never be able to sign any contract to sell assets, because the other parties would have the right to back out too. There is also no sound rationale for giving special consideration to a bankruptcy trustee because of his fiduciary duties to maximize assets. There are many other fiduciaries in other contexts, similarly charged with an obligation to maximize the value of assets under their control, who are not exempted from ordinary contract rules. Also, how far can a trustee go to maximize assets? Is he allowed to make misrepresentations? Clearly, not. The better view of the cases is that once the Contracts were signed, the Trustee was bound by a covenant of good faith and fair dealing, was obligated to present the Contracts for approval by this Court and should not have attempted to deprive Plaintiff of the benefit of the Contracts by negotiating a new deal with Rudd.

Accordingly, in considering Plaintiff's request for a preliminary injunction and temporary restraining order, this Court should find that Plaintiff has met its burden of showing a likelihood of success on the merits.

*Sufficiently Serious Questions On The Merits/ Balance of Hardship.* Even if the Court finds that Plaintiff has not demonstrated it will likely succeed on the merits of the case, there can be no doubt that Plaintiff has raised fair grounds for litigation. There is no

definitive law in this Circuit which exculpates bankruptcy trustees from the covenant of good faith and fair dealing applicable to all parties who sign a contract. Cases outside of this Circuit have ruled on both sides of the issue, but Plaintiff submits that there are good policy reasons which would impel courts in this Circuit to hold bankruptcy trustees to the same standards in the market place as other fiduciaries are held.

There will be no hardship to the Trustee if he is required to postpone his auction sale. While the Trustee has not disclosed the actual contracts with Rudd, he has described them as being "essentially" the same as Plaintiff's Contracts. The Contracts allow for termination by Purchaser if not approved within 60 days. So long as Plaintiff's request for an injunction is resolved within 60 days, the proposed new purchaser of the Properties, Rudd Development Group LLC., will have no excuse to walk away from its new contract. Thus, no harm will befall the Trustee if the auction sale is postponed.

### Conclusion

The Trustee should be enjoined from conducting the auction sale scheduled for December 21, 2007 or from taking any other steps to sell the Properties. Plaintiff has demonstrated irreparable harm. Plaintiff has also demonstrated a likelihood of success; alternatively, Plaintiff has demonstrated fair grounds for litigation and a tipping of hardships dividedly in Plaintiff's favor.

Dated: New York, New York
     December 19, 2007

Nutovic & Associates
Attorneys for 125th Street Owner LLC.

*s/ Isaac Nutovic*
Isaac Nutovic (IN2076)
488 Madison Avenue
16th Floor
New York, New York 10022
(212) 421-9100

RECEIVED

AUG 0 5 1998

Givans Pursley LLP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

U.S. COURTS

1998 AUG -3 P 2:18

REC'D_____LODGED
FILED_____

|  |  |
|---|---|
| In re: | Bankruptcy case Nos. 93-02986<br>93-02987 |
|  | Civ. No. 97-0263-N-BLW |
| PINTLER CORPORATION and<br>GULF USA CORPORATION, | MEMORANDUM DECISION |
| Debtors. |  |
| NYCAL CORPORATION, |  |
| Plaintiff/Appellant, | Adversary No. 96-6120 |
| v. |  |
| BERNARD GOODSON, et al, |  |
| Defendants/Appellees |  |

## INTRODUCTION

The Court has before it an appeal from a decision of the Bankruptcy Court. The appeal is fully briefed and at issue. Pursuant to Bankruptcy Rule 8012(3), the Court finds that oral argument is not necessary. After reviewing the briefing and the record in the Bankruptcy Court, the Court finds that the Bankruptcy Court's summary judgment for Appellees must be reversed. This decision is explained below.

Memorandum Decision -- page 1

## FACTUAL BACKGROUND

On October 18, 1993, involuntary petitions for relief under Chapter 11 were filed against Pintlar and Gulf (hereinafter referred to collectively as "Gulf"). Shortly thereafter, Gulf filed an adversary action in Bankruptcy Court against its former directors and officers, Nycal Corporation, and Interallianz Bank A.G. ("IBZ"), among other parties. The parties have referred to this adversary action as the "D&O" action, and the Court will adhere to that designation.

On November 17, 1994, Gulf assigned its claims in the D&O action to a Litigation Trust created by a Litigation Trust Agreement. That Agreement stated that the Trust was being formed under Idaho law to pursue the D&O claims on behalf of certain creditors. The Agreement also provided that any settlement must be approved by the Bankruptcy Court. On June 29, 1995, the Bankruptcy Court confirmed Gulf's reorganization plan, and approved the assignment of claims to the Litigation Trust. A few months later, the Litigation Trust was substituted for Gulf as the named plaintiff in the D&O litigation.

In October, 1995, the Bankruptcy Court dismissed the Litigation Trust's claims against IBZ in the D&O litigation for lack of personal jurisdiction. The Litigation Trust considered various responses to the adverse ruling, including filing (1) an appeal, and (2) a new suit against IBZ in a different forum where the Trust could obtain personal jurisdiction. At this point, the Trust started negotiating a settlement with IBZ. To preserve its right to file a new suit at a later time if settlement failed, the Trust entered into a series of tolling agreements with IBZ to toll the statute of limitations on any of the Trust's claims.

At the same time, the Trust was negotiating with Nycal, another party that it had sued

Memorandum Decision -- page 2

in the D&O action. Nycal wanted to resolve the Trust's claims against it, and also saw an opportunity in the Trust's failure to obtain personal jurisdiction over IBZ. Confident that it could obtain personal jurisdiction over IBZ in New York, Nycal wanted an assignment of the Trust's claims against IBZ. IBZ had earlier filed an action against Nycal in New York. Nycal planned to obtain an assignment of the Trust's claims against IBZ, and then file a counterclaim asserting those assigned claims in IBZ's suit, or file a new action in New York asserting the assigned claims.

Nycal and the Trust signed a Settlement Agreement on April 30, 1996. That Agreement stated that the Trust would dismiss its claims against Nycal and assign its claims against IBZ to Nycal. In return, Nycal would pay the Trust one million dollars in cash, and turn over to the Trust the first million dollars of any recovery on the assigned claims along with two-thirds of any recovery over two million dollars. The Agreement also contained the following provision concerning approval by the Bankruptcy Court: "This Settlement and Assignment Agreement is subject to the approval of the Bankruptcy Court, failing which the terms and provisions of the agreement contained herein shall be void and of no force and effect."

The Trust also continued to negotiate with IBZ. About a month after the Trust entered into the Agreement with Nycal (hereinafter referred to as the "Nycal Agreement"), the Trust entered into an agreement with IBZ (hereinafter referred to as the "IBZ Agreement"). The IBZ Agreement stated that (1) the Trust would drop all claims against IBZ; (2) IBZ would cooperate with the Trust's continuing prosecution of the D&O action against the remaining defendants, including Nycal; (3) IBZ and the Trust would share any recovery obtained against

Memorandum Decision -- page 3

Nycal; and (4) the Trust would cooperate with IBZ in IBZ's New York suit against Nycal. In return, IBZ agreed to pay the Trust $1.75 million.

The IBZ Agreement, like the Nycal Agreement, was subject to Bankruptcy Court approval. The approval condition contained an additional provision that the Bankruptcy Court had to not only approve the IBZ Agreement but also must specifically find that "the terms and conditions of the IBZ Settlement provide the best and highest offer available to the Trust for the settlement of the IBZ Claims and is superior to the Nycal Settlement, failing which the terms and provisions of the agreement contained herein . . . shall be void and of no force and effect."

The Trust had earlier filed a motion with the Bankruptcy Court for approval of the Nycal Agreement. After the IBZ Agreement was struck, the Trust filed a motion urging approval of the IBZ Agreement and rejection of the Nycal Agreement. The Bankruptcy Court held a hearing where the Trust's counsel repeated this position. Midway through that hearing, the parties suggested that the Court take a recess so that the parties could discuss settlement. When the hearing resumed, Nycal's counsel increased his cash offer for the Trust's IBZ claims to $1.75 million. In addition, he stated that "our original offer that was accepted in a contract by the trustees, it included the settlement of the trustees' claims against us. That's off the table now." Transcript of Hearing at 19, ll. 23-25. Counsel for the Trust was not impressed, and continued to urge the approval of the IBZ Agreement. The Bankruptcy Court eventually found that the IBZ Agreement was in the best interests of the beneficiaries and was superior to the Nycal Agreement.

Nycal responded by filing a breach of contract adversary action against the Trust in the

Memorandum Decision -- page 4

Bankruptcy Court. The suit alleged that the Trust violated its duty of good faith and fair dealing by soliciting a higher bid from IBZ and urging the Bankruptcy Court to reject the Nycal Agreement. The Trust filed a motion to dismiss or for summary judgment. The Bankruptcy Court found that Nycal had no enforceable contract with the Trust because the Agreement was subject to Bankruptcy Court approval, which was never obtained. The Bankruptcy Court therefore granted summary judgment to the Trust. Nycal appealed that ruling to this Court.

Nycal had earlier taken a separate appeal from the Bankruptcy Court's decision approving the IBZ Agreement and finding it superior to the Nycal Agreement. *See Nycal v. Goodson*, Civ. No. 96-294-S-BLW. After that appeal was filed, the parties entered into a stipulation that the appeal could be dismissed. This Court approved the stipulation and dismissed the appeal. With that dismissal, there is now no challenge to the Bankruptcy Court findings that (1) the Trust is governed by common law trust principles; (2) the Trust was acting at all times in the interests of the creditors in negotiating the IBZ Agreement; and (3) the IBZ Agreement was superior to the Nycal Agreement. The Court takes these findings as established and uncontroverted.[1]

---

[1] As discussed earlier, the Trust was created under Idaho law, and hence the Court will apply Idaho trust law. Idaho courts have often applied the Restatement (Second) of Trusts (1959). *See, e.g., DBSI/TRI v. Bender*, 130 Idaho 796, 948 P.2d 151 (1997). The Restatement (Second) was partially revised in 1992 by the Restatement (Third) that set forth a detailed explanation of the prudent investment rule. The official comments to Idaho's statutory law governing trusts make frequent reference to the Restatement (Third). *See, e.g.,* I.C. § 68-502. The Court will therefore rely on Idaho law as supplemented by the Restatements (Second & Third). With regard to contract issues concerning the Nycal Agreement, that Agreement states that it shall be governed by the laws of New York. New York has frequently applied the Restatement (Second) of Contracts. *See, e.g., New York v. Warren Brothers Co., Inc.*, 593

## STANDARD OF REVIEW

This Court reviews the Bankruptcy Court's findings of fact under the clearly erroneous standard and its findings of law under a de novo standard. *See In re Alcala,* 918 F.2d 99 (9th Cir. 1990). The clearly erroneous standard is a deferential one, authorizing the Court to disturb the Bankruptcy Court's factual findings only if upon review the Court is "left with the definite and firm conviction that a mistake has been committed." *Sawyer v. Whitley*, 505 U.S. 333 n.14 (1992). Even if the Court concludes that had it been acting as the fact finder below it would have weighed the evidence differently than did the bankruptcy court, the court still may not disturb the bankruptcy court's findings unless they are not "plausible in light of the record viewed in its entirety." *Service Employees Int'l. Union v. Fair Political Practices*, 955 F.2d 1312, 1317 n. 7 (9th Cir.) (quoting *Anderson v. Bessemer City*, 470 U.S. 564 (1985)), *cert. denied*, 505 U.S. 1230 (1992).

## ANALYSIS

In their briefing, both sides spend considerable time discussing whether the provision in the Nycal Agreement requiring Bankruptcy Court approval is a condition precedent or a condition subsequent. In fact, it does not matter. Either way, the Trust had a contractual duty to avoid interfering with the occurrence of the condition, *i.e.*, the Bankruptcy Court's approval. *See* Restatement (Second) of Contracts, §225b at 166; §230 at 189 (1981).

The Restatement uses the term "condition" to describe conditions precedent, and the term "event" to describe conditions subsequent. *Id.* at § 224 cmt e. In the Restatement

---

N.Y.S.2d 308 (Sup.Ct. 1993). On contract issues, the Court will therefore rely on New York law as supplemented by the Restatement (Second) of Contracts.

analysis, conditions are governed by §§ 224-229, while events are governed by § 230. The Restatement places on the Trust the duty to avoid interfering with either the condition, *see* § 225b at 166 ("the non-occurrence of a condition . . . may be excused by prevention or hindrance of its occurrence through a breach of the duty of good faith and fair dealing"), or the event, *see* § 230 at 189 ("[t]he obligor's duty is not discharged if occurrence of the event is the result of a breach by the obligor of its duty of good faith and fair dealing."). The Trust's contractual duty is a duty of good faith and fair dealing to avoid interfering with the Bankruptcy Court's approval.

The Trust is also bound by a fiduciary duty, defined by the Litigation Trust Agreement and Idaho law. The Agreement requires the Trust to act "for the sole benefit of the Beneficiaries." Litigation Trust Agreement at ¶ 3.1.[2] Idaho law requires the Trust to sell its assets with the care and skill that a person of ordinary prudence would exercise. *See* I.C. § 68-502. The Official Comments to this statutory provision show that the statute is largely based on the Restatement (Third) of Trusts. The Restatement (Third) expounds on the prudent investor rule by stating that the trustee "cannot properly make a sale for an unreasonably low price or on unreasonable terms." *See* Restatement (Third) of Trusts, § 190 cmt. I (1992).

The Trust contends that when it enters into a contract to sell an asset, and then receives a higher bid from another party, it faces a dilemma: should it follow its fiduciary duty and

---

[2] The Litigation Trust Agreement was not a part of the original record before the Court. The Court contacted counsel and asked them to provide a copy. Counsel had no objection and promptly provided the Court with a copy. The Court shall therefore assume that the Litigation Trust Agreement is now a part of the record on appeal in this case, and the Court will direct the Clerk to file a copy in this matter.

pursue the higher bid, or should it follow its contractual duty and avoid action that would ensure rejection of the first contract? The Third Circuit spoke to this issue in *In re Martin*, 91 F.3d 389, 395 (3rd.Cir. 1996):

> [T]he bankruptcy court must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate. Accordingly, the trustee should inform the court and the parties of any changed circumstances since the entry into the stipulation of settlement. The trustee may even opt not to argue in favor of the stipulation, as was done here, if she no longer believes the settlement to be in the best interest of the estate.
>
> . . . .
>
> If . . . a trustee is prohibited from informing the court of changed circumstances, or from advocating on behalf of creditors in light of changed circumstances, a bankruptcy court could proceed without full information, and the creditor body could suffer.
>
> Accordingly, we conclude that the better course is to allow a trustee who fulfills her statutory duty to maximize assets of the estate the opportunity to report the change in circumstances to the court and to the creditors; such an act without more would not constitute a breach of contract.

Thus, *Martin* holds that a trustee does not commit a breach of contract when, after the trustee has entered into a deal with one party, it notifies the Bankruptcy Court of a better offer it has received from a different party. The Court agrees. That does not, however, resolve the present case because the Trust here was far more active than the trustee in *Martin* in pursuing

Memorandum Decision -- page 8

approval for a competing offer. The trustee in *Martin* had nothing whatsoever to do with the changed circumstances; she simply informed the Bankruptcy Court about those circumstances when she discovered them. In contrast, the Trust here actively negotiated a competing deal that included a litigation alliance against the Trust's former contracting partner, and then urged approval of the new deal before the Bankruptcy Court.

No authority has been cited to the Court that insulates, as a matter of law, this conduct from a breach of contract claim. A trustee is not given a license to interfere with the Bankruptcy Court's approval. *Martin* appears to be the outer boundary of how far courts are willing to go in conferring immunity on trustees. Thus, at most, the Trust's conduct in informing the Bankruptcy Court of a higher offer would be immune from a breach of contract claim. *Martin* refused to go further, stating that the reporting of a higher offer "without more" was not a breach of contract. *Id.* at 395. Thus, outside of the narrow circumstance identified in *Martin*, a trustee's duty to creditors exists side-by-side with its contractual duties.

The Trust contends, however, that the approval provision in the Nycal Agreement put all parties on notice that higher and better offers would be considered.[3] That may be true, but it is a much greater stretch to say that the approval provision put Nycal on notice that the Trust would actively negotiate a better bid, form a hostile litigation alliance with Nycal's enemy, and urge the Bankruptcy Court to approve the competing bid. Such a reading stretches the already-

---

[3] The approval provision provides as follows:
"This Settlement and Assignment Agreement is subject to the approval of the Bankruptcy Court, failing which the terms and provisions of the agreement contained herein shall be void and of no force and effect. The Bankruptcy Court shall retain jurisdiction to resolve any disputes or controversies arising from or related to this Settlement and Assignment Agreement."

Memorandum Decision -- page 9

thin approval provision past its breaking point.

In conclusion, Nycal has stated a claim for breach of the duty of good faith and fair dealing. The approval provision in the Nycal Agreement does not insulate the Trust from a claim for interfering with the Bankruptcy Court's approval. The Trust exposed itself to that claim when it went beyond informing the Bankruptcy Court of a new bid received since its original contract, and actively negotiated a new bid, formed a litigation alliance against the original contracting party, and urged approval of the new bid.

With these findings, the Court has reviewed the issues addressed by the Bankruptcy Court. There remain other issues, not addressed by the Bankruptcy Court, concerning the formation of the agreement between the parties. Until those issues are resolved by the Bankruptcy Court, and properly appealed, the Court will not address them.

The Court therefore reverses the grant of summary judgment and remands the case to Bankruptcy Court for further proceedings consistent with this decision. The Court will enter a separate Judgment to this effect.

Dated this 3rd day of August, 1998.

B. LYNN WINMILL
UNITED STATES DISTRICT COURT

United States District Court
for the
District of Idaho
August 3, 1998

1g

* * CLERK'S CERTIFICATE OF MAILING * *

Re:  3:97-cv-00263

I certify that a copy of the attached document was mailed to the
following named persons:

Jeffery Glen, Esq.
DEFOREST & DUER
90 Broad St
New York, NY  10004

Brian F McColl, Esq.
WILSON CARNAHAN & MCCOLL
PO Box 1544
Boise, ID  83701

Richard W Reinthaler, Esq.
1301 Avenue of the Americas
New York, NY  10019-6092

Janis M Meyer, Esq.
1301 Avenue of the Americas
New York, NY  10019-6092

Dianne F Coffino, Esq.
1301 Avenue of the Americas
New York, NY  10019-6092

Dewey Ballantine, Esq.
1301 Avenue of the Americas
New York, NY  10019-6092

1 copy

Terry L Myers, Esq.
GIVENS PURSLEY & HUNTLEY
PO Box 2720
Boise, ID  83701

Ramona S Neal, Esq.
GIVENS PURSLEY & HUNTLEY
PO Box 2720
Boise, ID  83701

1 copy



Isaac Nutovic (IN-2076)
Nutovic & Associates
488 Madison Avenue – 16th Floor
New York, New York 10022
(212) 421-9100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

MAYWOOD CAPITAL CORP., et al.,                                    Chapter 11
                                                                  Case No. 05-10987
(RDD)

                                                    Debtors.
----------------------------------------------------------------x

125TH STREET OWNER LLC.,

                                          Plaintiff.

                  vs.

JOHN S. PEREIRA, AS CHAPTER 11 TRUSTEE
  OF-- 65-67 EAST 125TH STREET REALTY
  CORP., 77 EAST 125TH STREET REALTY CORP.
  and 79 EAST 125TH STREET REALTY LLC,
  JOHN DOES 1-10 AND
  RUDD DEVELOPMENT GROUP LLC.,

                                          Defendants.
----------------------------------------------------------------x

### NUTOVIC DECLARATION

Isaac Nutovic, declaring under penalty of perjury pursuant to 28 U.S.C. § 1746

states as follows:

1.  I am counsel to 125th Street Owner LLC., (the "Plaintiff"). I make this declaration in

support of Plaintiff's motion for a preliminary injunction and a temporary restraining order.

Plaintiff requests that the defendant-Trustee John Pereira, be enjoined from conducting an

auction sale or taking any steps to transfer three ("Properties") which the Trustee contracted to

sell to Plaintiff.

2.     Shortly after midnight this morning I caused the documents upon which Plaintiff's motion for a temporary restraining notice is based, (Complaint, Motion for Preliminary Injunction and Temporary Restraining Order, Shapiro Declaration and Memorandum of Law) to be emailed to counsel to the Trustee at jcampo@dreierllp.com. I later caused these documents to be hand delivered to John Campo, Esq c/o Dreier LLP, 499 Park Avenue, New York, N.Y. 10022 during business hours.

Dated: December 20, 2007

_____*s/Isaac Nutovic*_____
Isaac Nutovic

Exhibit "H"

169625

1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-10987

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  MAYWOOD CAPITAL, INC.,

9

10          Debtor.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                December 21, 2007

19                10:21 AM

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

0

2

1

169625

2   HEARING re Notice of Hearing to Consider Applications for

3   Allowance of Compensation and Reimbursement of Expenses.

4

5   HEARING  re Application for Final Compensation and

6   Reimbursement of Expenses of Dewey & LeBoeuf LLP.

7

8   HEARING re Chapter 11 Trustees' First Interim Report and

9   Request for Commissions.

10

11   HEARING re Chapter 11 Trustee's Motion Seeking Court Approval

12   of the Sale of Trustee's Right, Title and Interest of Certain

13   Real Property and Improvements.

14

15   HEARING re Objection of Commercial Mortgage Corporation to

16   Trustee's Proposed Sale of Real Property.

17

18

19

20

21

22

23

24   Transcribed by:  Penina Wolicki

25

☐

3

1

2   A P P E A R A N C E S :

3   DEWEY & LEBOEUF

4       Former Counsel for Trustee

Page 2

169625

```
 5          125 West 55th Street
 6          New York, NY 10019
 7
 8    BY:   JEFFREY S. BERKOWITZ, ESQ.
 9
10
11    UNITED STATES DEPARTMENT OF JUSTICE
12          Office of the United States Trustee
13          33 Whitehall Street
14          New York, NY 10004
15
16    BY:   ANDREW D. VELEZ-RIVERA, ESQ.
17
18
19    DREIER LLP
20          Attorneys for Chapter 11 Trustee
21          499 Park Avenue
22          New York, NY 10022
23
24    BY:   JOHN P. CAMPO, ESQ.
25
```

⬚

4

```
 1
 2    COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
 3          Attorneys for Bodden Funding
 4          900 Third Avenue
 5          New York, NY 10022
 6
 7    BY:   LAURENCE MAY, ESQ.
```

                    169625
8

9

10   PEREIRA & SINSI, LLP

11        Chapter 11 Trustee

12        150 East 58th Street

13        New York, NY 10155

14

15   BY:   JOHN S. PEREIRA, ESQ.

16

17

18   NUTOVIC & ASSOCIATES

19        Attorneys for Mr. Shapiro

20        488 Madison Avenue

21        New York, NY 10022

22

23   BY:   ISAAC NUTOVIC, ESQ.

24

25

☐

                                                           5

1

2   PRYOR CASHMAN LLP

3        Attorneys for Rudd Development

4        410 Park Avenue

5        New York, NY 10022

6

7   BY:   RICHARD LEVY, JR., ESQ.

8

9

10

11                              169625
12
13
14
15
16
17
18
19
20
21
22
23
24
25

0

                                                          6

1                            P R O C E E D I N G S
2              MR. CAMPO:  Good morning, Your Honor.
3              THE COURT:  Good morning.
4              MR. CAMPO:  Your Honor, if we may, this morning, take
5        the applications of the trustee and Dewey & LeBoeuf, former
6        counsel to the trustee for allowance of compensation and
7        reimbursement of expenses, first?
8              THE COURT:  Okay.
9              MR. CAMPO:  Your Honor, this application is an
10       application with respect to the trustee.  It's a 506(c)
11       application in which the trustee is seeking an interim payment
12       of seventy percent of the commissions that were earned in
13       connection with the sale of the twelve properties that the

169625

14    trustee's conducted in the estate for the benefit of ten

15    estates.  And in connection therewith, Your Honor, we've had a

16    conversation with the U.S. Trustee who has indicated they have

17    no objection, provided that the trustee only sought seventy

18    percent on an interim basis.

19            With respect to the Dewey & LeBoeuf application, Your

20    Honor, they seek, as former counsel, the payment of an

21    allowance of final 506(c) fees in connection with the services

22    that they rendered in connection with disposing of -- with

23    preserving and disposing of those twelve properties, allocated

24    to the various properties, as set forth in the applications,

25    and their allowance of final 506(c) expenses in connection with

7

1    those property sales.  And then, in addition, Your Honor, they

2    seek interim non 506(c) commission -- I'm sorry, compensation

3    in connection with two estates:  108 West 130th Street Realty

4    Corp. Estate, and the Maywood Capital Corp. Estate.  And in

5    those cases, Your Honor, the request for the interim non 506(c)

6    fees are at the seventy percent amount that the U.S. Trustee

7    has requested that the parties all agree to within this case

8    for this application.  And the expenses are set forth in the

9    application.

10            Your Honor, we perceive no objections to the

11    application other than the limited objection of Bodden, who has

12    asserted basically, that the Dewey & LeBoeuf fees shouldn't be

13    paid under 506(c) because of the -- because of their secured

14    liens with respect to two properties:  2278 Eighth Avenue

15    Realty Corp. and the Maywood Consolidated Properties.  Dewey

16    has prepared a response to that objection, Your Honor, which,

Page 6

169625

17    if you'd like, I can go through it rather than -- or have Mr.
18    Berkowitz from Dewey do it.  But I'm certainly familiar with
19    it, at least.
20            THE COURT:  Well, let me just -- I reviewed the
21    response.
22            MR. CAMPO:  Okay.
23            THE COURT:  Assuming the lien is good, okay?
24            MR. CAMPO:  Right.
25            THE COURT:  Is Bodden oversecured by these

0

8

1    properties?
2            MR. CAMPO:  Well, if the -- it depends on where they
3    are in the priority with respect to these properties.  On
4    Maywood Consolidated Properties, Your Honor, the Bodden lien is
5    the next lien in order.  And I believe on those properties,
6    they would probably be oversecured.  But I'm not sure.  But in
7    any event, on the Maywood Consolidated Properties, there has
8    been the avoidance and preservation of the first lien under
9    550, and there's 437,000 dollars in that estate that's free,
10    and clear.
11            THE COURT:  And they have not opposed this relief.
12    The first lien holder has not opposed the --
13            MR. CAMPO:  The first lien holder --
14            THE COURT:  -- 506(c) request?
15            MR. CAMPO:  -- no.  The first lien holder stipulated
16    and there was an approv -- there was a motion before the Court
17    to approve that stipulation of settlement, with Intervest as
18    the first lien holder that provided for partial avoidance of a
19    portion of their lien on the preservation of that under 550 and

169625

20  551.  So that -- no, nobody has opposed the relief sought

21  herein.  But I'm saying --

22          THE COURT:  Well, Bodden has.

23          MR. CAMPO:  -- no, I understand that.  Nobody other

24  than Bodden has opposed the relief.

25          THE COURT:  All right.

9

1           MR. CAMPO:  But there is already an estate --

2           THE COURT:  So your point there is that the 506(c)

3  recovery by the trustee on behalf of Dewey LeBoeuf's fees in

4  relation to this is coming out of the senior creditor?

5           MR. CAMPO:  Well, it's -- it conceivably could come

6  out of the senior creditor to the extent it's been avoided and

7  preserved --

8           THE COURT:  And preserved.

9           MR. CAMPO:  -- or it may come out of the other lien

10  holders --

11          THE COURT:  Well, no under --

12          MR. CAMPO:  -- but we don't need to charge --

13          THE COURT:  -- it would come out --

14          MR. CAMPO:  -- their liens at this point.

15          THE COURT:  -- it would come out of that lien, the

16  senior lien --

17          MR. CAMPO:  That's correct.

18          THE COURT:  -- which has been preserved for the

19  estate.

20          MR. CAMPO:  Which has been preserved for the benefit

21  of the estate.

22          THE COURT:  Okay.

Page 8

169625
23          MR. CAMPO:  So the only objection that really stands
24     at this point with respect to the 506(c) and the Bodden lien
25     issue, is really on 2278 Eighth Avenue, where the fees that

☐

                                                                10

1     Dewey & LeBoeuf seeks are about 48,001 dollars, and there's
2     about 800 dollars of disbursements.  Now, in that property,
3     Your Honor, the trustee's holding 1.3 million dollars.  Bodden
4     has a mortgage claim of a million dollars on that property, but
5     that prop -- that mortgage is also secured by the Maywood
6     Consolidated Properties properties.  And in addition, there're
7     senior lien holders on those -- on that property are investor
8     liens, senior to Bodden's.  Thos senior liens are approximately
9     735,000 dollars, and those lienors have not objected to the
10    relief that's been requested.
11          THE COURT:  But has the trustee --
12          MR. CAMPO:  So to the extent that --
13          THE COURT:  -- but those senior liens may not -- as
14    the --
15          MR. CAMPO:  The trustee has not determined the
16    validity of them.  They may be --
17          THE COURT:  That he's got totally --
18          MR. CAMPO:  -- subject to a void.
19          THE COURT:  -- that he's gotten totally in agreements
20    from them.
21          MR. CAMPO:  However, if they're later avoided -- if
22    they're later avoided then they would be preserved, the lien
23    would be preserved for the estate --
24          THE COURT:  Right.
25          MR. CAMPO:  -- and that to the extent that the
                              Page 9

169625

11

1  surcharge comes out of those senior liens, it'll come out of
2  either their proceeds, if they're valid, they haven't objected,
3  or the proceeds that would then come into the estate by virtue
4  of the preservation and avoidance.
5          THE COURT:  Okay.
6          MR. CAMPO:  So with all due respect to Bodden, we
7  think that they really don't have any standing to object to
8  that application, because they're behind the three -- they're
9  behind the investor liens in any event.  If Bodden, on the
10 other hand, were to argue that they're senior to those liens,
11 and they're first, then there's equity in the property and it
12 would come out of the junior liens to Bodden, which would also
13 be in that instance --
14         THE COURT:  Well, that I don't follow.  If -- but why
15 would they be senior?
16         MR. CAMPO:  They're not.  But I don't know what their
17 position is going to be, as to whether they're senior or not.
18 I haven't heard --
19         THE COURT:  But if -- I mean -- if there is
20 sufficient equity in the property, so that if in a foreclosure
21 sale, they'd collect their costs, then they wouldn't be charged
22 under 506(c)?
23         MR. CAMPO:  That's correct.
24         THE COURT:  When I first read your reply, I thought
25 that's what you were saying.  But you're basically relying on

12

169625

1   the fact that there're senior liens here that have been

2   preserved for the estate in the first property's case, or that

3   either will remain senior or will be preserved to the estate in

4   the second property's case?

5          MR. CAMPO:  That's correct, Your Honor.

6          THE COURT:  Okay.  All right.

7          MR. MAY:  Good morning, Your Honor.  Laurence May of

8   Cole Schotz, Meisel, Forman & Leonard, counsel for Bodden

9   Funding.  Your Honor, to the extent that these 506(c) expenses

10  are paid from a void of liens of property -- or liens that

11  would have been ahead of our client, we really don't have any

12  objection to the payment of those sums.  Our concern here, Your

13  Honor, is that, at least with respect to 2278 Eighth Avenue,

14  that our interest be preserved and that we have, in addition

15  and let the Court know, as this is going to be part of

16  subsequent issues in disputes in this case, is that -- is that

17  the 2278 lien is a lien which I think is also secured by

18  additional collateral guarantees that these debtors gave to the

19  original mortgagee, which I believe was BRT Funding, back in

20  2001 or 2002.  So we will have issues with respect to that.

21  But as to today's -- provided that these payments are being

22  made from avoided senior liens, we have no objection.

23         THE COURT:  Okay.  Either avoided -- yeah.  Senior

24  liens or avoided liens where they can preserve for the estate.

25  Okay.  I -- that's how I would have ruled anyway, so -- but I

0

13

1   think that's the law.  That's why you said what you said.  So I

2   will grant the request on that basis.  As far as the other fees

3   and expenses, I've reviewed them, and I think a thirty percent

169625

4   holdback is appropriate, given the status of the case.  And

5   with that holdback, I'll approve those as well.  It's not clear

6   to me that all of the claimed 506(c) charges would, in fact,

7   count, but this was clearly explained and on notice to parties

8   in interest, and the senior holders have not objected.  And so

9   the other -- the other basis for a 506(c) claim would apply

10  here, I consent, even as to those matters.

11        Now, if for some reason that I can't conceive of, it

12  turns out, with regard to the second property, that not only

13  are the liens -- the senior liens no good, but also, for some

14  reason, they're not preserved by the estate, then I think

15  Bodden would have a right to seek reconsideration of this

16  order.  But --

17        MR. CAMPO:  I'd have no objection to that, Your

18  Honor.

19        THE COURT:  -- but that's down the road, if ever.  So

20  you can submit an order --

21        MR. CAMPO:  Thank you, Your Honor.

22        THE COURT:  -- on the applications to that effect.

23        MR. CAMPO:  Thank you, Your Honor.  Your Honor, at

24  this point are we going to --

25        THE COURT:  Well, I think we should deal with the --

▯

14

1        MR. CAMPO:  Can I just submit that order to chambers,

2   Your Honor?

3        THE COURT:  Yes.

4        MR. CAMPO:  Or would you like me to -- all right.  I

5   will.  Thank you.

6        THE COURT:  That's fine.

Page 12

169625

7          MR. CAMPO:  Thank you.

8          THE COURT:  I think before you all turn to the

9   auction, we should deal with the request by 125th Street Owner,

10  LLC for an adjournment, and effectively reconsideration of the

11  order I entered approving the trustee's agreement with Route --

12  I'm sorry, with Rudd -- with Rudd, excuse me, Rudd Development

13  Corporation for a breakup fee.  So why don't we turn to Mr.

14  Nutovic's motion.

15          MR. NUTOVIC:  Thank you, Your Honor.  Your Honor, I

16  have a little bit of a cold, may I bring my water with me?

17          THE COURT:  That's fine.

18          MR. NUTOVIC:  As Your Honor knows, 125th Street

19  Owner, LLC and for purposes of this argument, I'm going to

20  refer to them as the purchaser, contracted with Mr. Pereira

21  through Mr. Campo to purchase the three properties that are

22  scheduled to be auctioned today.  For two years prior to the

23  contracts being signed, Mr. Saadia Shapiro, the principal --

24  one of the principals of 125th Street Owner, LLC met with Mr.

25  Campo, spoke with him, and explained to him the value of the

⬚

15

1   properties that are at issue here today.  And, Your Honor, I

2   don't think that Mr. Campo had any idea that these properties

3   would have a unique value as a collection of three properties

4   other than to anybody than Mr. Shapiro, because Mr. Shapiro

5   owned three parcels directly in between the three part -- the

6   three properties that are to be sold today.  So for Mr.

7   Shapiro, this appeared to the trustee as a unique opportunity

8   to string together six parcels in a row, and Mr. Shapiro told

9   him I'm going to pay you more for it because it's worth more

Page 13

169625

10    only to me. And without Mr. Shapiro, I doubt that the trustee

11    would have been able to identify anybody else to purchase these

12    three properties together as a unit. And that's where we are

13    here today.

14            Your Honor, Mr. Shapiro has submitted a declaration

15    stating under oath that he was repeatedly reassured that in

16    light of his unique position, in light of the several

17    appraisals that he provided to the trustee of his own

18    properties that he had purchased, the evidence of his own

19    purchases of the property, of the prices, and other comparable

20    sales, that the price that he was going to be offering for the

21    properties was well above what Mr. Campo would have gotten had

22    he been trying to sell these properties to anybody else or try

23    to sell them individually as separate properties.

24            Obviously, Mr. Campo must have been impressed by the

25    evidence, because it seems very clear that he bargained away

16

1    the right to seek higher and better offers. We have put before

2    you, the Court identified eight other sales in this particular

3    case where every one of those contracts was made subject to

4    higher and better offer, with a very elaborate paragraph 19 in

5    each one of them, specifying: This contract subject to higher

6    and better offer. If the trustee wants to he can conduct an

7    auction sale. That provision is specifically omitted from Mr.

8    Shapiro's contracts. Not only that, but the application for

9    approval of the contracts specifically notes that the purchaser

10    had requested that this be -- not be subject to higher and

11    better offer.

12            So I think Your Honor, for purposes of this hearing,

169625

13  can conclude that the trustee bargained away that right.

14  Because why else did he omit that provision in this contract,

15  and why else did he report to the Court in his motion that

16  the -- that the contracts had been requested by the purchaser

17  not to be subject to higher and better offer?

18       We've also put before Your Honor, Mr. Shapiro's

19  declaration.  And it could be substantiated with documents that

20  he provided to Mr. Campo, that prior sales of properties, very

21  recent sales of properties, including some that Mr. Shapiro had

22  purchased within the last couple of years before the contract

23  was entered into with Mr. Pereira, that those prices paid for

24  very comparable properties were between 1.675 million and 2.3

25  million.  So it is hard to question the trustee's business

17

1   judgment that he entered -- that he would accept a price

2   300,000 dollars above each one of those comparable -- the

3   highest of the comparable sales previously made for these

4   properties.  It was good business judgment.  It was a good

5   business decision.  And only -- only Mr. Shapiro was somebody

6   who could identify that would be a -- would be willing to pay

7   this.  Without Mr. Shapiro approaching him, he wouldn't know

8   where should he turn to for three other -- for any other people

9   that would want this particular collection of properties,

10  because Mr. Shapiro had it smack in the middle, right over

11  there between the three properties at issue here today.

12       So we have a situation where Mr. Campo enters into a

13  contract, bargains away his right for higher and better offer,

14  puts forward a motion seeking approval of that contract, and I

15  can understand, Your Honor, there may be dispute as to how Rudd

169625

16    emerges as a new bidder.  But Mr. Shapiro, in his declaration

17    sets forth that shortly after he signed his contract with Mr.

18    Campo, and before it was made public knowledge through filing

19    the motion, Rudd was already chasing him.  Sell me a property.

20    Sell me a property.  Now, that's -- the timing and coincidence

21    of those events strongly suggests that Rudd was made aware of

22    the contract.  How it was made aware of, I think for the

23    litigation, discovery may produce the tale of that story.

24          THE COURT:  Do you contend that the trustee undertook

25    a nondisclosure and gave your client an exclusive?

☐

                                                              18

1           MR. NUTOVIC:  No.

2           THE COURT:  And he wouldn't talk to anybody?

3           MR. NUTOVIC:  No.  We didn't say that, Judge.  But as

4     we pointed out in memorandum of law that we submitted in

5     connection with the request for a TRO, the trustee had a duty

6     of good faith and fair dealing not to attempt to frustrate Mr.

7     Shapiro's purchase of these properties.  And to the extent he's

8     going around soliciting or attempting to induce other people to

9     make other offers and break up this contract, we believe that

10    he breached his duty of good faith.  We've cited a good faith

11    and fair dealing --

12          THE COURT:  Where -- what provision of the contract

13    would have prevented him from doing that?

14          MR. NUTOVIC:  Of inducing other people to come and

15    make higher offers?

16          THE COURT:  Yes.

17          MR. NUTOVIC:  Your Honor, that's the duty of --

18    that's an implied duty of good faith and fair dealing which
                            Page 16

169625

19    have been applied to all New York contracts, under the

20    restatement of contracts --

21              THE COURT:  But again, there was no -- no --

22              MR. NUTOVIC:  There's no specific provision.

23              THE COURT:  -- no shop provision or anything like

24    that?

25              MR. NUTOVIC:  No.

19

1               THE COURT:  And certainly no -- no advance approval

2     of such a provision.  Or there wouldn't have been, because it

3     wasn't in the contract, but.

4               MR. NUTOVIC:  No, I agree, Your Honor, but I appended

5     to my memorandum of law, a decision in the case called In re

6     Pintlar, which was similarly defended by -- well defended on

7     the other side, I'm taking the trustee's position here, firm of

8     Dewey Ballantine represented the other side over there.  And in

9     that particular case, Your Honor, a litigation trustee of a

10    litigation trust that had been formed pursuant to a Chapter 11

11    plan and was required to bring, just like any other trustee --

12    Chapter 11 trustee, was required to bring settlements, sales of

13    assets or -- to -- for approval to the Bankruptcy Court.  That

14    litigation trust entered into a contract to sell litigation

15    rights to a party called Likal (ph.) Corporation.  Likal

16    Corporation agreed to pay one million dollars for those rights

17    to sue a third party.  After the trustee signed, just the same

18    as he did over here, sign a contract with no provision in there

19    for higher or better offers, subject only to Bankruptcy Court

20    approval, the trustee went and negotiated a deal with the

21    targets of the litigation to settle the litigation for 1.75

Page 17

169625

22    million dollars.  He then withdrew his motion to sell these

23    rights to Likal Corporation and then sought approval of his

24    settlement deal.

25          Bankruptcy Court approved the deal and Likal

□                                                          20

1     Corporation turned around and sued the trustee for a breach of

2     this partic -- of implied duty of fair dealing.  Because the

3     allegation was that once you've done a deal with somebody, and

4     it's not subject to higher and better offers, you cannot take

5     any steps to frustrate the other party to the contract from

6     reaping the benefits of the deal.  So, the Bankruptcy Court

7     dismissed -- on a motion to dismiss the complaint, he dismissed

8     the action.  Technically it went down as a motion for summary

9     judgment because other papers were appended to the pleadings.

10    But on appeal to the District Court, Your Honor, the District

11    judge reversed, finding that the trustee violated this implied

12    duty of good faith, which is in the restatement of contracts,

13    it's implied in all contracts.  We cited a case to you that

14    it's applicable in New York also, stating that the trustee

15    cannot go out and do things after he signs a contract, even if

16    it's subject to Court approval, that would attempt to frustrate

17    that contract from coming to fruition.

18          So we believe in the first instance that the trustee

19    should not have gone and negotiated another deal with -- with

20    Rudd or with anybody else.  And the mo -- and the litigation

21    trust in that case argued, we have a fiduciary duty to maximize

22    assets and therefore we're obligated to pursue it.  The

23    District judge said that doesn't trump your right -- your

24    implied duty of fair dealing.  And, Your Honor, we've cited to

Page 18

169625

25    you in that memorandum of law, divergent -- diverging lines of

21

1    cases falling on both sides of this issue.  None of them were

2    in this district that we found.  And we represent to Your

3    Honor, that there is a very respectable line of authority, and

4    principally I think this case involving Likal Corporation, is

5    almost directly on point.  You've got a situation where a

6    trustee signs a contract not subject to higher or better offer,

7    and then goes and negotiates another deal with somebody else.

8          THE COURT:  Were you here in Court on the day of the

9    trustee's motion for approval of your client's contract?

10          MR. NUTOVIC:  Your Honor, I was not retained at the

11    time.

12          THE COURT:  Okay.

13          MR. NUTOVIC:  I was not here.

14          THE COURT:  All right.

15          MR. NUTOVIC:  I asked --

16          THE COURT:  You don't think there's a difference

17    given the context of that matter, where there was actually a

18    motion before the Court for approval of the contract, and I had

19    competing bidders standing up who said they were prepared to

20    pay considerably more for the -- based on the same terms?

21          MR. NUTOVIC:  No, Your Honor, I think that's exactly

22    the Likal --

23          THE COURT:  So the Court has no role at all in

24    considering whether a motion should be approved or not.  It

25    should just rubber stamp what the trustee has done?

169625

22

1          MR. NUTOVIC:  No, Your Honor, I'm not saying that.

2          THE COURT:  Why would you have a motion under 363(b)

3     then?

4          MR. NUTOVIC:  Your Honor, I think the answer to that

5     lies in the standard for judges approving contracts for sale of

6     properties is, as Collier describes it, a business judgment

7     test.

8          THE COURT:  Have you read O'Ryan Pictures, second

9     Circuit?

10          MR. NUTOVIC:  I have not -- I cannot tell Your Honor

11     that I have read that case.  But I've --

12          THE COURT:  Okay.

13          MR. NUTOVIC:  -- not discovered any case where the

14     trustee has signed a contract not subject to higher or better

15     offer --

16          THE COURT:  And so the Court just immediately defers

17     to the trustee on the business judgment?

18          MR. NUTOVIC:  No, Your Honor, I think -- I think over

19     here that the trustee exercised good business judgment at the

20     time he signed the contract.

21          THE COURT:  And you don't think that the relevant

22     time is the date of the hearing as opposed to the time that the

23     contract's signed?

24          MR. NUTOVIC:  No, Your Honor, and I'll tell you why.

25     Because if you are going to do that, Your Honor, what you're

☐

23

1     really doing is you're saying the trustee's contract with --

Page 20

169625

2  with the purchaser, or any purchased contract is a loseree.

3       THE COURT:  Isn't that inherent in the concept of

4  getting Court approval?

5       MR. NUTOVIC:  No, Your Honor, because if the Court

6  approval --

7       THE COURT:  Why would you even need approval of a

8  breakup fee agreement, then?  Why would Judge Mukasey have had

9  to have ruled in Integrated Resources on approval, and the

10 application of the business judgment standard, which he said is

11 applicable by analogy in bankruptcy cases.  Why wouldn't he

12 have just accepted the fact and not even had to have had a

13 motion?

14      MR. NUTOVIC:  No, Your Honor.  I think --

15      THE COURT:  The trustee already entered into it?

16      MR. NUTOVIC:  No, Your Honor.  I don't think that's

17 correct.

18      THE COURT:  Why would he have spent twenty pages

19 consider it an the merits of it?

20      MR. NUTOVIC:  Because -- because the trustee could

21 have -- if the trustee had brought before Your Honor a contract

22 for two million dollars, I would not argue with you that he was

23 not allowed -- that Your Honor could disapprove such a

24 contract.  If Your Honor found that there was a gross

25 inadequacy in the price, Your Honor could disapprove the

0

24

1  contract.  All of these things -- the question is did he

2  exercise valid business judgment when he signed the contract?

3  I think that's the issue, Your Honor.  And I -- Your Honor was

4  never presented with any of the evidence which would have shown

Page 21

169625

5  that there were comparable sales substantially lower --

6          THE COURT:  It doesn't matter.  The cash price was

7  higher.

8          MR. NUTOVIC:  Well --

9          THE COURT:  There was someone willing -- how much

10  more money were they -- was Rudd willing to pay?

11          MR. CAMPO:  One million dollars.

12          THE COURT:  A million dollars.

13          MR. NUTOVIC:  I understand that, Your Honor.  And if

14  Your Honor is ruling that as a matter of law, if somebody comes

15  in with a higher bid after the trustee has exercised good

16  business judgment in signing that particular contract, you're

17  telling me as a matter of law that you have to disapprove that

18  contract, I think Your Honor is in error.  Because what you are

19  doing, then, is a matter of public policy --

20          THE COURT:  Have you read the FNN case?

21          MR. NUTOVIC:  I cannot say that I have.

22          THE COURT:  Second Circuit case on the conduct of

23  auction sales.

24          MR. NUTOVIC:  Your Honor.

25          THE COURT:  And even there, FNN said the Court, the

☐

25

1  Court, not the trustee, the Court walks a tightrope as far as

2  maximizing the estate and ensuring fair auction procedures.

3  Now, where there's no auction at all --

4          MR. NUTOVIC:  Your Honor --

5          THE COURT:  -- you're saying the Court plays no role

6  at all?

7          MR. NUTOVIC:  No.  Your Honor, because what I'm

169625

8  saying to you is, that without Mr. Shapiro being there, we

9  would not have an auction sale today. Why? Because these

10  three properties have unique property to him, which he

11  identified.

12      THE COURT: But he didn't seek to have any buyer

13  protection.

14      MR. NUTOVIC: Your Honor, that was something that the

15  trustee decided to bargain -- he decided to bargain the issue

16  of subject to higher and better offer away. He didn't -- he

17  didn't feel the need to do that.

18      THE COURT: Because you don't need to do that. It's

19  part of the process.

20      MR. NUTOVIC: Your Honor --

21      THE COURT: It's inherent. If he'd had -- if he'd

22  had you representing him -- well, no, I won't put -- that's not

23  fair.

24      MR. NUTOVIC: No, but Your Honor, I'm not quibbling

25  with the idea that maximizing the value of the -- of creditors

0

26

1  is a fundamental underpinning of Court decisions related to

2  sale of assets. But I think that what you're talking about is

3  insuring fairness in the process while at the same time

4  maximizing the value of assets. But you -- this is an unusual

5  situation here, where a trustee has signed a contract and the

6  cases that we have cited to you, show that it's a valid

7  contract subject to a condition subsequent. And if Your Honor

8  finds -- and I think that if Your Honor --

9      THE COURT: But the condition subsequent is

10  Bankruptcy Court approval.

Page 23

169625

11          MR. NUTOVIC:  Correct.  And I think that the correct

12    standard, Your Honor, is finding whether or not the trustee

13    exercised valid business judgment at that point.  Because, Your

14    Honor, I --

15          THE COURT:  At the point of entry into the contract?

16          MR. NUTOVIC:  Yes.

17          THE COURT:  Do you have any case law that supports

18    that theory?

19          MR. NUTOVIC:  I think -- Your Honor, you rendered

20    your decision last night.  I mean, I got it -- it came at the

21    Internet at lunch time.

22          THE COURT:  No, no.  I'm talking about any case law

23    involving sales?

24          MR. NUTOVIC:  All I'm saying to Your Honor is that

25    I've not had an opportunity to research that.  But I would

0

27

1     submit to Your Honor, I --

2           THE COURT:  It's kind of a key point.  I am not aware

3     of any.

4           MR. NUTOVIC:  -- but, Your Honor, I will give you an

5     analogous situation where there are cases, and that is, once

6     there is an auction sale, and somebody -- somebody then wants

7     to come and bid after that --

8           THE COURT:  That's different.  That's FNN.  That's

9     where the Court talks about the need to have fair rules for an

10    auction sale, and the tradeoff that the estate and all the

11    parties make in having an auction where everyone bids, knowing

12    there are fair rules.  And even there, in FNN, the Court said

13    the Court walks a tightrope as to whether you adhere to those

169625

14   rules blindly or whether you have some play in the joints.  But

15   here there was -- there was no auction procedure.

16          MR. NUTOVIC:  But, Your Honor --

17          THE COURT:  I agree with you.  The trustee holds an

18   auction in twenty minutes or so, and then after that someone

19   comes in who had held back during the auction and says, oh no,

20   wait, I want to be considered, that's different.  That person's

21   monkeying  around with the rules.

22          MR. NUTOVIC:  Your Honor, I think that when the

23   trustee signed his contract without putting a clause in there

24   subject to higher and better offer, it was the equivalent of

25   having an auction sale at that time.  And that just the same

□

                                                          28

1   way as the Court has to ensure that there are fair -- fair

2   procedures, when a trustee enters into a contract, he cannot

3   give him a pass and say, you're allowed to do what you want,

4   but it's always subject to higher and better offer, Your Honor.

5          THE COURT:  Okay.

6          MR. NUTOVIC:  I think there's a difference in that.

7          THE COURT:  All right.

8          MR. NUTOVIC:  Your Honor, I think that the standard

9   for overturning auction sales are fraud, deceit or grossly

10   inadequate price.

11          THE COURT:  If it's an auction.

12          MR. NUTOVIC:  Okay.  Your Honor, here we have another

13   procedure which under normal rules of law is a fair procedure.

14   The trustee -- if you were to hear today --

15          THE COURT:  But I'm sorry, I just, I've heard enough

16   on this one.  I'm sorry.

                         Page 25

169625

17          MR. NUTOVIC:  Well, Your Honor, finally, I just want
18     to mention one other point, Your Honor.
19          THE COURT:  Okay.
20          MR. NUTOVIC:  It is grossly unfair for Mr. Shapiro to
21     have worked all this time for two and a half years, educated
22     the trustee as to what the values of the properties are, and
23     for him today to be in a position to accept something in excess
24     of 7.8 million, because for sure my client had been unwilling
25     to offer that, would not have happened but for Mr. Shapiro.

☐                                                                      29

1     For him to walk away from this without having any compensation
2     at all, no breakup fee, no nothing, is simply inequitable.  And
3     there has to be some redress to Mr. Shapiro of this situation.
4          THE COURT:  Okay.
5          MR. NUTOVIC:  Thank you, Your Honor.
6          MR. CAMPO:  Your Honor, I'm going to try to be very
7     brief in responding to Mr. Nutovic, but I think there are
8     certain points that I think just can't be left the way he has
9     stated them on the record.  First, Your Honor, to suggest that
10    the trustee couldn't identify other purchasers for these
11    properties, or wasn't aware of their unique value, is
12    absolutely absurd.  It is true that Mr. Shapiro contacted the
13    trustee who then advised him to contact me in 2 -- in late
14    2005.  It's also true that he advised me at that time that he
15    was holding a mortgage on one of the properties, that he had
16    acquired in an attempt to foreclose one of the properties so
17    that he could acquire it to see if he could continue to add to
18    his assemblage.
19          We advised him that there was a -- there was now the

Page 26

169625

20 bankruptcy proceeding. There was an automatic stay. And we
21 then started a conversation concerning whether or not he might
22 be interested in purchasing the properties. The trustee, at
23 the time that he entered into the Shapiro contracts, had
24 another bid at 7.5 million dollars. That bidder was unwilling
25 to agree to the same terms that Shapiro agreed to, namely that

 

30

1 he would enter into the contract and notwithstanding the
2 pendency of the litigation, deposit the proceeds with the
3 trustee, subject to a determination of the litigation.
4         In that sense, Your Honor, Mr. Shapiro was unique.
5 We agree with them. However, Your Honor, at no time did the
6 trustee or I, and I do want to state that Mr. Nutovic
7 continually refers to Mr. Campo doing things, Mr. Campo signed
8 away, obviously, Your Honor, I didn't do anything without
9 consulting with my client who's a fiduciary. And the trustee
10 made very sound business decisions in connection with this
11 matter.
12         The sales price, Your Honor, which was negotiated to
13 7.8 million dollars, at that time the trustee believed was a
14 good sales price for the property. And given the fact that
15 Shapiro was willing to enter into the contract, we did take the
16 higher and better provisions out of the contract. We don't
17 refute that. Our motion so states it. It was very clear.
18 However, we continually told Mr. Shapiro, notwithstanding
19 what's in his declaration, that while it wouldn't be subject to
20 higher and better offers, if anybody objected or the Court had
21 an opposition to it, or alternatively if somebody came out of
22 the woodwork and made some significantly higher offer, the

Page 27

169625

23    trustee was a fiduciary, the trustee would consider it.  And at
24    that point, it was very likely that the trustee would have to
25    support a bid that was substantially higher.


☐                                                                      31


1          Mr. Shapiro says that his price was unique, etcetera.
2    However, as Mr. Nutovic just told you, the prior sales prices,
3    which, Your Honor, we were aware of because we had an appraisal
4    of the properties done, as you will recall in connection with
5    the Irgang litigation, we knew what the properties were
6    approximately worth.  Those sales prices were between 1.65 and
7    2.3 million dollars.  But the contract was at a total of an
8    average of 2.6, and the contracts that Mr. Shapiro refers to
9    were contracts and closings that were prior to that date.
10          Was it good business judgment to enter into it?  Yes.
11    The trustee wouldn't have entered into it if he didn't think it
12    was sound at that time.  But obviously, facts change.  Mr.
13    Shapiro clearly indicated to us that he thought he was
14    "overpaying" for the property, that he was the best offer in
15    town, and that we would never find an alternative bidder.  And
16    we, based on what we understood at that time, said okay, we'll
17    go with this, but it's got to be subject to Bankruptcy Court
18    approval.  The trustee didn't do anything to solicit the other
19    bids.  The other bidders came to the trustee independent, as
20    all prospective purchasers have come to the trustee from time
21    to time in connection with various properties in this case.
22          It's no surprise that people knew about these three
23    unique properties on 125th Street, given what's going on on
24    125th Street.  And part of it is due to the fact that Mr.
25    Shapiro himself had discussed his properties and the fact that

169625

1   he was doing an assemblage.  It was quite known that he was
2   doing an assemblage at 125th Street.
3           As Your Honor points out, there was no no shop
4   provision in the contract.  The Pintlar case, Your Honor, is
5   very distinguishable.  I mean, there was no question that the
6   trustee wasn't negotiating with Shapiro and negotiating with
7   somebody else at the same time.  In fact, after the contract
8   terms were agreed to in principle and before they were even
9   executed, the trustee didn't speak to anyone else about the
10  properties.  When people called, we told people that --
11  prospective bidders that the properties were in litigation.  We
12  weren't soliciting bids, and that was it.
13          It was after the contract was executed and how Mr.
14  Rubin contacts Mr. Shapiro is unbeknownst to us, but
15  understanding from what Mr. Shapiro says, he contacted him
16  about his other properties.  He certainly didn't hear about
17  these contracts from us.  We never told Mr. Rubin or Rudd about
18  the existence of these contracts until after the motion was
19  filed and it was a matter of record.  And that was because he
20  had contacted us and said, can we buy them?  And we told him,
21  look, there's a contract out there.  It's not subject to higher
22  and better offers, and that's it.  He examined the contracts,
23  examined the motion, and then came to us and said I'm prepared
24  to make a significantly higher offer.  The trustee didn't turn
25  around and negotiate it with Mr. Shapiro.

169625

1        Your Honor will recall the hearing last week which
2    Mr. Nutovic wasn't at, in which I represented to the Court, as
3    a fiducia -- as an officer of this Court, that we went to Mr.
4    Shapiro immediately after Rudd contacted us and said I want to
5    offer a million dollars higher, we told Mr. Shapiro about it.
6    We said to Mr. Shapiro look, this is the kind of an offer that
7    we can't just ignore, the Court won't ignore.  We offered to
8    him to enter into -- to revise his contract, become the
9    stalking horse, get the bid protection that Rudd wanted and
10   continue with the sale which would obviously now be subject to
11   higher and better offers, because notwithstanding what Mr.
12   Shapiro had told us that his was the best offer in the world,
13   there obviously were two other bidders who were interested,
14   both Rudd at 8.8 million dollars, and Bernato at 9 million.
15       Your Honor, the -- I don't need to go any further
16   with respect to what transpired unless Your Honor has
17   additional questions.  But suffice it to say that the trustee
18   notwithstanding that the trustee had no prohibition on not
19   shopping, that he hadn't entered into any nondisclosure
20   agreements, he didn't shop.  It's as pure and simple as that.
21   The properties shopped themselves.  And Mr. Shapiro, who is an
22   attorney, and who negotiated the contract, and attended all of
23   those negotiations by himself, as his own counsel, said that he
24   was fully aware, and we disclosed to him the trustee's
25   fiduciary duty, and he confirmed that he understood it; and

0

34

1    when Rudd offered to enter the contract, we proposed it to
2    Shapiro.  He took a week to decide that he didn't want to do
3    it.  When he contacted us and said this isn't a real deal, we
                            Page 30

169625

4    don't think Rudd's -- we didn't even tell him Rudd's name -- we

5    don't think this even a real offer.  It doesn't make sense.

6    The numbers don't play out.  I said look, if he's real, this

7    bidder is real, and he comes to us and says he wants to enter

8    into a contract at 8.8 million dollars, you understand that

9    we're going to enter into it.  He said yes, I understand,

10   you'll have two contracts.  You'll go to the Court with two

11   contracts.  That's what happened, Your Honor.

12            THE COURT:  Okay.

13            MR. NUTOVIC:  Your Honor, a couple points.  First, I

14   don't want to gloss over issues that we didn't talk about, Your

15   Honor, which is that on the standard of what we're seeking over

16   here, which is an adjournment, which is effectively a stay, if

17   you will, the standards are generally whether or not there's a

18   likelihood of success or if there's a fair question going to

19   the merits and whether there's a balance of hardships, how you

20   balance the hardships.  And I say to Your Honor that given the

21   different lines of cases that we have over here regarding the

22   Likal Corporation and Mr. Shapiro's rights, I certainly think

23   that you have a fair question over here, where there is no case

24   directly on point saying you cannot -- that you can consider

25   higher bids after a no subject to higher or better offer

0

35

1    contract is signed, or a contract which specifically eliminates

2    that provision is signed.

3            So I don't think we have anything directly on point

4    that is going to say to Your Honor, you're out of the box,

5    you've lost.  I think you've got a fair question over here, and

6    I think what you have is a situation where if the trustee's

Page 31

169625

7   allowed to go forward and sell the property, Mr. Shapiro's out
8   of the box altogether.  He's lost.  The trustee's not in that
9   situation.  The trustee still has to wait for your ruling
10  before he can close.  This has not been an advertised sale
11  where he's incurred tremendous costs advertising or anything
12  like that.  It just happened December 10th, oral notification.
13  There's been no newspaper advertising or anything like that.
14  There is no harm to the trustee if this is adjourned for a
15  short period of time while we get an opportunity to brief this
16  issue properly to you.  Because, Your Honor, my client
17  certainly left the courtroom on December 10th with the
18  impression that there was ruling on their motion.  There was no
19  ruling on the motion just the same way the Likal Corporation
20  never got a ruling on its motion because the trustee
21  withdrew --
22          THE COURT:  I specifically ruled on the motion.
23          MR. NUTOVIC:  Okay.  Then, Your Honor --
24          THE COURT:  I granted the breakup fee.  I found that
25  there was a higher proposal that I couldn't, in my business

0

36

1   judgment, approve the existing motion to your client.
2           MR. NUTOVIC:  Okay.  And then, Your Honor, coming
3   back to that point about what your standards are.  And you
4   asked whether the trustee -- whether the Court is just rubber
5   stamping the trustee's judgment.  Your Honor, this idea of a
6   duty to maximize assets for the estate is really a fiduciary
7   duty.  It is not a Court duty.
8           THE COURT:  Oh, so you just would write 363(b) out,
9   notice and a hearing?
                        Page 32

169625

10          MR. NUTOVIC:  No, Your Honor --

11          THE COURT:  Who would object?  Why would you bother

12     to object?  What's the role of a creditors' committee?  Should

13     they just defer to the trustee?  I've heard enough of this.

14     This is bizarre.

15          MR. NUTOVIC:  Thank you, Your Honor.

16          THE COURT:  Have you read the guidelines of the

17     Southern District Court on the conduct of asset sales?

18          MR. NUTOVIC:  I have before, Your Honor.

19          THE COURT:  Okay.  All right.  I have before me a

20     motion  for reconsideration of an order issued yesterday based

21     on a ruling at -- on the trustee's motion dated November 12th,

22     which was given orally at a hearing on December 10th for

23     approval of the trustee's entry into a purchase and sale

24     agreement with an entity known as 125th Street Owner, LLC.  The

25     trustee's motion was brought under Section 363(b) of the

☐

37

1     bankruptcy code as well as 363(f), which requires that any

2     action taken by a trustee out of the ordinary course of

3     business be on notice to the parties in interest and subject to

4     the opportunity for objection and a hearing.

5          Among the actions covered by Section 363(b) are sales

6     of assets out of the ordinary course.  Other actions covered by

7     Section 363(b) in my view, and I believe this is clearly

8     supported by the case law, would be the grant of a breakup fee

9     and other bidding protections.  In addition, I believe,

10     consistent with the Southern District Guidelines on sales, that

11     any agreement to provide a no shop or an exclusive, would also

12     be out of the ordinary course, and something that creditors

Page 33

169625

13    would be entitled to notice of and the Court would be entitled

14    ultimately, and required, to rule on if there were an

15    objection.

16         It transpired that the trustee determined, rather

17    than conduct a full auction process with a Court reviewed set

18    of auction procedures and ultimately an auction if there were

19    higher and better bidders, he would, as contemplated as a

20    possibility by the Southern District Guidelines, proceed with

21    approval of the 125th Street Owner transaction.  He disclosed

22    that in his motion, that he was not going through an auction

23    process.  He did not, however, agree with 125th Street Owners,

24    to give them a no shop or even worse, and exclusive, and it was

25    clear that he would be noticing the transaction, since it's

⬜

38

1    required by statute, which is implicit in any contract, under

2    Section 363(b).  And if there were any objections, it would be

3    subject to ruling and that he could seek a hearing on it

4    himself with a ruling by the Court.

5         At the hearing, the trustee's counsel reported, as I

6    believe he was under an obligation to me to do so, that there

7    were two other bids for the property that were considerably

8    higher than the bid covered by the motion.  Indeed, one was a

9    million dollars higher than the bid covered by the motion.

10    Exercising my business judgment, I directed the trustee to

11    consider those proposals and to explore their bona fides,

12    including ability to close and ability to post their deposit,

13    which the trustee did, and then confirm to me, as part of the

14    record of the hearing that indeed, one of the bidders had the

15    financial wherewithal to proceed, was prepared to put up a

Page 34

169625

16  deposit, and was prepared to follow the contract previously
17  agreed to by 125th Street Owner, LLC, with one exception.  This
18  bidder wanted a modest breakup fee recognizing, as frankly any
19  bidder in a bankruptcy sale should know, given the nature of
20  Section 363(b), that there would be a possibility of being
21  overbid.
22      I approved the trustee's entry into that stalking
23  horse contract, including the breakup fee, and at the same
24  time, determined as a corollary matter, that the trustee's
25  continued performance under the 125th Street Owner, LLC

39

1  contract, would not be approved, because it would not be a
2  proper exercise of business judgment.  I don't believe there's
3  any mystery in this or anything that would give 125th Street
4  Owner, LLC any rights, given that determination by the Court.
5  The code contemplates ultimately the Bankruptcy Court
6  determining whether a sale or any other action out of the
7  ordinary course, being noticed to the Bankruptcy Court for
8  approval should be approved.  The standard for approving such a
9  sale was first articulated by the Second Circuit in Lionel
10  Industries (722 F. 2d, 1063 2d Cir. 1983), in which the Court
11  said that the Court -- the Bankruptcy Court has to find that
12  the debtor in possession or the trustee, in this instance, has
13  exercised good business judgment in connection with the
14  decision to proceed with the sale, and that the trustee has not
15  been coerced or blindly followed one particular constituency.
16      It's important to note that it is the Court that
17  makes the determination whether the trustee has exercised good
18  business judgment.  And that, of course, is implicit in the

169625

19    whole structure of Section 363(b) which requires notice and
20    approval.  The role of the Court in connection with an action
21    out of the ordinary course was reiterated by the Second Circuit
22    in In re O'Ryan Pictures Corporation (4 F 3d, 1095, 2d Cir.
23    1993), which the Court went to great length in explaining the
24    nature of the Bankruptcy Court's decision in respect of
25    business judgment, and said that it is just that, a decision on

￼

40

1     a business basis, where the Court would not be ruling on
2     whether the decision was right or wrong, ultimately as a matter
3     of law, but making a reasoned decision in the exercise of its
4     business judgment.
5            Now, it is true, that a number of courts, and this
6     Court have said, that in most instances it is appropriate to
7     apply by analogy, tempered by the bankruptcy context, the State
8     Court Business Judgment Rule, in respect of actions out of the
9     ordinary course.  However, my caveats to that are important.
10    The business judgment rule is tempered by the bankruptcy
11    context.  That includes the fact that unlike in State Court
12    contexts or State Corporation Law contexts, the bankruptcy
13    process is a public process, and the Court will seriously
14    consider the views of the various parties in the bankruptcy
15    case, including official committees, creditors with interest in
16    the case and the like;  and that frequently, those views will
17    dilute or temper the Court's reliance on a trustee's or a
18    debtor in possession's business judgment.  After all, they are
19    fiduciaries too, as far as the official committees are
20    concerned.
21            In addition, in a State Court corporate law context
                                    Page 36

169625

22    where the business judgment rule applies, the corporation does

23    not have to go to court on notice for approval.  It can be

24    challenged by shareholders, and in some instances by creditors.

25    But here, in the bankruptcy context, it's incumbent upon the

ロ

41

1    debtor in possession or the trustee to go to court and seek

2    approval.  And that's obviously in contemplation of Congress

3    noting that when there is the misfortune of a bankruptcy case,

4    the creditors and the Court need to be on notice, and the Court

5    ultimately needs to rule.  Because it is the Court that is

6    supervising the sale and the case.

7         Consequently, cases like Integrated Resources, which

8    considered the applicability by analogy, as Judge Mukasey was

9    careful to say, of the business judgment standard, there in

10   connection with approval of a breakup fee, and Adelphia and

11   Global Crossing in terms of Judge Grober's discussion of the

12   business judgment case, all were cases where ultimately the

13   Court analyzed the debtor's business judgment.  And it was

14   crystal clear to me and clear to anyone in the courtroom, that

15   for the trustee to proceed with a transaction for less -- that

16   would bring in less than a million dollars to the estate, then

17   another transaction in hand would not be a proper exercise of

18   business judgment.

19        Consequently, I see no basis for reconsidering my

20   decision set forth on the record on December 10th, and

21   memorialized in an order from yesterday.  Nor do I see a basis

22   for enjoining an auction sale pursuant to the process that I

23   approved on December 10th.  The parties who were prepared to

24   participate in that sale are here ready to bid.  I don't

169625

25    believe the trustee can be second guessed in wanting to proceed

                                                                    42

1    with that sale. And the sale should proceed. This -- the
2    proposal or the argument that the Court should defer to a
3    decision made by a trustee weeks if not months before the
4    hearing on that decision, would gut Section 363(b) from the
5    code and is, in my view, completely inconsistent with how
6    bankruptcy sale should be conducted. It is, again, as I said
7    at oral argument, completely distinguishable from a situation
8    where the trustee has conducted an auction pursuant to Court
9    approved procedures and then suggests that another bidder
10   should be allowed to come in late. That whole set of facts, as
11   discussed at length by the Second Circuit in the Financial News
12   Network case, but that is not our set of facts. In essence the
13   trustee was starting anew on December 10th, after I concluded
14   that I would not grant the motion for approval of 125th Street
15   based on there being a clearly better offer. So I will deny
16   the motion, and Mr. Campo, you can submit an order to that
17   effect.
18           MR. CAMPO:  Thank you, Your Honor.
19           MR. NUTOVIC:  Your Honor, is Mr. Shapiro not even
20   entitled to a breakup fee for everything he --
21           THE COURT:  He can make his motion. But I suggest he
22   read the Third Circuit case law on that. He didn't seek a
23   breakup fee. But he has the right, of course, to file under
24   Section 503(b) if he wishes to.
25           MR. NUTOVIC:  Your Honor, it's not in our papers, but

169625

43

 1  Mr. Shapiro advises us that when they attempted to negotiate a
 2  breakup fee, he was advised there is no need for it.  There
 3  will be no other bidders.  That -- Your Honor --
 4          THE COURT:  You know --
 5          MR. NUTOVIC:  -- there is a draft --
 6          THE COURT:  -- I --
 7          MR. NUTOVIC:  -- which has a breakup fee and the
 8  trustee would normally --
 9          THE COURT:  You know what --
10          MR. NUTOVIC:  -- is given.
11          THE COURT:  -- I don't know Mr. Shapiro.  I don't
12  know whether he's a babe in the woods or not.  And maybe that
13  has some bearing on it.  But most lawyers are told lots of
14  things in negotiations by their opposite side.  It's really
15  incumbent upon them to know the law in this area.  And the law
16  in this area is clear.  So he can make whatever motion he wants
17  in respect of a breakup fee.  But I do suggest he read the case
18  law in it before he does so.
19          MR. NUTOVIC:  Your Honor, in the event we choose to
20  seek an appeal in a stay pending appeal, may we report that you
21  had denied on the basis of your same reasoning that you gave
22  for not granting the injunction that you were denying stay
23  pending appeal?
24          THE COURT:  There was no -- I already --
25          MR. NUTOVIC:  Your Honor --

44

 1          THE COURT:  You mean your ex parte motion for a TRO
                        Page 39

169625

2   earlier in the week?

3          MR. NUTOVIC:  Your Honor just said today --

4          THE COURT:  Yes, I conclude there's no basis for --

5          MR. NUTOVIC:  An injunction.

6          THE COURT:  -- an injunction.  There's no merit to

7   this motion.

8          MR. NUTOVIC:  Thank you, Your Honor.

9          THE COURT:  Okay.

10         MR. MAY:  Your Honor?  I assume that we're all going

11  to proceed to the auction in this case now, and --

12         THE COURT:  And then --

13         MR. MAY:  -- and then come back to Your Honor.

14         THE COURT:  -- and deal with your client's objection

15  to the extent it still exists?

16         MR. MAY:  Right.  Right.  And --

17         THE COURT:  Your client may still win the auction.  I

18  don't know.

19         MR. MAY:  Well, it's possible.  And that's -- and in

20  light of your colloquy with Mr. Nutovic, that's why I want to

21  beg the Court's indulgence for just a few seconds.  Because at

22  ten o'clock this morning, just before we were called to the

23  bench, I've got written terms of sale that were provided to me

24  by Mr. Campo and the trustee, and it's the first time I've seen

25  these written terms of sale.  And I think it's incumbent, I

45

1   think that we all should have a little discussion about them.

2   Because there are two terms of sale which I was unaware of

3   before I saw this document that I think are somewhat

4   troublesome.

Page 40

169625

5        First is that the terms of sale require a closing
6   with time of the essence provisions.  And given the
7   circumstances of this case, I have no idea what time of the
8   essence is.  Because as we stand here today, Mr. Campo's client
9   doesn't own these properties.
10        THE COURT:  Well, the closing -- the time of the
11  essence is not the trustee's part, it's the buyer's part.  And
12  clearly --
13        MR. MAY:  Well --
14        THE COURT:  -- no one's going to close before there's
15  a ruling on the --
16        MR. MAY:  -- exactly.
17        THE COURT:  -- adversary proceeding.  That was very
18  clear at the December 10 hearing.
19        MR. MAY:  Right.  And my question is, what does time
20  of the essence mean in that context?  Does that mean that
21  within a day after the ruling or two days after the ruling, I
22  mean, there's a required closing?  Because the terms of sale
23  also state in them that the property shall be transferred and
24  conveyed by the trustee to the successful purchaser at the
25  closing, and the successful purchaser shall pay the balance of

46

1   the purchase price on the closing date set by the trustee.  So
2   I don't understand exactly how that's supposed to work in this
3   time of the essence provision.
4        MR. CAMPO:  May I, Your Honor?  Your Honor, the
5   time -- the terms of the sale also confirm that the purchasers
6   are acquiring the property under the same terms and conditions
7   as the contract that's now been entered into with Rudd --

Page 41

169625

8          THE COURT:  I think Mr. May's going to a different

9     point.  He wants some notice of it so he can go seek a stay.

10    Right?  Is that what you're to?

11          MR. MAY:  And I also want to know, if I'm the

12    successful purchaser, what my obligations are to me to close.

13    Because I'm going to want to have some reasonable period of

14    time to come to a closing and not have to be bound by a time of

15    the essence provision that I don't know what it means.

16          MR. CAMPO:  Your Honor, the time of the essence

17    provision as it pertains to any purchaser or successful

18    purchaser, including the ones that are defined in first the

19    Shapiro contract and now the Rudd contract, is very clear.

20    It's set forth in the terms of the contract.  It is on a

21    date -- the closing shall be set by the trustee on a date, on

22    not less than five days notice, for a date that will occur

23    within no less than -- that can be no less than forty days

24    after the order approving the sale.  So there isn't any --

25          THE COURT:  All right.

☐

47

1          MR. CAMPO:  -- I don't think there's a disconnect

2     here.

3          THE COURT:  That seems -- that seems sufficient.  For

4     someone to organize a closing.

5          MR. CAMPO:  If Mr. -- if Mr. May had read the

6     contract --

7          THE COURT:  I mean I understand your point.  If he

8     was going to -- he was going to say you have to close five

9     minutes after a ruling, then obviously that's basically an

10    option.  But that doesn't seem -- that's not the case.  If you

Page 42

169625

11  want the trustee to reiterate that on the record at the

12  auction, that's fine.

13          MR. MAY:  Well, yeah.  I think -- I mean, we will

14  obviously, if we make our bid and we have an issue with this

15  particular term, we will close --

16          THE COURT:  Well, he -- if what --

17          MR. MAY:  -- on the record --

18          THE COURT:  -- it is -- if the term is consistent

19  with the contract, as recited by Mr. Campo, and as will be

20  recited on the record of the auction in front of the court

21  reporter, then I don't think there's anything to reserve on.  I

22  think that's a fair term.

23          MR. MAY:  And the second condition, Your Honor, that

24  I wanted to bring to the Court's attention, is the provision in

25  the contract that says that if you're the successful purchaser,

⬜                                                                48

1   and for some reason you don't close, you forfeit your entire

2   deposit.  And that's a provision which says that that's

3   supposed to a liquidated damage provision.  And I think that

4   that all parties should understand that, and I don't think that

5   that's a particularly fair term and condition to a complete

6   forfeiture of a deposit, because I don't think it reflects the

7   actual damage amount.

8           THE COURT:  Well, it's in there.

9           MR. MAY:  I mean, if it's --

10          THE COURT:  It's what the trustee's prepared to go

11  ahead with.

12          MR. MAY:  Well, it's not an approved term or

13  condition, because this Court hasn't ruled on these terms and

Page 43

169625

14  conditions.  This is something --

15        THE COURT:  But it's certainly -- it's something that

16  the trustee can impose.  If no one says they're prepared to bid

17  on that condition, then he may reconsider it.  But it's

18  certainly a condition that has appeared in other contracts.  In

19  fact, I recently ruled on such a provision.

20        MR. MAY:  Well, I just wanted to make the position to

21  clear --

22        THE COURT:  From another trustee.

23        MR. MAY:  -- that we believe that that's an unfair

24  and objectionable provision.

25        THE COURT:  There's a lot -- there's actually quite a

49

1  bit of case law on this point.  And it's been upheld.

2        MR. MAY:  Well, I -- well, liquidated damage

3  provisions as a matter of state law --1

4        THE COURT:  No, no.  I'm talking about this very

5  provision.

6        MR. MAY:  No, but the term says that he's retaining

7  this deposit as liquidated damage.  And liquidated damage is a

8  provision which is governed by New York law as to whether --

9  under what circumstances it would or wouldn't be appropriate.

10  And if a liquidated damage provision really is not intended to

11  actually make the trustee whole for any losses he may suffer as

12  a result of this, and it's a penalty, and it's not really

13  liquidated damages, it's an illegal and improper term.

14        THE COURT:  You can't judge that.  Listen, there's

15  case law on this very provision at the District Court level, at

16  the State Court level.  And I'm not going to prejudge it now.

Page 44

169625

17    You're right.  Under some circumstances maybe, although it's a
18    very hard burden, a buyer might have some ability to get out
19    from under it.  But I'm not going to prejudge that, because the
20    more common case is that it actually applies.
21            MR. MAY:  And I -- just one last point, and that is,
22    it is unclear from the terms and conditions, although I think I
23    know the answer to this, is that our bid, letting everyone
24    know, will not be a bid that is exactly all dollars.  We have
25    lien rights and other things that will be part of our bid.

                                                                50

1            THE COURT:  I think that's understood.
2            MR. MAY:  Okay.
3            THE COURT:  And I made that clear at the December
4    10th hearing, that while the trustee is certainly -- and I
5    think this is appropriate given the nature of these assets,
6    within his rights to insist that everyone else bid on apples to
7    apples, that because of your client's unique position, given
8    the litigation, which everyone else is aware of, obviously.
9    It's part of the cont -- it's in the contract.  When the
10   trustee considers your client's bid, he's factoring into it,
11   all of the elements that he would do when he considers a
12   settlement of that litigation, including the lien rights.
13           MR. MAY:  Fair enough.
14           THE COURT:  And the ownership rights.
15           MR. CAMPO:  Your Honor, just so we're clear.  It's
16   what he would factor into in considering the settlement.
17           THE COURT:  Yes.
18           MR. CAMPO:  As opposed to an assertion that these are
19   my claims and this is what I have.

                              Page 45

169625

20          THE COURT:  No, he would consider a settlement of

21   those issues.

22          MR. CAMPO:  Correct.

23          THE COURT:  Right.

24          MR. CAMPO:  Very good, Your Honor.

25          THE COURT:  But you can't consider the settlement

                                                        51

1    without considering Mr. May's position.

2           MR. CAMPO:  Not a problem.  Not a problem, Your

3    Honor.

4           MR. MAY:  It doesn't sound like there's a distinction

5    there that I'm aware of.

6           THE COURT:  Probably not.  Okay.  So you can come

7    back and report when you're done on the -- on the sale process.

8           MR. CAMPO:  Thank you, Your Honor.

9           MR. NUTOVIC:  Thank you, Your Honor.

10          (Proceedings concluded at:  11:27 AM)

11

12

13

14

15

16

17

18

19

20

21

22

169625

23

24

25

☐                                                                                                          52

1

2                                    I N D E X

3

4                                        RULINGS

5                              Page      Line

6    Application for            13        2

7    Compensation and

8    Reimbursement of Dewey &

9    LeBoeuf Granted

10   Motion for Adjournment     42        15

11   And Reconsideration of

12   Order Denied

13

14

15

16

17

18

19

20

21

22

23

24

25

169625

53

```
1
2                    C E R T I F I C A T I O N
3
4      I Penina Wolicki, court approved transcriber, certify that the
5      foregoing is a correct transcript from the official electronic
6      sound recording of the proceedings in the above-entitled
7      matter.
8
9      _____  __January 24, 2008_____
10     Signature of Transcriber              Date
11
12     ____PENINA WOLICKI_____
13     typed or printed name
14
15
16
17
18
19
20
21
22
23
24
25
```

Exhibit "I"

Isaac Nutovic (IN-2076)
Nutovic & Associates
488 Madison Avenue – 16th Floor
New York, New York 10022
(212) 421-9100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

|  |  |
|---|---|
| In re: | Chapter 11<br>Case No. 05-10987 (RDD) |
| MAYWOOD CAPITAL CORP., et al., | |
| Debtors | |

---

## NOTICE OF APPEAL

---

125TH STREET OWNER LLC. appeals, under 28 U.S.C. §158(a), from the final order of United States Bankruptcy Judge Robert D. Drain entered in the above captioned case on December 20, 2007, to the extent such order denies the motion of John S. Pereira, as Chapter 11 Trustee, for an order allowing the Trustee to sell to 125th Street Owner LLC certain real property and improvements located at 65-67 East 125th St., New York, 77 East 125th St., New York, New York, and 70 East 125th St., New York, New York (the "Properties"). The names of all parties to the order appealed from and the names, addresses and telephone numbers of their respective attorneys are as follows:

Appellant:
125th Street Owner LLC represented by:
Isaac Nutovic, Esq.
Nutovic & Associates
488 Madison Avenue
New York, NY 10022
(212) 421-9100
 Appellee:

John S. Pereira, as Chapter 11 trustee of 65-67 East 125th Street Realty Corp, 77 East 125th Street Realty Co. and 79 East 125th Street LLC, represented by:
John P. Campo, Esq.
Dreier LLP
499 Park Ave
New York, New York 10022
(212) 328-6114

65-67 East 125th LLC., 77-79 E. 125th LLC., the SPC Entities and Bodden Funding Corporation, represented by:
Lawrence May, Esq.
Cole, Schotz, Meisel,
Forman & Leonard, P.A.
A Professional Corporation
900 Third Avenue
New York, New York 10022
(212) 752-8000

Commercial Mortgage Corporation represented by:
Kevin J. Nash, Esq.
Finkel, Goldstein, Rosenbloom & Nash, LLP.
26 Broadway, Suite 711
New York, New York 10004
(212) 344-2929

Dated: New York, New York
         December 28, 2007

                                        Nutovic & Associates
                                        Attorneys for 125th Street Owner LLC

                                        By:   _s/ Isaac Nutovic_
                                            Isaac Nutovic (IN2076)
                                            488 Madison Ave, 16th Fl
                                            New York, New York 10022
                                            (212) 421-9100

Exhibit "J"

Isaac Nutovic (IN-2076)
Nutovic & Associates
488 Madison Avenue -- 16th Floor
New York, New York 10022
(212) 421-9100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:

MAYWOOD CAPITAL CORP., et al.,

Debtors
------------------------------------------------------------x

125TH STREET OWNER LLC.,

Plaintiff.

vs.

JOHN S. PEREIRA, AS CHAPTER 11 TRUSTEE
OF-- 65-67 EAST 125TH STREET REALTY
CORP., 77 EAST 125TH STREET REALTY CORP.
and 79 EAST 125TH STREET REALTY LLC,
MICHAEL RUBIN, JOHN DOES 1-10 AND
RUDD DEVELOPMENT GROUP LLC.,

Defendants.
------------------------------------------------------------x

Chapter 11
Case No. 05-10987 (RDD)

## COMPLAINT

Plaintiff, 125th Street Owner LLC., by its attorneys, Nutovic & Associates, as and

for its complaint against John S. Pereira, (the "Trustee") Chapter 11 trustee of 65-67 East

125th Street Realty Corp, 77 East 125th Street Realty Co. 79 East 125th Street LLC,

Michael Rubin, John Does 1-10 and Rudd Development Group LLC.  ("Rudd")

## JURISDICTION AND VENUE

1.    The jurisdiction of this Court is founded upon 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.).

2.    This adversary proceeding is a core proceeding pursuant to sections 157(a) and 157(b) of title 28 of the United States Code because this adversary proceeding arises in or under the procedurally consolidated cases of three related Chapter 11 debtors, now pending in the United States Bankruptcy Court for the Southern District of New York.

3.    Venue of this proceeding in this Court is proper pursuant to Section 1409(a) of title 28 of the United States Code because this action is one arising in or under a case under Title 11 of the United States Code.

## INTRODUCTION

4.    On March 23, 2005, this Court ordered the joint administration of the Chapter 11 cases of forty eight different debtors under the above main caption and directed the appointment of a Chapter 11 Trustee for these debtors. The debtors in these procedurally consolidated cases had filed voluntary Chapter 11 petitions between November 2, 2004 and September 12, 2005. The Chapter 11 petitions for the debtors (the "Debtors") involved in this adversary proceedings -- 65-67 East 125th Street Realty Corp., 77 East 125th Street Realty LLC and 79 East 125th Street Realty LLC -- were each filed on February 19, 2005.

5.    By order dated March 24, 2005, the Court approved, pursuant to 11 U.S.C. § 1104(d), the appointment of John S. Pereira as the Chapter 11 Trustee for the

procedurally consolidated debtors (the "Trustee"), which included his appointment as the Chapter 11 Trustee for the estates of the Debtors.

6.     Upon information and belief, following the Trustee's appointment, he has been in possession and control of the assets of each of the Debtors.

7.     This action arises out of the Trustee's attempt to abrogate and rescind three carefully negotiated and executed contracts of sale (the "Contracts") for valuable and unique properties known as 65-67 East 125th Street, 77 East 125th Street, and 79 East 125th Street (the "Properties").

8.     As will hereinafter appear, through his sophisticated attorneys, the Trustee contracted, subject to approval by the Bankruptcy Court, to sell the Properties to the Plaintiff at a price well above the recent market prices for several virtually identical properties.

9.     Plaintiff stands ready, willing and able to purchase the Properties from Defendant.

10.     Because the Trustee has negotiated with a new party to sell the Properties at a higher price, the Trustee, in breach of the implied covenant of good faith and fair dealing, has refused to present the Contracts for approval by the Bankruptcy Court and has attempted in bad faith to cancel the sale without the right to do so.

11.     Accordingly, Plaintiff brings this action against the Trustee for a judgment (i) declaring that the Contracts remain in full force and effect in accordance with their terms, (ii) directing Defendant to proceed with the presentation of the Contracts for approval by the Bankruptcy Court and the sale of the Properties to Plaintiff pursuant to the Contracts if approved; and (iii) granting injunctive relief, together with attorneys' fees

3

and costs incurred by Plaintiff in connection herewith.  Plaintiff also seeks damages
against Rudd Development Group LLC ("Rudd") and Michael Rubin ("Rubin") for
interfering with Plaintiff's valuable Contracts with the Trustee.

## THE PARTIES

12.    Plaintiff is a limited liability company organized and existing under the
laws of the State of New York, having its principal place of business at 1300 Flatbush
Avenue, Brooklyn, New York.

13.    John Pereira is the chapter 11 trustee of the Debtors.

14.    Upon information and belief, Rudd is a New York limited liability
company doing business at 413 Grand Street, New York, N.Y. 10022.

15.    Upon information and belief Michael Rubin is the Associate Director of
Management of Rudd Realty Management Corp doing business at 413 Grand Street, New
York, N.Y. 10002.

16.    John Does 1-10 are the individuals who, in concert with Rudd and Rubin,
negotiated with the Trustee in an attempt to buy the Properties despite knowing they were
under contract to be sold to Plaintiff.

## THE CONTRACTS OF SALE

17.    In or about April, 2007, the Trustee entered into negotiations with Plaintiff
to sell the Properties to Plaintiff.

18.    In the negotiations, the Trustee was represented by John Campo, an
attorney currently with the law firm of Dreier LLP, but formerly with Leboeuf Lamb
Green & MacRae LLP. Plaintiff acted through its manager, Saadia Shapiro.

4

19.    Approximately two years before the commencement of contract negotiations, Shapiro had approached the Trustee's attorney, on several occasions regarding his interest in purchasing the Properties. Shapiro explained that he owned, or was about to purchase the lots in between the Properties and because of his unique position would pay above market prices to obtain the Properties.

20.    Counsel to the Trustee initially told Shapiro that the time was not right to sell the Properties. He explained that the Trustee was still in litigation seeking to recover title to the Properties. However, Shapiro told counsel to the Trustee that he would be prepared to enter into a contract, give the Trustee a deposit and have the closing take place if or when the Trustee prevailed in the litigation. Shapiro repeatedly sought and received reassurance from counsel to the Trustee that, in light of his willingness to have his deposit monies tied up for a lengthy period of time, the Trustee would not "shop" the deal further.

21.    To convince counsel to the Trustee that the price Shapiro would pay for the Properties was above market, Shapiro provided him with (i) information regarding the recent acquisition of the lots owned by Shapiro which were the same size as each of the Properties, (ii) bank appraisals on those lots which had been performed between the years 2004 and 2006 in connection with a purchase or financing of the properties (iii) other recent comparable sales of identically sized properties and (iv) other pertinent information. The appraisals and comparable sales showed that the value of identically sized lots with identical zoning features and comparable buildings ranged from $1.675 million to $2.3 million.

22.     After negotiations between counsel to the Trustee and Shapiro, the parties agreed that the price for the three Properties would be fixed at $7,800,000, or an average price of $2,600,000 for each property. In a time when real estate prices on 125th Street were trending downwards as a result of announced down-zoning of that section of the street, this represented an increase of $300,000, or 13%, over the highest of the most recent comparable sales.

23.     In the course of negotiations counsel to the Trustee, repeatedly assured Shapiro that the Trustee did not see the need to look for other buyers and would not solicit any other offers. The evidence of the appraisals and history of recent sales at significantly lower values, the fact that the Properties were not yet in the Trustee's name and Shapiro's willingness to leave his deposit without interest and wait an indeterminate period for the closing, all mitigated in favor of the Trustee providing Plaintiff with the assurance sought. It was only because of these assurances that Shapiro parted with all the information he gave to the Trustee's counsel and did all the work necessary to educate the Trustee as to the value of the Properties.

24.     Accordingly the Trustee specifically agreed that the Contracts would not be subject to higher or better offers. This is reflected in the Contract's omission of a paragraph, included in eight prior sale contracts filed by the Trustee in this case, which provided the Trustee the right to accept other offers and to conduct an auction sale.

25.     On August 21, 2007, the Trustee, as seller, entered into the Contracts with Plaintiff, as purchaser, pursuant to which the Trustee agreed to sell the Properties to Plaintiff, on terms and conditions therein set forth.

26.     John S. Pereira, as Trustee, and Saadia Shapiro, on behalf of Plaintiff, executed the Contracts.

27.     The Contracts contained a number of provisions favorable to the Trustee.

28.     Pursuant to the Contracts:

• Plaintiff agreed to pay $7,800,000 for the Properties for an average price of $2,600,000 which is $300,000 per lot above the <u>highest</u> of most recent comparable sales in a down-trending market

• Plaintiff agreed to leave $780,000 on deposit for an indeterminate period of time [paragraph 6, date set by Trustee not <u>less</u> than 40 days after Court approval]

• Interest on the deposit monies was <u>not</u> to be credited against the purchase price [paragraph 2(i)]

• The contracts were subject to Bankruptcy Court approval [paragraph 3], but were <u>not</u> made subject to other higher or better offers

• The Trustee agreed to "promptly" file a motion to obtain Bankruptcy Court approval of the contracts [paragraph 3(ii)]

• The Trustee was not penalized in any fashion if he was not able to obtain title to the Properties [paragraph 20]

29.     Implied in the Contracts is the covenant of good faith and fair dealing requiring that the Trustee not do, permit or condone any act or conduct that would obstruct, frustrate or delay Plaintiff's contemplated purchase of the Properties.

30.     The Trustee has egregiously breached that covenant.

## SUBSEQUENT DEVELOPMENTS

31.     Although the Trustee had agreed to submit the Contracts for approval by the Bankruptcy Court "promptly" upon execution of the Contracts on August 21, 2007, it was not until November 12, 2007 that the Trustee actually filed a motion (the "Approval Motion"), seeking approval of the Contracts. The Approval Motion did not contain any

7

indication that the Contracts were subject to higher or better offers for the Properties and specifically noted the Plaintiff had required that the Contracts not be subject to higher and better offer.

32.    The Approval Motion contained the following relevant paragraphs:

"6. In consideration for entering into the Contracts notwithstanding that the litigation was pending, and agreeing to remit the deposits under the Contracts at the time of their execution, the Purchaser has requested that the Contracts, which the Trustee believes are at fair market value, not be subject to higher or better offers.
....
10. ........... In the instant case, the Trustee has sufficient business justification for the sale of the Properties to the Purchaser, under the terms set forth in the Contracts.
....
11. The price for which each Property is being sold reflects the current market conditions of New York real estate. The Trustee believes that these conditions favor the sale of each Property at this time. The Trustee has determined in his business judgment that sale into the current market, pursuant to the terms of each Contract, should lead to the best results for the Debtor's estate."

33.    In the intervening 80 days between execution of the Contracts and the filing of the Approval Motion, Plaintiff's Manager, Saadia Shapiro and Plaintiff's attorney, Abe Rappaport made numerous phone calls and sent numerous emails to counsel to the Trustee complaining about the delay in filing the Approval Motion and inquiring as to the reasons. Counsel to the Trustee offered a variety of miscellaneous excuses which Shapiro and Rappaport found unsatisfactory.

34.    Upon information and belief, the reason the Trustee delayed in filing the Approval Motion was that the Trustee and his attorneys were exploring other buyers for the Properties in violation of their covenant of good faith and fair dealing. This conclusion is buttressed by the emergence of Rudd as the new proposed contract vendee

for the Trustee's Properties, because Rudd, shortly after the Contracts were signed, had begun pestering Shapiro to sell him his three contiguous properties on 125th Street.

35.     In late August, 2007, shortly after the Contracts were signed, but before they became public knowledge with the filing of the Approval Motion, Shapiro received a call from Michael Rubin ("Rubin"). He asked whether Shapiro would sell him his three properties on 125th Street and offered a price higher than the price Shapiro had paid for those properties. Shapiro replied that the properties were not for sale. Rubin subsequently sent him an email reiterating the offer and identifying himself as the Associate Director of Management of Rudd Realty Management Corp.

36.     Over the ensuing weeks Rubin called many more times; at one point he was calling almost every day. Although Shapiro was aware of his calls, he did not take them. Even though the price offered by Rubin in his email represented a profit to Shapiro over what he had paid for those properties, Shapiro did not pursue the offer because he relied on the representations made by counsel to the Trustee and the enforceability of the Contracts upon their terms. The very day before the hearing on the Trustee's Approval Motion, Rubin called Shapiro again with the same request and Shapiro again refused to discuss the sale of his properties.

37.     At some point after the Approval Motion was filed, the Trustee's counsel called Shapiro to say that another buyer for the properties had materialized and was offering an additional $1 million over the price agreed upon with the Trustee. He did not identify who made the offer and suggested that Shapiro match the offer. Shapiro declined because he believed he had a binding contract.

38.     On December 10, 2007, about one hour before the return date of the Approval Motion, counsel to the Trustee sent an email to Shapiro advising him that "early this afternoon", in complete disregard of the numerous representations made to Plaintiff that he would not entertain any other offers for the Properties, the Trustee had signed new contracts for the Properties with Rudd. Counsel to the Trustee advised that the new contracts specified a price of $8,800,000 and contained "essentially" the same terms as the Contracts, except that the new contracts were specifically made subject to higher or better offers and Rudd was entitled to a "break-up fee of 2%.

39.     Counsel to the Trustee later appeared in Court and announced that he was not proceeding with the Approval Motion because the Trustee had signed another contract for the Properties and wished instead to proceed with an auction sale. An auction sale was then scheduled for December 21, 2007. Michael Rubin attended the hearing on behalf of Rudd.

40.     The Trustee's refusal to proceed with the Approval Motion constitutes an anticipatory and material breach of the Contracts, and a breach of the implied covenant of good faith and fair dealing.

41.     Further, the Trustee acted in egregious and deliberate bad faith by participating in the negotiation and drafting of the new contracts with Rudd.  The Contracts did not give him the right to do so and counsel to the Trustee had deliberately and frequently represented to Plaintiff that he would not entertain other offers.

42.     Plaintiff is ready, willing and able to perform Plaintiff's obligations under the Contracts.

10

## FIRST CAUSE OF ACTION
## (DECLARATORY JUDGMENT)

43.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "42" hereof with the same force and effect as if herein set forth at length.

44.     Plaintiff asserts that the Contracts remain in full force and effect, in accordance with their terms and that the Trustee is required to present the Contracts for approval to the Bankruptcy Court, and if approved, convey title to the Properties to Plaintiff in accordance with their terms.

45.     Upon information and belief, the Trustee asserts that he has the right to cancel the Contracts and that he is not required to go forward with the Approval Motion or convey title to the Property to Plaintiff under terms of the Contracts.

46.     A justiciable controversy exists between Plaintiff, on the one hand, and the Trustee, on the other, as to whether the Contracts remain in full force and effect, in accordance with their terms and whether the Trustee is obligated to seek approval of the Bankruptcy Court to convey title to the Properties to Plaintiff pursuant thereto.

47.     Plaintiff has no adequate remedy at law.

## SECOND CAUSE OF ACTION
## (SPECIFIC PERFORMANCE)

48.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "42" hereof with the same force and effect as if herein set forth at length.

11

49.    The Properties are unique.

50.    The Trustee is legally bound, obligated and required to seek approval of the Contracts from the Bankruptcy Court and, if approval is obtained, he must convey title to the Properties to Plaintiff in accordance with the terms of the Contracts.

51.    Plaintiff has no adequate remedy at law.

**THIRD CAUSE OF ACTION**
**(INJUNCTIVE RELIEF)**

52.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "42" hereof with the same force and effect as if herein set forth at length.

53.    In order to maintain the *status quo* pending a hearing by the Bankruptcy Court on the Approval Motion, the Trustee must be enjoined from attempting to consummate the new contracts with Rudd or otherwise dispose of the Properties.

54.    Plaintiff has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**(ALTERNATIVELY, DAMAGES)**

55.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "42" hereof with the same force and effect as if herein set forth at length.

56.    In the event the Trustee conveys title to the Properties not in accordance with the Contracts, Plaintiff is entitled to damages for the Trustee's breach of the Contracts.

## FIFTH CAUSE OF ACTION
## (MISREPRESENTATION)

57.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "42" hereof with the same force and effect as if herein set forth at length.

58.     The Trustee and his attorneys induced Plaintiff to enter into the Contracts only by misrepresenting the Trustee's intentions with respect to considering other offers for the Properties.

59.     Counsel to the Trustee repeatedly told Plaintiff "the Properties are yours and we will entertain no other offers", using those words or words virtually identical and conveying the same meaning.

60.     But for these numerous representations Plaintiff would not have entered into the Contracts or would have insisted on a "break-up fee" and been entitled to no less than 2% of any amounts that the Properties are sold for.

61.     As a result of these misrepresentations Plaintiff has been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE AGAINST RUDD)

62.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "42" hereof with the same force and effect as if herein set forth at length.

63.     Upon information and belief, no later than November 12, 2007 (after the Approval Motion was filed), Rudd, Rubin  and John Does 1-10 acting on Rudd's behalf,

became aware that Plaintiff had signed the Contracts and that they contained no provision allowing the Trustee to accept higher offers.

64.    Upon information and belief, despite knowledge of the Contracts, the provisions thereof and the Trustee's Approval Motion, Rudd, Rubin and John Does 1-10 negotiated with the Trustee new contracts for the sale of the Properties (the "New Contracts") with terms different than those contained in the Contracts.

65.    Upon information and belief the terms of the New Contracts were finalized and at least partially negotiated after November 12, 2007 when the terms of Plaintiff's deal with the Trustee became public knowledge.

66.    Although Rudd and John Does 1-10 had knowledge of the existence of the Contracts, Rudd and John Does 1-10 intentionally induced the Trustee to breach the Contracts without justification.

67.    The Trustee has breached the Contracts by failing to go forward with the Approval Motion and convey the Properties to Plaintiff.

68.    Plaintiff is entitled to be compensated for damages sustained by it as a result of Rudd and Rubin and John Does 1-10 inducing the Trustee's breach of the Contracts.

**WHEREFORE,** Plaintiff, 125th Street Owner LLC., demands judgment against:

(a) Defendant John S. Periera, Trustee in respect to the First Cause of Action, declaring that the Contracts remains in full force and effect in accordance with their terms; and further declaring that Defendant is obligated to convey title to the Properties to Plaintiff in accordance with the terms thereof;

(b) Defendant John S. Periera, Trustee in respect of the Second Cause of Action, ordering the Trustee to convey the Properties to Plaintiff in accordance with the Contracts once Bankruptcy Court approval is obtained;

(c) Defendant John S. Periera, Trustee in respect of the Third Cause of Action, temporarily restraining and preliminarily and permanently enjoining the

Trustee from transferring the Properties until the Trustee has brought the Approval Motion before the Bankruptcy Court for a hearing;

**(d)** Defendant John S. Periera, Trustee in respect of the Fourth Cause of Action, granting Plaintiff damages in an amount to be determined at trial;

**(e)** Defendant John S. Periera, Trustee in respect of the Fifth Cause of Action, granting Plaintiff damages in an amount to be determined at trial;

**(f)** Defendants Rudd, Rubin and John Does 1-10 jointly and severally in respect of the Sixth Cause of Action, granting Plaintiff damages in an amount to be determined at trial: and

**(g)** all Defendants for such other and further relief as to the Court may seem just and proper, including reasonable attorneys' fees and the costs and disbursements of this action.

Dated: New York, New York
      December 19, 2007

Nutovic & Associates
Attorneys for Plaintiff

By: _s/ Isaac Nutovic_
Isaac Nutovic (IN2076)
488 Madison Ave, 16th Fl
New York, New York 10022
(212) 421-9100

Exhibit "K"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | Chapter 11 Cases |
| In re: | : | Case No. 05-10987 (RDD) |
| | : | |
| MAYWOOD CAPITAL CORP., et al. | : | (Jointly Administered) |
| | : | Case Nos. 04-17047, 05-10944 to |
| Debtors. | : | 05-10987, 05-11521, 05-11523, |
| | : | 05-17778 (RDD) |
| | x | |

**ORDER APPROVING BREAK-UP FEE FOR RUDD DEVELOPMENT GROUP, LLC,
IN CONNECTION WITH CHAPTER 11 TRUSTEE'S PROPOSED SALE OF THE
TRUSTEE'S RIGHT, TITLE AND INTEREST OF CERTAIN REAL PROPERTY
AND IMPROVEMENTS LOCATED AT 65-67 EAST 125TH ST., NEW YORK,
NEW YORK, 77 EAST 125TH ST., NEW YORK, NEW YORK, AND 70 EAST 125TH ST.,
NEW YORK, NEW YORK, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS
AND ENCUMBRANCES, PURSUANT TO 11 U.S.C. §§ 363, 506(c) AND 1146(c)**

Upon the motion of John S. Pereira, as Chapter 11 Trustee ("Trustee"), for an order

allowing the Trustee to sell certain real property and improvements located at 65-67 East 125th

St., New York, New York, 77 East 125th St., New York, New York, and 70 East 125th St., New

York, New York (the "Properties"), and for related relief (the "Motion")(Dkt. No. 465); and

objections having been filed to the Motion (Dkt. Nos. 476, 477), and the Trustee having filed a

response to certain of the objections (Dkt. No. 482); and the Motion having come before the

Court for a hearing in open court on December 10, 2007 ("Hearing"); and the Trustee, through

his counsel, having represented to the Court that Rudd Development Group, LLC ("Rudd") and

the Trustee have signed firm contracts of sale as of December 10, 2007 ("Rudd Contracts"),

pursuant to which Rudd (or a permitted assignee under the Rudd Contracts) agreed to purchase

the Properties for the aggregate price of $8.8 million, subject to the Trustee's receipt of higher

and better bids as provided therein, if any, and further conditioned upon Rudd being entitled to

receive a "break-up" fee in the amount of $176,000.00, in cash, representing two percent (2%) of

1

Rudd's purchase price, in the event that the Trustee accepts a high and better offer to purchase the Properties ("Break-Up Fee") and a closing occurs on such higher and better offer; and the Trustee having orally moved the Court at the Hearing to grant the limited relief of approving the Break-Up Fee pursuant to 11 U.S.C. §§ 105(a) and 363(b); and the Court having considered the arguments of the Trustee, by his counsel, presented at the Hearing; and upon due deliberation, and for good cause shown; and for the reasons stated by the Court on the record of the Hearing, which reasons constitute the Court's findings of fact and conclusions of law with respect to the Trustee's request for approval of the Break-Up Fee; and further court proceedings on the Motion having been adjourned to December 21, 2007, at 10:00 a.m.; it is

ORDERED, as follows:

1.     The Motion is denied in light of the existence of a higher and better transaction (as memorialized by Rudd Contract).

2.     The Break-Up Fee is approved, and shall be paid by the Trustee to Rudd in cash as an administrative expense pursuant to 11 U.S.C. § 503(b), without further order or notice, immediately upon the closing of, and from the proceeds of, the sale of the Properties to any person or entity other than Rudd (or a permitted designee under the Rudd Contracts).

3.     This order shall not constitute, and shall not be construed, as a determination by the Court of any other aspect of the Motion or of any objection filed against the Motion.

4.     The Court shall have jurisdiction to enforce this Order.

Dated: New York, New York
         December 20, 2007

/s/Robert D. Drain
ROBERT D. DRAIN
United States Bankruptcy Judge

2

633181